IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

**STATE OF NEW MEXICO,** *by and through its Attorney General Raúl Torrez;*
    408 Galisteo St, Santa Fe, NM 87501

    ***Plaintiff,***

    **v.**

**U.S. DEPARTMENT OF JUSTICE;**
    950 Pennsylvania Avenue NW
    Washington, DC 20530

**TODD BLANCHE,** *in his official capacity as Acting Attorney General of the United States;*
    950 Pennsylvania Avenue NW
    Washington, DC 20530

    ***Defendants.***

**Case No.**

---

## COMPLAINT

1.      Jeffrey Epstein and his co-conspirators engaged in widespread trafficking and sexual abuse of young girls, some as young as fourteen when the abuse occurred. Throughout his lifetime, per the federal government's own accounting, Epstein and his criminal network subjected over 1,000 survivors to egregious and predatory conduct, including vulnerable young girls in New Mexico. By 2021, the United States Court of Appeals for the Eleventh Circuit already had recognized that the relevant facts were "beyond scandalous—they tell a tale of national disgrace." *In re Wild*, 994 F.3d 1244, 1247 (11th Cir. 2021).

2.      Current Acting United States Attorney General Todd Blanche and members of United States Department of Justice ("USDOJ") leadership in Washington, D.C., the Southern

District of New York, and the District of New Mexico perpetuate that disgrace. Their conduct now actively harms victims and undermines the public interest, by stonewalling New Mexico Attorney General Raúl Torrez's ongoing criminal investigation into conduct by Epstein and his co-conspirators at "Zorro Ranch" located outside Santa Fe.

3.  Acting Attorney General Blanche and USDOJ's conduct violates promises USDOJ made to New Mexico to secure an agreement for state law enforcement to stand down Epstein-related investigations in 2019. USDOJ wanted federal investigators to complete their work before the state investigated related crimes and assured New Mexico that federal law enforcement would cooperate in subsequent state investigations and prosecutions. In reliance on those assurances, New Mexico gave up timely access to witnesses, victims, and other evidence. The state's reliance was reasonable given decades of successful state-federal cooperation that has included the sharing of confidential investigative files, evidence, and reports in similar criminal investigations. New Mexico had no reason in 2019 to believe federal law enforcement officials would breach their express assurances and deviate from historical practice just to block their state counterparts from successfully investigating child sexual abuse under state law.

4.  After reopening New Mexico's investigation in February 2026, however, Attorney General Torrez and senior prosecutors he leads at the New Mexico Department of Justice[1] ("NMDOJ") have faced sustained resistance to the type of information-sharing that has been routine from USDOJ under prior administrations of both political parties. NMDOJ started with the informal requests that normally are adequate to obtain investigative information from federal law enforcement for a related state matter. USDOJ responded by promising cooperation while requesting formal *Touhy* requests. Attorney General Torrez and NMDOJ provided those formal

---

[1] On January 10, 2024, what previously had been the New Mexico Attorney General's Office was renamed the New Mexico Department of Justice. For clarity's sake, the complaint uses the agency's current name throughout.

requests only to have USDOJ and various components respond with a rejection, reneging on their promise.

5.    USDOJ has betrayed survivors and the public related to Jeffrey Epstein and his co-conspirators at least three times. ***First***, USDOJ secretly negotiated a non-prosecution agreement with Epstein without consulting survivors. "[I]t appears that prosecutors worked hand-in-hand with Epstein's lawyers—or at the very least acceded to their requests—to keep the [non-prosecution agreement's] existence and terms hidden from victims." *In re Wild*, 994 F.3d at 1248. As things progressed, "the government's efforts appear to have graduated from passive nondisclosure to (or at least close to) active misrepresentation." *Id*. ***Second***, bipartisan legislation from Congress required public disclosure, before the end of 2025, of the files from federal investigation(s) of Epstein and his co-conspirators ***redacted to protect survivors***. *See* Exhibit 1 at 2, 7 (Letter from P. Bondi and T. Blanche to U.S. Congress (Jan. 30, 2026)). But USDOJ instead publicly posted detailed, unredacted personal information about survivors, ranging from their contact information to nude images.

6.    ***Now***, USDOJ and Acting Attorney General Blanche are refusing to facilitate the investigation of state law crimes by hiding information about Epstein and his co-conspirators from Attorney General Torrez and state law enforcement, when New Mexico is one of few jurisdictions that still may have an opportunity to hold Epstein's associates accountable or otherwise provide some sense of justice to survivors. Attorney General Torrez has marched through every bureaucratic hoop USDOJ has demanded only to have years of promised federal cooperation turned into bureaucratic defiance. Federal inaction does not merely stall the investigation; it prolongs and compounds the suffering of survivors.

7. New Mexico seeks declaratory and injunctive relief to compel USDOJ and Acting Attorney General Blanche to abandon their unlawful non-cooperation policy and comply with NMDOJ's investigative demands. USDOJ's conduct is arbitrary and capricious, an abuse of discretion, and not in accordance with the law.

8. Alternatively, if USDOJ denies it has taken final agency action, it is unlawfully withholding and unreasonably delaying that action in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## PARTIES

10. Plaintiff State of New Mexico is a sovereign state of the United States. New Mexico is represented by and through its chief legal officer, Attorney General Raúl Torrez, who is authorized to sue on the State's behalf. NMSA 1978 §§ 8-5-2, 8-5-3 (2025). Attorney General Torrez has statutory authority to investigate and prosecute crimes on behalf of the State, NMSA §§ 8-5-2, 8-5-3. And under Attorney General Torrez's leadership, NMDOJ is vested with broad authority to investigate violations of New Mexico criminal law. NMSA § 8-5-5(B).

11. Defendant USDOJ is a federal cabinet agency within the Executive Branch of the United States government.

12. The United States Attorney's Office for the District of New Mexico ("DNM") is the component of USDOJ responsible for representing the United States in federal prosecutions within that district. The office currently operates without a United States Attorney. The highest

designated official for the office today is First Assistant United States Attorney Ryan Ellison. Ellison operates under the supervision and direction of Acting Attorney General Blanche.

13.    The United States Attorney's Office for the Southern District of New York ("SDNY") is the component of USDOJ responsible for representing the United States in federal prosecutions within that district. Jamie McDonald was appointed by the federal judiciary to serve as United States Attorney for the Southern District of New York effective July 29, 2026.

14.    The Federal Bureau of Investigation ("FBI") is also a component of USDOJ that operates under the supervision and direction of the Attorney General.

15.    Defendant Todd Blanche is the Acting Attorney General of the United States and the federal official in charge of USDOJ. Defendant Blanche is sued in his official capacity.

## BACKGROUND

*USDOJ Halts New Mexico's Investigation into Epstein and His Co-conspirators' Crimes with Promises of Cooperating in Later State Criminal Investigation and Prosecution.*

16.    After originally entering a non-prosecution agreement with Epstein in 2008, USDOJ revived its investigation into Epstein and his associates in 2018.

17.    SDNY led the investigation with the assistance and collaboration of other federal agencies, including prosecutors from DNM and the FBI.

18.    Unsurprisingly, that investigation disclosed concerning information about Epstein and his associates' ties to, and alleged criminal contact in, New Mexico.

19.    In 1993, Epstein purchased Zorro Ranch, in Santa Fe County, New Mexico, and visited the state repeatedly until his death in 2019.

20.    Public records from the redacted documents released publicly through USDOJ's online Epstein Library pursuant to the Epstein Files Transparency Act ("EFTA"), Pub. L. No. 119-

5

38, 139 Stat. 656 (2025) ("Epstein Files") reveal that Zorro Ranch was one of the locations where Epstein's victims were taken.[2]

21.     Epstein's known criminal associate, Ghislaine Maxwell, likewise visited Zorro Ranch repeatedly in the years Epstein owned the property, often accompanying him during his visits to New Mexico.

22.     In December 2021, a jury returned a verdict finding Maxwell guilty of sex trafficking of a minor, transportation of a minor with intent to engage in criminal sexual activity, and conspiracy to transport minors with intent to engage in criminal sexual activity, in connection with her role in the web of sexual abuse surrounding Epstein. Acts that formed the basis of Maxwell's grand jury indictment included those that occurred in New Mexico.

23.     The Epstein Files include over 13,000 references to Zorro Ranch and 5,000 references to New Mexico as locations where victims were trafficked, groomed, and assaulted.

24.     NMDOJ began its investigation into potential crimes occurring at Zorro Ranch in February 2019. *See* Exhibit 2 at 2 (Statement from the New Mexico Department of Justice Regarding Zorro Ranch (Feb. 19, 2026)). Between February and July 2019, NMDOJ investigators and attorneys contacted and interviewed victims who reported being sexual abused in New Mexico by Epstein, his associates, and former contractors of Epstein and Zorro Ranch.

25.     Recognizing the potential for overlapping state and federal criminal investigation, on May 14, 2019, NMDOJ informed USDOJ that New Mexico "has been actively engaged in an ongoing investigation and review" into potential criminal activities at Zorro Ranch, explained that the investigation "may also involve a referral of certain criminal matters within the exclusive

---

[2] *See, e.g.*, U.S. Dep't of Justice, Epstein Library, EFTA02731082 at -109 to -110, -112, https://www.justice.gov/epstein/files/DataSet%2012/EFTA02731082.pdf (last visited July 28, 2026) (U.S. Department of Justice's prosecution memo regarding investigation into Epstein's potential co-conspirators).

statutory authority of the federal government," and requested to meet with USDOJ to "de-conflict on sensitive law-enforcement matters and discuss possible strategies to streamline investigation and charging." *See* Exhibit 3 at 18 (Email from E. Langenwalter to S. Sullivan, enclosing letter from R. Ellison (June 30, 2026)).

26.    On May 17, 2019, USDOJ initially rebuffed the invitation to share information and coordinate. *See* Exhibit 3 at 17 (stating that DNM "certainly supports your investigation and review of these matters," noting that USDOJ would be happy to receive information, but stating that it was "not in a position to share any information relating to these matters or to discuss any possible coordination").

27.    During a subsequent telephone call on July 23, 2019, USDOJ told NMDOJ to stand down from its investigation into Epstein's potential criminal activity in New Mexico. Federal records included in the publicly disclosed Epstein Files document that call. The records reflect that NMDOJ "agreed to cease any investigation into sex trafficking and share whatever [NMDOJ] had gathered to date regarding sex trafficking activity with [SDNY]."[3]

28.    Documents from the Epstein Files further confirm that, in exchange for NMDOJ's deference to federal law enforcement, USDOJ would refer to NMDOJ state crimes and "pass along any information [USDOJ] may have gathered about state crimes that were committed in [NMDOJ's] jurisdiction."[4]

29.    On September 17, 2019, NMDOJ provided USDOJ with its entire investigative file, including police reports, recorded witness interviews, and materials related to Epstein's use of New Mexico public lands. In doing so, NMDOJ reiterated its "inten[t] to work in union" with federal

---

[3] U.S. Dep't of Justice, Epstein Library, EFTA00019183 at -89 to -90,
https://www.justice.gov/epstein/files/DataSet%208/EFTA00019183.pdf (last visited July 28, 2026).
[4] U.S. Dep't of Justice, Epstein Library, EFTA01681971 at -71,
https://www.justice.gov/epstein/files/DataSet%2010/EFTA01681971.pdf (last visited July 28, 2026).

prosecutors if "further investigation reveal[s] additional survivors of crimes occurring in New Mexico" and specifically requested to be notified if the federal investigation "reveal[s] survivors of crimes occurring in New Mexico not mentioned in the [state's] provided investigative materials." *See* Exhibit 4 at 2 (Letter from H. Balderas to M. Comey (Sept. 17, 2019)). USDOJ internally discussed Epstein and his associates' criminal activities tied to New Mexico and discussed taking investigative steps based on that knowledge even after Epstein's death.[5]

30.    But federal law enforcement failed to ever search Zorro Ranch.[6] USDOJ likewise failed to make any attempt to seize Zorro Ranch and Epstein's associated New Mexico property and failed to do anything else to preserve or gather evidence of Epstein's crimes in New Mexico.

31.    NMDOJ remained engaged in addressing Epstein and his associates' crimes. On October 15, 2019, following Epstein's death, then-New Mexico Attorney General Hector Balderas wrote to USDOJ. He reminded USDOJ that his office had turned over "materials supportive of their Federal investigation into allegations of misconduct by Epstein's possible conspirators," and requested that USDOJ "explore initiating the process to seize Epstein's New Mexico land holdings for the eventual benefit of survivors of these acts and the people of the State of New Mexico." Exhibit 3 at 16.

32.    A year after pausing the state investigation, and following Epstein associate Ghislaine Maxwell's arrest, on July 2, 2020, NMDOJ again contacted USDOJ to offer assistance with any federal prosecution. At that time, NMDOJ reiterated the state's intent "to move forward on any State-level charges, should any viable charges exist." USDOJ replied: "We very much

---

[5] *See* U.S. Dep't of Justice, Epstein Library, EFTA00019183 at -89 to -90, https://www.justice.gov/epstein/files/DataSet%208/EFTA00019183.pdf (last visited July 28, 2026) (email dated October 11, 2019).

[6] *See* U.S. Dep't of Justice, Epstein Library, EFTA00165502, https://www.justice.gov/epstein/files/DataSet%209/EFTA00165502.pdf (email dated Aug. 23, 2019 acknowledging "one victim who may have been raped at the NM residence" but nonetheless asserting no "PC for a search of the NM residence").

appreciate your support, and we will reach out should we learn of viable state-level charges that are not already covered by our federal investigation." Exhibit 5 at 2 (Emails between M. Comey and Z. Jones (July 2, 2020)). USDOJ never provided New Mexico any information it learned about potential New Mexico state law crimes the federal investigation revealed.

33.    On July 8, 2020, NMDOJ sent another letter to USDOJ recounting NMDOJ's assistance to federal prosecutors, warning that Zorro Ranch appeared to have been "used by Epstein and others to facilitate the commission and prolonged concealment of his trafficking of children," and again requesting that assets in New Mexico belonging to Epstein's estate or his co-conspirators be seized "in conjunction with the pending criminal prosecution of Epstein's associates and co-conspirators." Exhibit 6 at 2 (Letter from H. Balderas to A. Strauss (July 8, 2020)). This request was ignored.

34.    Local federal prosecutors in New Mexico seemingly shared the state's concern. On July 15, 2020, DNM officials in Albuquerque contacted SDNY noting that "conduct in New Mexico formed the basis of one of [the] overt acts" in Maxwell's indictment and requested a call to discuss the potential "seizure/forfeiture of Epstein's NM property."[7] Officials at SDNY did not act on that request.

> ### By Forcing USDOJ to Publicly Disclose Epstein Files, Congress Revealed that USDOJ Violated Its Agreement to Share Information with NMDOJ About Criminal Conduct in New Mexico in Exchange for the State Deferring to the Federal Investigation.

35.    On November 18, 2025, Congress passed bipartisan legislation to force USDOJ to disclose information about Epstein and his co-conspirators. EFTA "is an unprecedented disclosure law requiring the Attorney General, with few exceptions, to make publicly available in a searchable and downloadable database all unclassified Department of Justice ('Department') files related to

---

[7] U.S. Dep't of Justice, Epstein Library, EFTA00019183 at -86, https://www.justice.gov/epstein/files/DataSet%208/EFTA00019183.pdf (last visited July 28, 2026).

its investigation of the notorious sexual predator and child sex trafficker Jeffrey Epstein, the child sex trafficker Ghislaine Maxwell, and their associates." *Phang v. Blanche*, 2026 WL 1831251, at *1 (D.D.C. June 25, 2026).

36.     Materials made "publicly available" through EFTA include "all unclassified records, documents, communications, and investigative materials in the possession of the Department of Justice, including the Federal Bureau of Investigation and United States Attorneys' Offices" relating to broad topics surrounding Epstein and Maxwell. EFTA, § 2(a).

37.     EFTA permits five categories of information to be withheld or redacted from ***public*** disclosure: victims' personally identifiable information and privacy, child sexual abuse materials, material that "would jeopardize an active federal investigation or ongoing prosecution, provided that such withholding is narrowly tailored and temporary," "images of death, physical abuse, or injury of any person," and material classified for national security. EFTA, § 2(c)(1).[8] Any such withholding of or redactions to materials made publicly available through EFTA "must be accompanied by a written justification published in the Federal Register and submitted to Congress." EFTA, § 2(c)(2).

38.     EFTA imposed a December 19, 2025, deadline for USDOJ compliance. USDOJ violated that statutory deadline and posted Epstein documents on a rolling basis through January 30, 2026. *See* Exhibit 1 at 2, 7; Exhibit 7 at 2 (Department of Justice Publishes 3.5 Million Responsive Pages in Compliance with the Epstein Files Transparency Act (Jan. 30, 2026)). The redacted Epstein Files provide significant cause to investigate whether criminal activities had

---

[8] USDOJ has confirmed that no materials were withheld or redacted subject to the provision applicable to national security. *See* Exhibit 25 at 3 (Letter from P. Bondi and T. Blanche to C. Grassley et al. (Feb. 14, 2026)).

occurred in New Mexico, including the 13,000 *public* references to Zorro Ranch already noted. *See* Exhibit 8 at 3 (Letter from R. Torres to T. Blanche and D. Pestana (July 14, 2026)).[9]

39.     The released documents show that USDOJ had long known that crimes occurred in New Mexico. In fact, USDOJ had secured grand jury testimony from one of its own witnesses detailing a victim's account of being abused in New Mexico.[10] Maxwell's indictment also included alleged overt acts of grooming and abuse in New Mexico. S*ee* Indictment, *United States v. Maxwell*, 1:20-cr-00330, Dkt. No. 1 (S.D.N.Y. June 29, 2020); Superseding Indictment, *Maxwell*, 1:20-cr-00330, Dkt. No. 187. And USDOJ elicited testimony under oath at trial from a victim, Ms. Moe, who described being sexually assaulted in New Mexico as a minor. *See United States v. Maxwell*, 118 F.4th 256, 268-69 (2d Cir. 2025) (finding victim's testimony regarding abuse suffered in New Mexico was within the conduct charged in the indictment).[11]

40.     In December 2021, Maxwell was found guilty of sex trafficking and other crimes; she was sentenced in June 2022. *See* Judgment, *Maxwell*, 1:20-cr-00330, Dkt. No. 696.

41.     In response to Senate questioning, Acting Attorney General Blanche has confirmed that USDOJ is not proceeding with any Epstein-related prosecutions at this time. *See* Exhibit 9 at 191-192 (Questions for the Record, Nomination of T. Blanche (July 17, 2026)).

42.     Violating the promises that induced New Mexico to stand down the state investigation into Epstein and his co-conspirators in 2019, USDOJ never shared information related to Epstein and his co-conspirators conduct in and related to New Mexico.

---

[9] NMDOJ did not limit its requests for documents and other evidence to material contained with the Epstein Files released pursuant to EFTA and in no way intends to limit its action to such materials.

[10] *See* U.S. Dep't of Justice, Epstein Library, EFTA00008631 at -80 to -85, https://www.justice.gov/epstein/files/DataSet%206/EFTA00008631.pdf (last visited July 28, 2026) (describing overt acts of grooming and abuse in New Mexico).

[11] See *also* U.S. Dep't of Justice, Epstein Library, EFTA00068582 at -782 to -785, https://www.justice.gov/epstein/files/DataSet%209/EFTA00068582.pdf (last visited July 28, 2026) (transcript of trial testimony).

43.     Despite USDOJ's failure to provide the information as promised, the NMDOJ continued pursuing avenues to advance justice for survivors. On December 26, 2023, and February 14, 2024, respectively, Deutsche Bank and JPMorgan Chase Bank entered into agreements with New Mexico related to the banking services they provided to Epstein. The resulting funds from these agreements were dedicated to supporting the state's anti-human trafficking initiatives. Although these agreements represented an important step, the investigation and possible prosecution of criminal conduct requires distinct information and records solely in the USDOJ's possession.

### *USDOJ's Ongoing Refusal to Provide Documents to New Mexico Law Enforcement.*

44.     In February 2026, NMDOJ reopened its investigation into potential criminal activity at Zorro Ranch. *See* Exhibit 2 at 2. On March 9, 2026, NMDOJ conducted the first law enforcement search of Zorro Ranch. *See* Exhibit 10 at 2 (Statement from New Mexico Department of Justice Spokesperson Regarding Today's Search of the Former 'Zorro Ranch' (Mar. 9, 2026)).

45.     Given the renewed investigation under Attorney General Torrez and the information released by USDOJ in redacted form confirming that it has relevant documents and evidence regarding criminal conduct in New Mexico, NMDOJ has asked USDOJ to finally live up to the 2019 agreement and provide New Mexico non-public information related to potential crimes in New Mexico.

46.     Consistent with the longstanding history of state and federal law enforcement collaboration and USDOJ's 2019 agreement, NMDOJ first sought access to this information on a voluntary law enforcement-to-law-enforcement basis.

47.     On February 13, 2026, NMDOJ, through its Chief of Criminal Affairs, sent then-Deputy Attorney General Blanche a letter requesting immediate production of the full, unredacted

copy of a specific document in the Epstein Files – EFTA01250229 – that  alleges the burial of two female victims in the land surrounding Zorro Ranch, as well as production "of any and all other unredacted documentation, correspondence, investigative materials, internal memoranda, or related records in your possession that reference or pertain to these allegations, Zorro Ranch, or potential victims connected to this matter." *See* Exhibit 11 at 2 (Letter from J. Duran to T. Blanche (Feb. 13, 2026)).

48.     On March 13, 2026, Attorney General Torrez sent then-U.S. Attorney General Pam Bondi a letter requesting immediate production of the full, unredacted copies of five additional specific documents in the Epstein Files–EFTA00006970; EFTA00008631; EFTA00068582; EFTA02731082; EFTA01873236–and requesting general access to unredacted versions of materials related to Zorro Ranch. *See* Exhibit 12 at 2-3 (Letter from R. Torrez to P. Bondi (Mar. 13, 2026)). These materials reflect victims of Epstein's sexual abuse recounting being brought by him to New Mexico and grand jury testimony by an FBI witness in the *Maxwell* case regarding abuse in New Mexico.[12]

49.     The letter emphasized that "[a]ccess to complete, unredacted versions of these materials is essential to advancing the NMDOJ's investigation." Exhibit 12 at 3. And Attorney General Torrez specifically offered that "[t]o facilitate this process and minimize the administrative burden on your office, we are prepared to send a team to Main Justice in Washington, D.C., at your convenience to conduct an in-person review of these materials, subject to any security protocols

---

[12] *E.g.*, U.S. Dep't of Justice, Epstein Library, EFTA00008631 at -80 to -85, https://www.justice.gov/epstein/files/DataSet%206/EFTA00008631.pdf (last visited July 28, 2026) (describing overt acts of grooming and abuse in New Mexico); U.S. Dep't of Justice, Epstein Library, EFTA00068582 at -77 to 78, 83 to -85, https://www.justice.gov/epstein/files/DataSet%209/EFTA00068582.pdf (last visited July 28, 2026) (victim testimony by Ms. Moe, who described being sexually assaulted in New Mexico while a minor).

and access conditions you deem necessary." *Id.* This letter requested a response by March 27, 2026. *See id.* at 4. No response was received by that date.

50.    On April 1, 2026, NMDOJ Special Counsel Sean Sullivan spoke with USDOJ Associate Deputy Attorney General Diego Pestana regarding NMDOJ's request. Mr. Pestana expressed USDOJ's willingness to engage collaboratively with NMDOJ's investigation and acknowledged the critical importance of NMDOJ's investigation in ensuring justice for survivors. But contrary to historical practice, Mr. Pestana demanded that NMDOJ submit a formal *Touhy* request addressed to DNM and the local New Mexico FBI field office.

51.    On April 7, 2026, Mr. Sullivan emailed Mr. Pestana at USDOJ, confirming that per USDOJ's request, NMDOJ would "memorialize our request in a Touhy letter and provide to the local FBI field office, with the anticipation that it will ultimately make its way to FBI HQ." Exhibit 13 at 2 (Email from S. Sullivan to D. Pestana (Apr. 7, 2026)).

52.    On May 1, 2026, in telephone conversations, Mr. Sullivan informed DNM First Assistant Ryan Ellison and FBI Albuquerque Special Agent in Charge Justin Garris of the impending *Touhy* request from NMDOJ.

53.    On May 3, 2026, Mr. Sullivan sent, via certified mail, a formal *Touhy* request from NMDOJ pursuant to 28 C.F.R. §§ 16.21–16.29 (2026), to First Assistant Ellison and Special Agent in Charge Garris. *See* Exhibit 14 (Letter from S. Sullivan to R. Ellison and J. Garris (May 3, 2026)). As is required by USDOJ's *Touhy* regulations, NMDOJ's *Touhy* request provided a summary of information sought and its relevance to New Mexico's investigation. *See id.* at 2-6; *see also* 28 C.F.R. § 16.22(d).

54.    The letter requested access to unredacted "documents collected, assembled, and prepared in connection with investigations and prosecutions [of Epstein and his associates]

previously handled by the USDOJ," as well as "any relevant nonprivileged unreleased files," Exhibit 14 at 3, and requested a response by May 11, 2026, in order to finalize the logistics of access to these materials. *Id.* at 6. NMDOJ's *Touhy* request informed USDOJ that NMDOJ is currently "investigating potential felony offenses" under New Mexico's state criminal code, "including but not limited to homicide, kidnapping, criminal sexual penetration, criminal sexual contact, and human trafficking. *See* NMSA 1978, §§ 30-2-1, 30-4-1, 30-9-11 to -13, and 30-52-1." *Id.* at 3.

55.    NMDOJ's *Touhy* request highlighted nine specific records, by document control number (*i.e.*, by Bates number beginning "EFTA"), that relate to the predicate facts of these criminal offenses under New Mexico law. *Id.* at 4-5. These records reflected patterns and practices of criminal behavior by Epstein, Maxwell, and their associates occurring in New Mexico and at Zorro Ranch.

56.    The perpetrators described in these records were not limited to Epstein and Maxwell. USDOJ's own prosecution memorandum for the "Investigation into Potential Co-Conspirators of Jeffrey Epstein" describes a sexual assault by a woman who was not Ghislaine Maxwell occurring at Zorro Ranch.[13]

57.    Another FBI interview summary (which does not redact the name of either Epstein or Maxwell) recounts: "The first assault happened in New Mexico; EPSTEIN and [REDACTED] were both there in the room."[14]

---

[13] U.S. Dep't of Justice, Epstein Library, EFTA02731082 at -09 to -10,
https://www.justice.gov/epstein/files/DataSet%2012/EFTA02731082.pdf (last visited July 28, 2026) (U.S. Department of Justice's prosecution memo).
[14] U.S. Dep't of Justice, Epstein Library, EFTA01245688 at -88 to -89,
https://www.justice.gov/epstein/files/DataSet%209/EFTA01245688.pdf
(last visited July 28, 2026) (FBI interview memo).

58.    Other records requested by NMDOJ refer to Epstein's "inner circle," to visitors to Zorro Ranch, and to staff of Zorro Ranch, some of whom are alleged to have participated in abuse or witnessed the circumstances surrounding abuse, but the names of these persons are frequently redacted.

59.    The identities and roles of persons whose names are redacted are material to New Mexico's ongoing criminal investigation. As NMDOJ explained in its *Touhy* request, access to unredacted names and details would allow NMDOJ investigators to identify potential witnesses, including additional victims or additional corroborating witnesses; identify potential unindicted perpetrators; verify travel movements; and conduct a more thorough examination of criminal behavior in New Mexico.

60.    The refusal of USDOJ to disclose their identities to NMDOJ substantially impedes NMDOJ's ability to conduct follow-up interviews and compel the production of relevant materials from sources directly. Further investigation by NMDOJ would help advance the pursuit of justice for survivors: NMDOJ would examine Maxwell's and others' roles in Epstein's criminal behavior and assess whether their involvement constituted co-conspiracy or accessory liability under New Mexico law. *See* Exhibit 14 at 4-5.

61.    On May 4, 2026, Special Agent in Charge Garris replied to Mr. Sullivan's email transmitting the *Touhy* request. Garris asserted that "FBI-ABQ will coordinate with FBI-HQs and other field offices regarding any requests associated with this Tuohy [*sic*] Letter." *See* Exhibit 15 at 2 (Email from J. Garris to S. Sullivan (May 4, 2026)).

62.    On May 15, 2026, Mr. Sullivan learned from FBI Albuquerque that their office did not have an update on the status of USDOJ's response to the *Touhy* request, and that USDOJ and

officials from SDNY had the lead on the matter. *See* Exhibit 16 at 2 (Emails between S. Sullivan and T. Frank (May 15, 2026)).

63.    On May 27, 2026, Mr. Sullivan reiterated the urgency of NMDOJ's need for access to the material requested in the *Touhy* letter in a voicemail message left for Mr. Pestana at USDOJ, after Mr. Sullivan was unable to reach him directly.

64.    On May 29, 2026, after receiving no response from USDOJ, NMDOJ reiterated its request for access to the pertinent unredacted records in the custody of USDOJ, in a certified letter sent to then-Acting Attorney General Blanche and to Associate Deputy Attorney General Pestana. *See* Exhibit 17 (Letter from S. Sullivan to T. Blanche and D. Pestana (May 29, 2026)). NMDOJ explained that access was necessary for New Mexico law enforcement to "identify victims [and] corroborating witnesses, develop investigative leads, understand relationships among actors, reconstruct accurate timelines, authenticate critical evidence, pursue necessary legal process such as warrants or subpoenas, [and] fully comprehend the scope and nature of the underlying criminal conduct." *Id.* at 4. The letter reiterated NMDOJ's intent to minimize any administrative burdens on USDOJ, its commitment to comply with applicable security protocols and reasonable confidentiality requirements, and its sole use of the material for New Mexico's criminal investigation and any subsequent criminal prosecution. *Id*.

65.    By this point, over 100 days had elapsed since NMDOJ first sought access to these investigation files.

66.    Attorney General Torrez followed up with letters to Mr. Blanche and Associate Deputy Attorney General Rachel Jag on June 4, 2026, and June 5, 2026, requesting in-person meetings in Washington, D.C. *See* Exhibit 18 at 2 (Letter from S. Sullivan to T. Blanche (June 4, 2026)); Exhibit 19 at 2 (Letter from S. Sullivan to R. Jag (June 5, 2026)). USDOJ did not respond.

17

67.    On June 11, 2026, First Assistant Ellison's chief deputy for DNM called Sean Sullivan at NMDOJ to tell him that "Main Justice" was working to prepare files for NMDOJ's *Touhy* request and assure him of a forthcoming response.

68.    On June 12, First Assistant Ellison made a public promise of cooperation with NMDOJ. In a statement, Ellison emphasized, "[Attorney General Torrez] wants cooperation, we want to cooperate," and "I anticipate full cooperation."[15]

69.    When NMDOJ still had no response by June 30, 2026, Attorney General Torrez reiterated NMDOJ's *Touhy* request in a certified letter to Mr. Blanche and Mr. Pestana. Attorney General Torrez recounted NMDOJ's assistance to USDOJ in the federal investigation, its suspension of its own state investigation at USDOJ's request, and its request to be notified if the federal investigation revealed additional survivors of crimes occurring in New Mexico. *See* Exhibit 20 at 3 (Letter from R. Torrez to T. Blanche and D. Pestana (June 30, 2026)). Attorney General Torrez emphasized New Mexico's intent to support and protect survivors through New Mexico's renewed criminal investigation and the critical role of records from the federal investigation: "USDOJ now holds in its possession the very records that would allow the NMDOJ to resume what federal intervention interrupted." *Id.* at 2. Attorney General Torrez asserted that if "[a]ccess to the database or production of all relevant documents and information previously redacted" were not provided by July 31, 2026, NMDOJ would consider its request denied. *Id.* at 3.

---

[15] Ryan Laughlin, *4 Investigates: DOJ Says Full Cooperation Coming for Epstein Investigation*, KOB News, June 12, 2026, https://www.kob.com/new-mexico/4-investigates-doj-says-full-cooperation-coming-for-epstein-investigation (last visited Aug. 4, 2026).

70.     On July 7, 2026, a spokesperson for USDOJ stated that USDOJ "reiterates that it welcomes New Mexico undertaking additional investigation of the Zorro Ranch and stands ready to provide necessary assistance with New Mexico's investigation.[16]

71.     On July 14, 2026, over five months after NMDOJ first sought access to files related to the federal investigation of the crimes in New Mexico, Attorney General Torrez again reiterated NMDOJ's *Touhy* request in a certified letter to Acting Attorney General Blanche and electronically to Associate Deputy Attorney General Pestana. *See* Exhibit 8. Mr. Torrez reiterated that if NMDOJ did not receive access to these unredacted materials by July 31, 2026, "NMDOJ will treat this request as denied and will pursue all available legal remedies without further notice." *Id.* at 2.

72.     Later that day, NMDOJ received a belated response from DNM to NMDOJ's March 3, 2026, *Touhy* request. Dated June 30, 2026, the DNM response stated that DNM "neither collected nor retained any investigative materials," and its file "consist[ed] mostly of transmittal materials [to SDNY] and materials collected from the public domain." *See* Exhibit 3 at 6. The letter purported to "produce[] or identif[y] by reference to the Epstein Library" those materials that were not subject to asserted privileges. *Id.* at 6.

73.     The thirty-one pages accompanying the DNM response were limited to: (a) a list of seventeen follow-up questions to ask "[i]f New Mexico is mentioned during a victim interview," *id.* at 10; (b) a copy of a public news article from the *Albuquerque Journal*'s website, *id.* at 11-14; (c) a public press release from former New Mexico Governor Bill Richardson, *id.* at 15; (d) copies

---

[16] Andrew Hay, *New Mexico says US Justice Dept hindering probe of former Epstein ranch*, REUTERS (Jun. 9, 2026, 2:56 PM), https://www.reuters.com/legal/government/new-mexico-says-us-justice-dept-hindering-probe-former-epstein-ranch-2026-07-09/. The Department of Justice has directed courts to look to unsworn public statements as binding party admissions. *See* Defs.' Resp. to Pls.' Mot. for a TRO at 4, n.1, *Floyd v. Dep't of Just.*, No. 26-cv-01399 (E.D. Va. Jun. 5, 2026), ECF No. 78 ("Because the Acting Attorney General's statements were recorded, this Court can take judicial notice of them.") (citing Fed. R. Evid. 201(b)(2)); *see also* Defs.' Resp. to Pls.' Mot. for a TRO at 4, n.1, *Citizens for Resp. and Ethics in Wash. v. Dep't of Just.*, No. 26-cv-01789 (D.D.C. Jun. 5, 2026), ECF No. 15 (same).

of correspondence between NMDOJ and USDOJ dating from May 14, 2019, to October 15, 2019, *id.* at 16-18; (e) redacted emails apparently sent and received within USDOJ regarding Governor Richardson's press release, *id.* at 19-20; (f) redacted emails apparently sent and received within USDOJ regarding an October 15, 2019, letter from then-Attorney General of New Mexico Hector Balderas, *id.* at 21; and (g) redacted records from the U.S. Virgin Islands regarding the incorporation of Cypress, Inc. *Id.* at 22-40.

74.    DNM's letter stated three primary objections to the *Touhy* request: that the request was overbroad and unduly burdensome, that it violated the Privacy Act, and that it violated protective orders entered in the Epstein and Maxwell cases. *Id.* at 5-6; *see also* Exhibit 21 (*Epstein* Protective Order); Exhibit 22 (*Maxwell* Protective Order).

75.    On July 14, 2026, Sean Buckley, the Deputy United States Attorney for SDNY, called Mr. Sullivan, informing him that SDNY would not provide any materials in response to NMDOJ's *Touhy* request. *See* Exhibit 23 at 3 (Email from S. Sullivan (July 16, 2026) and reply from S. Buckley (July 31, 2026)). Mr. Buckley represented that USDOJ would not produce unredacted records to NMDOJ for two reasons: first, disclosing records necessary for the NMDOJ's criminal investigation would purportedly violate the privacy and confidentiality to be afforded to victims of abuse by Epstein and Maxwell and second, releasing unredacted records would violate the protective orders entered in Epstein and Maxwell's prosecutions by the district court in the Southern District of New York. *See id.* at 3.

76.    Mr. Sullivan asked whether USDOJ would be willing to cooperate with NMDOJ in seeking a modification of applicable protective orders to make express that the orders permit disclosure for law enforcement purposes, and Mr. Buckley responded that such cooperation was "unlikely." Mr. Buckley qualified this position by noting that he would need to review any formal

proposal but identified no path through which NMDOJ could work with USDOJ on these matters. *See id.* at 2-3. Mr. Buckley, in a subsequent email on July 31, 2026, reiterated his view that EFTA and the existing protective orders precluded production of materials in response to NMDOJ's request, without any offer to seek any modification of those protective orders or otherwise provide NMDOJ the documents and evidence it has requested. *See id.* at 1. SDNY therefore also has denied NMDOJ's *Touhy* request.

77.     Neither Acting Attorney General Blanche, Deputy Assistant Attorney General Pestana, nor any other USDOJ officials have provided any further response to NMDOJ. That has remained true despite Acting Attorney General Blanche's statement before Congress that USDOJ was purportedly "continuing to work with them [NMDOJ]" and his express assurance that USDOJ would cooperate "and help [NMDOJ] get the information it needs." *See* Exhibit 9 at 185. USDOJ therefore also has denied NMDOJ's *Touhy* request in its entirety.

78.     To date, victims of Epstein and his associates who were trafficked and abused in New Mexico have not received the justice they deserve.[17] The people of New Mexico likewise deserve to know the truth of what happened and to have the laws of their state upheld through the investigation and prosecution of wrongdoers affiliated with Epstein's sex trafficking web. USDOJ should be actively assisting, rather than thwarting, NMDOJ in its effort to enforce state law and execute its legal duty to the people of New Mexico.

---

[17] A victim of Maxwell submitted a letter during Maxwell's trial stating her "disappointment that, to date, DOJ has not taken action against 'other critical inner circle Epstein accomplices.'" *United States v. Maxwell*, 811 F.Supp. 3d 667, 674 (S.D.N.Y. 2025).

## LEGAL BACKGROUND

### *Legal and Historical Background on Law Enforcement Information-Sharing*

79.     Under the United States Constitution's system of federalism, the States retain primary sovereign authority to define and enforce criminal law. *See, e.g., Heath v. Alabama*, 474 U.S. 82, 93 (1985) (citing The Federalist No. 9, at 55 (A. Hamilton)).

80.     The authority to investigate and prosecute criminal offenses lies at the core of those sovereign police powers. The Supreme Court has recognized that "[t]he States' powers to undertake criminal prosecutions… do[es] not derive from the Federal Government" but from "authority originally belonging to [the States] before admission to the Union and preserved to them by the Tenth Amendment." *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) (citations omitted). There is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

81.     Moreover, under the "dual-sovereignty" doctrine, the States retain their sovereign authority to prosecute crimes within their territories, even following prosecution by the federal government for the same crimes. *See Gamble v. United States*, 587 U.S. 678, 681 (2019) ("We have long held that a crime under one sovereign's laws is not 'the same offence' as a crime under the laws of another sovereign. Under this 'dual-sovereignty' doctrine, a State may prosecute a defendant under state law even if the Federal Government has prosecuted him for the same conduct under a federal statute."); *State v. Rogers*, 566 P.2d 1142, 1143-44 (N.M. 1977) (recognizing New Mexico's adoption of the dual sovereignty doctrine).

82.     New Mexico possesses both the authority and the duty to investigate potential crimes committed within its jurisdiction and to gather evidence necessary to enforce its laws. Many of the crimes New Mexico is investigating in connection with Epstein and his associates' conduct,

22

including allegations of criminal sexual penetration and criminal sexual contact, lack generally applicable analogues in federal law, so New Mexico is the only jurisdiction capable of investigating and prosecuting these potential crimes.

83.    Consistent with longstanding principles of federalism, cooperation and evidence-sharing between federal and state law enforcement authorities has long been a routine and essential feature of criminal investigations.

84.    New Mexico has been no exception to this historical practice of state-federal cooperation in law enforcement.

85.    And the practice has resulted in successful criminal investigations and prosecutions of a range of serious crimes, including ones related to human trafficking, human smuggling, and sexual abuse of minors. Recent examples in New Mexico include:

    a.    A joint investigation into transnational human smuggling operation resulting in the federal indictment of two alleged perpetrators on August 12, 2025. *See* Indictment, *United States v. Zhang et al.*, 25-cr-03104, Dkt. 2 (D.N.M. May 29, 2026).

    b.    A joint investigation into the sextortion and sexual exploitation of two girls, ages 12 and 15, resulting in a federal sentence of more than 19 years on two counts of using a facility of interstate commerce to coerce and entice minors.[18] *See* Clerk's Minutes, *United States v. Adrian Puentes*, 23-cr-01770, Dkt. 81 (D.N.M. Jan. 22, 2026).

    c.    An investigation under the Project Safe Childhood initiative facilitating NMDOJ's successful investigation and prosecution of a former Gallup firefighter for

---

[18] *Albuquerque Man Charged with Coercion and Enticing of Minors*, U.S. Attorney's Office, District of New Mexico, Dec. 21, 2023, https://www.justice.gov/usao-nm/pr/albuquerque-man-charged-coercion-and-enticement-minors (last visited Jul. 28, 2026).

possession of Child Sexual Abuse Material (CSAM) involving children under the age of 13.[19] *See New Mexico v. Garcia*, D-1113-CR-202400090 (Gallup Dist. Ct. Apr. 9, 2024).

d.  An investigation with FBI participation into sexual assaults of inmates at Central New Mexico Correctional Facility, a state prison, committed by a prison guard there. The case was prosecuted in state court. *See New Mexico v. Carrejo*, D-1314-CR-201200373 (Los Lunas Dist. Ct. Aug. 9, 2012).

e.  Consistent referrals state-to-federal and federal-to-state in cases involving sexual abuse of people in custody have resulted in convictions tailored to the criminal statutes that best fit the conduct at issue and supporting evidence.

f.  The practice of state-federal cooperation has long included sharing non-public investigative material to facilitate successful law enforcement consistent with our federalist system.

86.  After providing specific assurances that the USDOJ's Epstein investigation would follow the same cooperative practice while inducing NMDOJ to cease its investigation in 2019, USDOJ is now reneging on both historical practice and its promised cooperation.

### *USDOJ's* **Touhy** *Regulations*

87.  Federal regulations governing requests for testimony or documents for use in litigation or investigations in which the federal agency is not a party are commonly known as "*Touhy* regulations" after the Supreme Court decision in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). *Touhy* recognized the general validity of such regulations promulgated under authority derived from the Federal Housekeeping Act, 5 U.S.C. § 301.

---

[19] *Gallup Firefighter Arrested for Possession of CSAM*, New Mexico Dep't of Justice, Apr. 8, 2024, https://nmdoj.gov/press-release/gallup-firefighter-arrested-for-possession-of-csam/ (last visited Jul. 28, 2026).

88.    The Federal Housekeeping Act directs federal agencies to establish procedures governing how requests for testimony or records are to be handled internally. It expressly states that the statute does not grant federal agencies authority to withhold information. *See* 5 U.S.C. § 301 ("This section does not authorize withholding information from the public or limiting the availability of records to the public.").

89.    State law enforcement agencies frequently require testimony and records from federal agencies in connection with state law criminal investigations. USDOJ regulations outline two paths for state law enforcement to request and receive such records: make an informal request to the agency or submit a formal *Touhy* request.

90.    USDOJ *Touhy* regulations expressly provide that voluntary disclosure of information to state and local law enforcement and prosecutorial agencies is permitted, without the need for any formal demand. *See* 28 C.F.R. § 16.21(c) ("Nothing in this subpart is intended to impede the appropriate disclosure, in the absence of a demand, of information by Department law enforcement agencies to federal, state, local and foreign law enforcement, prosecutive, or regulatory agencies.").

91.    USDOJ policy also expressly "favors cooperation in state and federal cases… in which information obtained by the Department is sought. Authorization in one form or another is usually granted." U.S. Dep't of Justice, Justice Manual, § 1-6.240.

92.    USDOJ's *Touhy* regulations set forth a specific procedure USDOJ must follow when the agency receives a formal *Touhy* request, namely, that the decisionmaker "***will authorize disclosure***" unless disclosure would violate the law or procedural rules, or adversely affect law enforcement activities or governmental interests. *See* 28 C.F.R. § 16.26(c) (emphasis added).

25

93. The regulations go on to explicitly permit USDOJ to disclose "investigatory records compiled for law enforcement purposes," even in circumstances where disclosure "would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." 28 C.F.R. § 16.26(b)(5), (c); *see also* U.S. Dep't of Justice, Justice Manual, § 1-6.440 (providing that the "Deputy Attorney General or the Associate Attorney General" is authorized "to order disclosure" of investigatory records compiled for law enforcement purposes if "the administration of justice requires disclosure," in considerations of factors identified in 28 C.F.R. § 16.26(c)). Disclosure is appropriate when it "is ***necessary to pursue a civil or criminal prosecution*** or affirmative relief, such as an injunction," and disclosure is appropriate after considering, among other things, the seriousness of the violation or crime involved, the importance of the relief sought, the importance of the legal issues presented, and other matters brought to the attention of the Deputy or Associate Attorney General. 28 C.F.R. § 16.26(c) (emphasis added).

## CAUSES OF ACTION

### COUNT I
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious, Not in Accordance with Law, in Excess of Statutory Authority

94. The State realleges and incorporates by reference the allegations set forth above, as if fully set forth herein.

95. Under the Administrative Procedure Act ("APA"), "agency action, findings, and conclusions found to be either arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," "shall [be] h[e]ld unlawful and set aside" by the reviewing court. 5 U.S.C. § 706(2)(A), (C).

96.     USDOJ's refusal—unsupported in law and the circumstances at hand—to provide materials requested in NMDOJ's valid *Touhy* requests is arbitrary and capricious, an abuse of discretion, and not in accordance with the law.

97.     USDOJ's stated justifications for continuing to withhold from NMDOJ unredacted investigative records and other material from USDOJ's investigation into Epstein and his associates are not permissible grounds for rejecting *Touhy* requests under statute or agency regulations.

### *NMDOJ's Request Will Not Interfere with Enforcement Proceedings or Threaten to Impair Investigative Techniques or Procedures.*

98.     In correspondence, USDOJ invoked its regulatory authority to limit disclosure to NMDOJ because it allegedly would "interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." 28 C.F.R. § 16.26(b)(5); Exhibit 3 at 5.

99.     However, such an interpretation of its regulations is contradicted by the history of information sharing with state law enforcement authorities, including in New Mexico, with no interference in contemporaneous or subsequent federal law enforcement proceedings.

100.     Furthermore, Acting Attorney General Blanche has publicly confirmed that USDOJ is not currently engaged in any enforcement proceeding related to Epstein or anyone associated with him related to his ties in New Mexico.

101.     Moreover, NMDOJ has made clear it does not seek information about any confidential federal investigative techniques or procedures that could be impaired.

102.     Therefore, USDOJ refusal to comply with NMDOJ's *Touhy* request and unexplained deviation from long-standing agency practice violate the APA.

***NMDOJ's Request is Reasonable in Breadth and Burden, and is Reasonably Related to the Needs of Its Proceedings.***

103.    USDOJ has made a blanket assertion that NMDOJ's *Touhy* request is "overbroad, unduly burdensome, and not reasonably related to the needs of the case since there is no pending case and the requests are not targeted to any particular fact or issue." *See* Exhibit 3 at 5.

104.    This boilerplate objection fails because it provides no rational basis for refusing to comply and does not describe the actual burden associated with compliance. *See Franchitti ex rel. United States v. Cognizant Tech. Sols. Corp.*, 2023 WL 2759075, at *6 (D.N.J. Apr. 3, 2023) (finding USDOJ's undue burden and overbreadth objections to a *Touhy* request to be arbitrary and capricious because the USDOJ failed to provide a rational basis or describe the actual burden in searching or accessing the sought-after records).

105.    In addition, the objection ignores the substance of NMDOJ's requests, the nature of its ongoing investigation, and the status of responsive material --

    a.  NMDOJ requested unredacted copies of specific documents identified by individual EFTA production number, yet USDOJ has not provided that material even though the request was narrowly tailored. *See supra* ¶¶ 47, 48, 55, 58.

    b.  Outside these specifically identified documents, NMDOJ limited its request to matters associated with Epstein and his associates' ties and conduct at Zorro Ranch and in New Mexico. *See supra* ¶¶ 47, 48, 54, 55. As a result of EFTA, USDOJ's universe of potentially responsive documents should be easily searchable, and there are readily identifiable search terms to locate what New Mexico needs. Locating and producing the material NMDOJ requests is a task USDOJ has more than sufficient resources to handle while meeting its other obligations.

c. USDOJ's objection ignores NMDOJ's repeated offers to minimize any administrative burden on USDOJ in specified ways and that there already is a ready means for NMDOJ to access portions of the required material. NMDOJ has offered to "send a team to Main Justice… to examine the materials in person, subject to reasonable security protocols and access conditions the USDOJ deems appropriate." Exhibit 14 at 6; *see also* Exhibit 8 at 5; Exhibit 12 at 3 (reiterating offer to minimize burden through in-person review in Mar. 13, 2026 letter); Exhibit 17 at 4 (same, in May 29, 2026 letter). Such a review would pose minimal, if any, burden on USDOJ, as USDOJ has already "given Congress access to unredacted duplicative materials in the Reading Room," and NMDOJ would merely require access to the same. *See* Exhibit 24 at 11:15-16 (Committee on Oversight and Government Reform, Interview of P. Bondi (May 29, 2026)); *see also* Exhibit 25 at 4 ("The Department notes, and as discussed in the SDNY EFTA Orders and Submissions, unredacted versions of these materials are available for inspection at the Department by members of Congress.").

106.    Finally, NMDOJ targeted its requests to "particular fact[s] and issue[s]" by specifying that it is investigating potential violations of New Mexico state criminal laws in New Mexico by Epstein and his co-conspirators. *See supra* ¶ 54.

### *Complying with NMDOJ's Request Does Not Violate the Privacy Act.*

107.    The Privacy Act enumerates thirteen situations in which covered information may be disclosed without the consent of the individual to whom the record pertains. 5 U.S.C. § 552a(b). One of those exceptions fits exactly the present circumstances by allowing disclosure of covered information "to another agency or to an instrumentality of any governmental jurisdiction within or

29

under the control of the United States"—*i.e.*, to a state law enforcement agency—"for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." 5 U.S.C. § 552a(b)(7).

108.    Attorney General Torrez—the head of NMDOJ and New Mexico's top law enforcement officer—made written requests to USDOJ specifying the records requested and the authorized law enforcement activity for which these records are sought. *See supra* ¶ 71.

109.    The enumerated exceptions of the Privacy Act also permit disclosure of covered information "for a routine use," which is defined in that statute to mean "with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected."

110.    Sharing these requested records with state law enforcement *is* within the routine uses for which the USDOJ holds this material. Pursuant to the Privacy Act, the Criminal Division of the USDOJ can and does disclose covered information to State law enforcement agencies charged with investigating and prosecuting violations of law relating to such records.[20]

111.    At the very least, USDOJ cannot base its denial of NMDOJ's *Touhy* request on speculation that some unidentified responsive information **might** fall beyond disclosures authorized by the Privacy Act's enumerated exceptions.

---

[20] *See, e.g.*, Privacy Act of 1974, Systems of Records, 52 Fed. Reg. 47182, 47188 (Dec. 11, 1987) (Criminal Division Witness Security File (CRM-002)); Privacy Act of 1974, Systems of Records, 53 Fed. Reg. 1861, 1862 (Jan. 22, 1988) (Criminal Case Files of the Executive Office for U.S. Attorneys (USA-007)); Privacy Act of 1974, System of Records, 72 Fed. Reg. 44182, 44183 (Aug. 7, 2007) (Criminal Division Index File Systems and Associated Records (CRM-001)).

***Protective Orders Entered in Epstein-Related Cases Do Not Prevent Disclosure to NMDOJ.***

112.    USDOJ also cites protective orders in the Epstein and Maxwell criminal cases as a bar to compliance with NMDOJ's *Touhy* request. Specifically, USDOJ has taken the position that the orders, as modified for compliance with EFTA and as currently in effect, "prohibit the Department from 'disseminating the identity of any victims or witnesses referenced' in the covered materials, which include all discovery pursuant to Rule 16, Rule 17c, and the Jenks Act and comprise the vast majority of materials in the [Epstein] Library." *See* Exhibit 3 at 5-6.

113.    This objection misreads the protective orders and otherwise serves as a self-created excuse for USDOJ not to cooperate.

114.    The protective orders themselves only prohibit ***public*** disclosure by USDOJ:

   a.    "The Government (other than in the discharge of their professional obligations in this matter)... [is] strictly prohibited from ***publicly*** disclosing or disseminating the identity of any victims or witnesses referenced in the Discovery." Exhibit 22 at 5-6 (emphasis added).

   b.    "The Government (other than in the discharge of their professional obligations in this matter)... [is] precluded from ***publicly*** disclosing or disseminating the identity of any victims or witnesses referenced in the Discovery." Exhibit 21 at 4-5 (emphasis added).

115.    Non-public disclosure to NMDOJ is entirely consistent with the protective orders.

116.    Next, consider the aggressive position USDOJ takes generally to preserve its ability to share information with other law enforcement agencies. For example, in *ACI Constr., LLC v. United States*, 2020 WL 10317460, at *1 (D. Utah July 7, 2020), USDOJ vigorously opposed a proposed requirement for notice to the plaintiff if the government was disclosing information to

other law enforcement agencies. And in agreeing with USDOJ on that issue, the district court collected cases that show a long history of USDOJ safeguarding its freedom to share information with federal *and state* law enforcement:

> Not surprisingly, other courts faced with similar requests have rejected them. *See, e.g., Certified Enters., Inc. v. United States*, No. 4:17-CV-202 SNLJ, 2018 WL 1135383, at *1 (E.D. Mo. Feb. 14, 2018) (including, over the plaintiffs' objection, a "carve-out" in a protective order for the United States, which allowed it to disclose information "that may be relevant to any civil or criminal proceeding or investigation to any Federal *or State agency* with authority to enforce laws regulating any activity relating to the requested information") (emphasis added); *United States v. Elsass*, No. 2:10-CV-336, 2011 WL 335957, at *5 (S.D. Ohio Jan. 31, 2011) (denying the defendants' motion for protective order that sought to prohibit the United States from disclosing information obtained in the case to the IRS because "the issuance of a protective order as requested by [the defendants] would be unprecedented, [and] would restrict to an unwarranted degree the ability of the [United States] to enforce the laws"); *U.S. S.E.C. v. AA Capital Partners*, Inc., No. 06-51049, 2009 WL 3735880, at *3 (E.D. Mich. Nov. 3, 2009) (denying motion for protective order that sought to prevent the Securities and Exchange Commission ("SEC") from sharing information with the appropriate authorities because "the protective order sought by the Movant would impede the SEC's law enforcement function" and concluding that "[t]he SEC may share information with law enforcement agencies, including United States Attorneys *and state prosecutors*").

*ACI Constr.*, 2020 WL 10317460, at *2.

117.    The fact that USDOJ already has indicated that it is "unlikely" to seek a modification of the protective orders it claims prevent disclosure is strong evidence that they provide a fig leaf to justify secrecy USDOJ prefers. After all, the cases cited above show USDOJ taking active stances on this issue in favor of information sharing with law enforcement, including by seeking the amendment of protective orders USDOJ contends might prohibit such information sharing. NMDOJ repeatedly invited discussion of terms to protect from improper redisclosure non-public information USDOJ shares, which USDOJ ignored.

118.    USDOJ has provided no explanation for acting inconsistently with its repeated defense of its authority to share information with other law enforcement agencies in this matter,

which involves an internationally notorious child sex trafficker and associates who participated in or facilitated the abuse of survivors who, to this day, continue pressing for justice.

119. Most obviously, outside the language of EFTA, USDOJ unilaterally decided to make complete unredacted copies of every document available to any member of Congress. *See* Exhibit 24 at 11:15-16; *see also* Exhibit 25 at 4 ("The Department notes, and as discussed in the SDNY EFTA Orders and Submissions, unredacted versions of these materials are available for inspection at the Department by members of Congress.").

120. That is 535 people who can view the portion of the material NMDOJ has asked to review that is included in the Epstein Files subject to any reasonable security restrictions USDOJ might request.

121. Unlike NMDOJ, no member of Congress is in a position to investigate or prosecute crimes that New Mexico has been unable to investigate because of USDOJ's obstruction.

122. The unilateral provision of unredacted access to so many people while refusing to provide it to the type of law enforcement partner USDOJ has cooperated with throughout modern times underscores the arbitrary and capricious nature of USDOJ's action.

### USDOJ Has Ignored Factors Its Own *Touhy Regulations Require It to Consider.*

123. Notably absent from all USDOJ's responses (and non-responses) to NMDOJ's *Touhy* requests is any consideration of the factors its own *Touhy* regulations require it apply in deciding whether to disclose. *Health Plan v. Becerra*, 693 F. Supp. 3d 1, 9 (D.C. Cir. 2023) ("An agency action is arbitrary and capricious if an agency fails to 'comply with its own regulations.'").

124. Pursuant to 28 C.F.R. 16.26(c), "if disclosure is necessary to pursue a civil or criminal prosecution or affirmative relief, such as an injunction, consideration shall be given to:

(1) The seriousness of the violation or crime involved,

(2) The past history or criminal record of the violator or accused,

(3) The importance of the relief sought,

(4) The importance of the legal issues presented,

(5) Other matters brought to the attention of the Deputy or Associate Attorney General."

125.    USDOJ's own court filings underscore the seriousness of Epstein and his associates' crimes:

a.  "[O]ver the course of many years, Jeffrey Epstein... sexually exploited and abused dozens of minor girls." Sealed Indictment at ¶ 1, *United States v. Epstein*, No. 1:19-cr-00490, Dkt. No. 2 (S.D.N.Y. Jul. 2, 2019).

b.  "Maxwell assisted, facilitated, and contributed to Jeffrey Epstein's abuse of minor girls by, among other things, helping Epstein to recruit, groom, and ultimately abuse victims known to Maxwell and Epstein to be under the age of 18. The victims were as young as 14 years old when they were groomed and abused by Maxwell and Epstein, both of whom know that certain victims were in fact under the age of 18." Sealed Indictment at ¶ 1, *Maxwell*, 1:20-cr-00330, Dkt. No. 1; Superseding Indictment at ¶ 1, *Maxwell*, 1:20-cr-00330, Dkt. No. 187.

c.  At sentencing, USDOJ relied on "the nature and seriousness of the offense, the harm to victims, the need to promote respect for the law," to seek a sentence for Maxwell of "360 to 660 months' imprisonment"—*i.e.*, 30 to 55 years. Gov't's Sentencing Mem., *Maxwell*, 1:20-cr-00330, Dkt. No. 670; *see also id.* at 53 ("It is difficult to overstate the magnitude of [Maxwell]'s crimes and the harm she caused.").

34

126.     By this point, it is hard to imagine that Mr. Blanche (either as Deputy Attorney General or now as Acting Attorney General) fails to appreciate the seriousness of these matters. He claimed to understand in his recent senate confirmation hearings, and he recently acceded to the demand of a United States Senator to meet personally with survivors of Epstein and his associates' crimes.[21] There can be no question that this is a particularly heinous circumstance.

127.     Regarding the importance of the relief sought and legal issues presented, NMDOJ is one of few jurisdictions remaining that is in a position to seek justice for survivors, and there is no indication that—despite persistent references to criminal conduct in New Mexico—the true nature and extent of crimes committed within the state have been meaningfully investigated.

128.     USDOJ has not articulated and lacks any basis grounded in agency regulations that support its refusal to disclose the information requested in NMDOJ's *Touhy* request.

129.     USDOJ's denial of NMDOJ's *Touhy* request is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**COUNT II**
**Administrative Procedure Act, 5 U.S.C. § 706(1)**
**Unlawfully Withheld and Unreasonably Delayed Agency Action**

130.     The State realleges and incorporates by reference the allegations set forth above, as if fully set forth herein.

131.     To the extent the Court concludes that the USDOJ's refusal to provide NMDOJ access to unredacted materials responsive to its *Touhy* request does not constitute final agency action on which the State is entitled to relief, the State seeks relief under the APA for agency action unlawfully withheld or unreasonably delayed.

---

[21] *See* Devlin Barrett, *Blanche Meets with Epstein Victims as He Seeks Confirmation for Attorney General Post*, N.Y. TIMES, July 16, 2026 https://www.nytimes.com/2026/07/16/us/politics/todd-blanche-attorney-general-epstein.html (last accessed July 30, 2026).

132. The APA provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

133. USDOJ's *Touhy* regulations require officials to evaluate *Touhy* requests to determine whether to authorize disclosure under the factors set forth in those regulations. Where, as here, investigatory records compiled for law enforcement purposes are requested, "if disclosure is necessary to pursue a … criminal prosecution," the "Deputy or Associate Attorney General" is to review the request and direct release if "the administration of justice requires disclosure." 28 C.F.R. §§ 16.26(b)(5), 16.26(c).

134. Here, in particular, the administration of justice requires disclosure because NMDOJ reasonably relied on USDOJ's assurances that USDOJ would share investigative material if NMDOJ complied with USDOJ's request to stand down its investigation in 2019. The time for USDOJ to provide that promised cooperation has passed, but USDOJ continues refusing to share information while publicly insisting that cooperation is forthcoming.

135. To the extent the Acting Attorney General, or his Deputies or Associates, have not yet reviewed and responded to NMDOJ's *Touhy* request, this is a consummate failure to act or refusal to act. By failing to provide the agency's response to NMDOJ's *Touhy* request, USDOJ has unlawfully withheld agency action that its own regulations require USDOJ to take.

136. Alternatively, USDOJ's failure to respond to NMDOJ's *Touhy* request constitutes an unreasonable delay in agency action.

137. NMDOJ's initial request to USDOJ for access to unredacted relevant materials requested a response by March 27, 2026, fourteen days following the date on the letter. *See* Exhibit 12 at 4. A fourteen-day timeline is ordinary and customary for criminal investigations. Indeed, federal grand jury subpoenas typically require compliance within fourteen days, not merely a

response. And USDOJ does not need to search for, identify, collate, and produce materials that are within the EFTA release in redacted form. To facilitate the NMDOJ's access and use of relevant EFTA materials, USDOJ need only utilize the existing system for which it already permits members of Congress to review those records, subject to the reasonable safeguards NMDOJ has invited to ensure further protection of the information. In light of EFTA's broad disclosure mandate and USDOJ's own representations of full compliance, there is no reason why providing the remaining responsive materials would present any substantive obstacle.

138.    Nevertheless, it has been over three months since NMDOJ submitted its formal *Touhy* request, and over four-and-a-half months since NMDOJ's initial request to USDOJ for access to unredacted relevant materials.

139.    As set forth above, USDOJ adopted an authoritative and categorical policy or practice to refuse to share investigative information with New Mexico authorities concerning Zorro Ranch and potential allegations of human trafficking and widespread sexual abuse of young women and minors, hampering the State's ability to investigate and prosecute these matters. This policy or practice is evidenced by, among other things, USDOJ's final, definitive refusal to share evidence for use without providing a case-specific justification. These refusals were communicated to the State after assurances from 2019 and now again that USDOJ would provide materials and support NMDOJ's investigation.

140.    USDOJ's actions also exceed the authority conferred by the Federal Housekeeping Act, which permits agencies to establish procedures governing the disclosure of records but does not authorize agencies to withhold information or decline to evaluate disclosure requests absent a lawful basis.

141.    USDOJ failed to specify its reasoning for denying NMDOJ's *Touhy* request and offered nothing more than boilerplate language and buzzwords to conclude sharing information with another law enforcement agency would be inappropriate here. That explanation cannot justify USDOJ's radical departure from the ordinary norms of state-federal cooperation.

142.    USDOJ's inconsistent stance on providing information, initially indicating it would provide the requested materials then later denying the request after months of unresponsiveness, is an unreasonable delay. This delay is further unreasonable in light of USDOJ's initial 2019 request for NMDOJ to cease investigation into Epstein, Maxwell, and/or Epstein's web in New Mexico and commitment to share investigative materials in lieu of New Mexico conducting its own investigation.

143.    USDOJ's refusal to share documents constitutes an unexplainable deviation from the ordinary and customary practices, breaking down critical trust relationships between state and federal law enforcement agencies. In addition to being arbitrary, capricious, an abuse of discretion, and contrary to law, USDOJ has unlawfully withheld or unreasonably delayed agency action required by law in response to the State's *Touhy* request, the State is entitled to relief compelling such action under 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of New Mexico respectfully requests that this Court:

A)    Declare that the complete denial by Defendant United States Department of Justice of Plaintiff State of New Mexico's *Touhy* request constitutes final agency action subject to judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, and 706.

B)      Declare that Defendant United States Department of Justice's denial of Plaintiff State of New Mexico's *Touhy* request was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

C)      Declare that, to the extent Defendant United States Department of Justice's denial of Plaintiff State of New Mexico's *Touhy* request was in excess of statutory jurisdiction, authority, or limitations, such denial is unlawful under 5 U.S.C. § 706(2)(C).

D)      Declare that, to the extent Defendant United States Department of Justice failed to observe procedure required by law, including its own *Touhy* regulations, in denying Plaintiff State of New Mexico's request, such denial is unlawful under 5 U.S.C. § 706(2)(D).

E)      Direct Defendant United States Department of Justice to set aside its denial of Plaintiff State of New Mexico's *Touhy* request and to evaluate the request in accordance with the requirements of the Administrative Procedure Act and its own *Touhy* regulations.

F)      Compel Defendant United States Department of Justice to take all agency action required by law in response to Plaintiff State of New Mexico's *Touhy* request, including but not limited to producing the requested information or records, to the extent required by the Administrative Procedure Act.

G)      Award Plaintiff State of New Mexico its costs of suit as permitted by law.

H)      Grant such other and further relief as the Court deems just and proper.

Dated: August 5, 2026                    Respectfully submitted,

RAÚL TORREZ
NEW MEXICO ATTORNEY GENERAL

By:_____/s/ Anjana Samant_____
Anjana Samant, D.D.C. Bar ID 4267019
*Deputy Counsel*
NEW MEXICO DEPARTMENT OF JUSTICE
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
asamant@nmdoj.gov

Amanda Butler (*pro hac vice* forthcoming)
*Senior Counsel*
Jessica Serrano (*pro hac vice* forthcoming)
*Senior Counsel*
NEW MEXICO DEPARTMENT OF JUSTICE
201 3rd Street, NW, Suite 300
Albuquerque, New Mexico 87102
(505) 490-4060
abutler@nmdoj.gov
jserrano@nmdoj.gov

Mark T. Baker (*pro hac vice* forthcoming)
PEIFER, HANSON, MULLINS & BAKER, P.A.
500 Marquette Street NW, Suite 510
Albuquerque, New Mexico 87102
(505) 247-4800
mbaker@peiferlaw.com

*Attorneys for the State of New Mexico*