**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

*State of New Mexico vs. U.S. Department of Justice, et al.*

# Complaint-Exhibit 24

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM,
U.S. HOUSE OF REPRESENTATIVES,
WASHINGTON, D.C.

INTERVIEW OF: PAMELA J. BONDI

Friday, May 29, 2026

Washington, D.C.

The interview in the above matter was held in Room 2154, Rayburn House Office Building, commencing at 9:05 a.m.

Present: Representatives Comer, Garcia, Khanna, Stansbury, Frost, Lee, Subramanyam, Ansari, Min, and Walkinshaw.

Appearances:

For the COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM:

DANIEL ASHWORTH, GENERAL COUNSEL
STACY BAKER, DIRECTOR OF INFORMATION TECHNOLOGY
BRITTANY BRIGNAC, SENIOR COUNSEL
MALLORY COGAR, CHIEF CLERK AND DEPUTY DIRECTOR OF OPERATIONS
JESSICA COLLINS, COMMUNICATIONS DIRECTOR
JACK EMMER, CHIEF COUNSEL FOR INVESTIGATIONS
EMILY FEYERABEND, COUNSEL
RYAN GIACHETTI, CHIEF COUNSEL
BILLY GRANT, DEPUTY CHIEF COUNSEL FOR INVESTIGATIONS
AUSTIN HACKER, DEPUTY COMMUNICATIONS DIRECTOR
BAILEE JUSZCZYK, UNDERGRADUATE FELLOW
NICHOLAS LANGMAN, UNDERGRADUATE FELLOW
MARK MARIN, STAFF DIRECTOR
MELVIN SOTO, DIGITAL DIRECTOR
ELLISON TOLAN, COUNSEL
ASHLEE VINYARD, DEPUTY STAFF DIRECTOR
[redacted], MINORITY DEPUTY STAFF DIRECTOR
[redacted], MINORITY POLICY DIRECTOR
[redacted], MINORITY COMMUNICATIONS DIRECTOR
[redacted], MINORITY RESEARCH ASSISTANT

[redacted], MINORITY RESEARCH ANALYST

[redacted], MINORITY INTERN

[redacted], MINORITY PRESS SECRETARY

[redacted], MINORITY SENIOR COUNSEL

[redacted] MINORITY INTERN

[redacted], MINORITY SENIOR COUNSEL

[redacted], MINORITY SENIOR COUNSEL

[redacted], MINORITY OPERATIONS SPECIALIST

[redacted], MINORITY FELLOW

[redacted], MINORITY SENIOR COUNSEL

[redacted], MINORITY FELLOW

[redacted], MINORITY SENIOR ADVISOR

[redacted], MINORITY CHIEF COUNSEL

For the U.S. DEPARTMENT OF JUSTICE:

HARMEET DHILLON, ASSISTANT ATTORNEY GENERAL FOR CIVIL RIGHTS

JONATHAN D. GUYNN, DEPUTY ASSISTANT ATTORNEY GENERAL FOR THE TORTS BRANCH OF THE CIVIL DIVISION

ERNESTO SAMPERA, ADVISOR TO THE CHIEF OF STAFF, OFFICE OF THE ATTORNEY GENERAL

RACHEL JAG, ASSOCIATE DEPUTY ATTORNEY GENERAL, OFFICE OF THE DEPUTY ATTORNEY GENERAL

KISA MOTIWALA, CHIEF OF STAFF AND COUNSEL, OFFICE OF LEGISLATIVE AFFAIRS

Mr. Emmer. We will go on the record.

This is a transcribed interview of former Attorney General Pamela J. Bondi, conducted by the

House Committee on Oversight and Government Reform under the authority granted to it pursuant to House rule X. Accordingly, House rule X grants the Committee broad jurisdiction for the Committee to conduct investigations of any matter at any time.

This interview was requested by Chairman James Comer as part of the Committee's investigation into the circumstances and subsequent investigations into the crimes of Jeffrey Epstein and Ghislaine Maxwell, the operation of sex-trafficking rings and ways for the Federal Government to effectively combat them, the ways in which Mr. Epstein and Ms. Maxwell sought to curry favor and exercise influence to protect their illegal activities, and potential violations of ethics rules related to elected officials.

Can the witness please state her name and spell her last name for the record?

Ms. Bondi. Sure. Pamela Bondi, B-o-n-d-i.

Mr. Emmer. Thank you. My name is Jack Emmer, and I am chief counsel for investigations for Chairman James Comer.

Under the Committee on Oversight and Government Reform's rules, you are allowed to have counsel present to advise you during this interview. Do you have counsel representing you in a personal capacity present with you today?

Ms. Bondi. Only as my -- when I was Attorney General for the United States, and that's Harmeet Dhillon.

Mr. Emmer. Will counsel please identify themselves for the record?

Ms. Dhillon. Yes. I'm Harmeet Dhillon, the Assistant Attorney General for Civil Rights. And I'm here on behalf of the United States Department of Justice, as the former Attorney General was subpoenaed and is appearing here voluntarily in her official capacity only. And, accordingly, I am here to represent the interests of the DOJ and its interest in effectuating the Transparency Act, and solely to be here on behalf of the DOJ.

I am also accompanied by one of my colleagues, and he will state his appearance as well.

Mr. Guynn. I'm Jonathan Guynn, Deputy Assistant Attorney General for Civil Division. And I'm here appearing in the same capacity as Ms. Dhillon.

Mr. Emmer. We have Members of Congress here with us today. For the record, starting with the Chairman, can Members please identify themselves for the record?

Chairman Comer. James Comer, Chairman, Kentucky.

Mr. Garcia. Ranking Member Robert Garcia, Democrat.

Mr. Subramanyam. Congressman Suhas Subramanyam, Virginia's 10th District.

Ms. Ansari. Yassamin Ansari, Arizona's Third Congressional District.

Mr. Walkinshaw. James Walkinshaw, Virginia's 11th.

Mr. Frost. Maxwell Frost, Florida's 10th.

Ms. Stansbury. Melanie Stansbury, New Mexico.

Mr. Emmer. For the record, starting with the majority staff, can the additional staff members please introduce themselves with their name, title, and affiliation?

Mr. Grant. Billy Grant, deputy chief counsel for investigations, Chairman Comer.

Mr. Ashworth. Daniel Ashworth, general counsel for Chairman James Comer.

Mr. Giachetti. Ryan Giachetti, chief counsel for Chairman Comer.

Ms. Tolan. Ellison Tolan, counsel for Chairman Comer.

Ms. Feyerabend. Emily Feyerabend, counsel for Chairman Comer.

Ms. Brignac. Brittany Brignac, senior counsel for Chairman Comer.

Mr. Soto. Melvin Soto, videographer for Chairman Comer.

Ms. Collins. Jessica Collins, communications director for Chairman Comer.

Ms. Cogar. Mallory Cogar, director of operations and chief clerk, Chairman Comer.

Mr. Hacker. Austin Hacker, deputy communications director for Chairman Comer.

Ms. Vinyard. Ashlee Vinyard, deputy staff director for Chairman Comer.

Mr. Marin. Mark Marin, staff director, Chairman Comer.

Ms. Baker. Stacy Baker, director of technology, Chairman Comer.

[redacted], chief counsel for Ranking Member Garcia.

[redacted], research analyst for Ranking Member Garcia.

[redacted], research assistant, Ranking Member Garcia.

[redacted], senior counsel, Ranking Member Garcia.

[redacted], communications director, Ranking Member Garcia.

[redacted], deputy staff director, Ranking Member Garcia.

[redacted], fellow, Ranking Member Garcia.

[redacted], senior counsel, Ranking Member Garcia.

[redacted], intern, Ranking Member Garcia.

[redacted], intern, Ranking Member Garcia.

[redacted], director of oversight and policy, Ranking Member Garcia.

[redacted], deputy chief counsel for Ranking Member Garcia.

[redacted], press secretary for Ranking Member Garcia.

[redacted], senior advisor for Ranking Member Garcia.

Mr. Emmer. Thank you all.

Attorney General Bondi, before we begin, I would like to go over the ground rules for this transcribed interview.

The questioning will proceed in rounds. The majority will ask questions for up to an hour, and then the minority will have an opportunity to ask questions for an hour if they choose.

To the extent Members have questions for the witness, they will be propounded during their side's respective rounds.

The clock will stop if you need to confer with counsel, your counsel is speaking, and when Members or staff are speaking during the opposing side's rounds of questions.

We will alternate back and forth until there are no more questions.

Do you understand?

Ms. Bondi. Yes.

Mr. Emmer. There is a court reporter taking down everything I say and everything you say to make a written record of the interview.

For the record to be clear, please wait until the staffer questioning you finishes each question before you begin your answer, and the staffer will wait until you finish your response before proceeding to the next question.

Further, to ensure the court reporter can properly record this transcribed interview, please speak clearly, concisely, and slowly.

Also, the court reporter cannot record nonverbal answers, such as nodding or shaking your head, so it is important that you answer each question with an audible, verbal answer.

Do you understand?

Ms. Bondi. Yes.

Mr. Emmer. Exhibits may be entered into the record. Majority exhibits will be identified numerically. Minority exhibits will be identified alphabetically.

We want you to answer our questions in the most complete and truthful manner possible, so we will take our time. If you have any questions or do not fully understand the question, please let us know. We will attempt to clarify, add context to, or rephrase our questions.

If we ask about specific conversations or events in the past and you are unable to recall the exact words or details, you should testify to the substance of those conversations or events to the best of your recollection. If you recall only a part of a conversation or event, you should give us your best recollection of those events or parts of conversations that you do recall.

Do you understand?

Ms. Bondi. Yes.

Mr. Emmer. Although you are here voluntarily, you are required by law, pursuant to Title 18

of the United States Code, section 1001, to answer questions from Congress truthfully. This also applies to questions posed by congressional staff in this interview.

Do you understand?

Ms. <u>Bondi.</u> Yes.

Mr. <u>Emmer.</u> If at any time you knowingly make false statements, you could be subject to criminal prosecution. Do you understand?

Ms. <u>Bondi.</u> Yes.

Mr. <u>Emmer.</u> This includes both knowingly providing false testimony but also stating you do not recall or remember something when, in fact, you do. Do you understand?

Ms. <u>Bondi.</u> Yes.

Mr. <u>Emmer.</u> Furthermore, you cannot tell half-truths or exclude information necessary to make statements accurate. You are required to provide all information that would make your response truthful. A deliberate failure to disclose information can constitute a false statement.

Do you understand?

Ms. <u>Bondi.</u> Yes.

Mr. <u>Emmer.</u> Is there any reason you are unable to provide truthful testimony in today's interview?

Ms. <u>Bondi.</u> No.

Mr. <u>Emmer.</u> Please note that if you wish to assert a privilege over any statement today, that assertion must comply with the rules of the Committee on Oversight and Government Reform.

Pursuant to that, Committee rule 16(c)(1) states, "For the Chair to consider assertions of privilege over testimony or statements, witnesses or entities must clearly state the specific privilege being asserted and the reason for the assertion on or before the scheduled date of testimony or appearance."

Do you understand?

Ms. Bondi. Yes.

Mr. Emmer. Ordinarily, we take a 5-minute break at the end of each hour of questioning, but if you need a longer break or a break before that, please let us know, and we will be happy to accommodate.

However, to the extent that there is a pending question, we would ask that you finish answering the question before we take a break.

Do you understand?

Ms. Bondi. Yes.

Mr. Emmer. I would like to remind everyone here today that the taking of still photography and the recording of video of any part of today's proceeding is prohibited.

Attorney General Bondi, do you have any other questions before we begin?

Ms. Bondi. No.

Mr. Emmer. Do you have an opening statement that you will be reading into the record?

Ms. Bondi. Yes, please.

Mr. Emmer. You may proceed.

Ms. Bondi. Good morning.

Before we start today, I want to reiterate what I have said many times regarding the Department's handling during my tenure as Attorney General of the voluminous materials that are now commonly known as the "Epstein files": I am proud of the Department's record and commitment to transparency under my leadership.

We demonstrated an unprecedented commitment to transparency in the Department's search for, collection, and review of the Epstein files, producing nearly 3 million pages of material, including thousands of videos and hundreds of thousands of images.

These investigations span four administrations, dating back to the Bush administration, and have gone on through the Obama administration, the first Trump administration, the Biden

administration. The only time Federal prosecutors were permitted to launch investigations against Epstein and Maxwell was when President Trump occupied the White House. Only under President Trump were 3 million Epstein-related documents released.

This was an enormously complicated and labor-intensive process. To the best of my knowledge, the Department produced everything required under the Epstein Files Transparency Act. Our diligent and good-faith effort to collect materials ensured that all potentially responsive documents that could be reasonably located would see the light of day. All Department components were directed to submit any potential responsive records, resulting in a comprehensive review of millions of documents.

As the head of a large department with broad responsibilities, I did not lead every aspect of this effort nor conduct that document review myself. I delegated that oversight over this process to Deputy Attorney General Todd Blanche. The team of professionals who reviewed all of the materials that we collected assured me, the only materials that were withheld were either non-responsive, privileged, or duplicative.

Although not required by the act, the Department has given Congress access to unredacted duplicative materials in the Reading Room in an effort at maximum transparency.

There were redaction errors, but since day one of this process, the Department has been committed to accountability and transparency. Our stance has always been that the Department stands ready to review any potential evidence of criminal activity related to Epstein and his associates and would pursue the appropriate investigative or prosecutorial actions wherever the facts and law warrant.

I would like to repeat what I shared before the House Judiciary Committee in February.

I have spent my entire career fighting for victims, and I will continue to do so. I am deeply sorry for what any victim has been through, especially as a result of that monster. If they have any information to share with law enforcement about anyone who has hurt them or abused them, the

FBI is waiting to hear from them.

The bottom line is, justice and transparency in this matter have been delivered at the direction of President Trump and his administration.

Thank you.

Mr. Emmer. Thank you.

We've had another Member of Congress join. Can he please identify himself for the record?

Mr. Min. Congressman Dave Min.

Mr. Emmer. Thank you.

The time reads 9:18, and the majority's time will begin now.

EXAMINATION

BY MR. EMMER:

Q Attorney General Bondi, I just want to thank you again for participating in today's proceeding and your years of public service, both for our country and the State of Florida.

I want to recognize that you are currently undergoing cancer treatment, and I will say that we will do our best to ask all of the questions in the most efficient and timely way possible.

So let's start by briefly discussing your education and experience. I understand you've had a long career, but can you summarize it for the record?

A Sure.

I went to University of Florida, undergraduate. I graduated from Stetson College of Law.

I was a prosecutor in Hillsborough County, Florida, for 18 years, prosecuting almost every kind of crime imaginable, from first-degree murders all the way to domestic violence. I was felony bureau chief there as well.

I also then became attorney general for the State of Florida, where I served for 8 years.

And then for the past year, I was Attorney General of the United States.

Q So let's talk about your time as Attorney General. You started in February 2025. Is

that correct?

A Yes.

Q And as it relates to the Jeffrey Epstein matter, when you assumed office, what was DOJ doing?

A When I assumed -- regarding Epstein?

Q Yes.

A When I assumed office, nothing, to my knowledge. And nothing had been released, and I don't know if it had been requested to be released.

Q Did you direct the Department to conduct a review of the Epstein and Maxwell investigation?

A Immediately. I mean, within weeks of assuming office.

Q Can you describe for the Committee what that looked like?

A Yes. I spoke to the FBI, and we asked them to turn over all documents in their possession related to Epstein.

Q And as far as turning over those documents, what was the DOJ going to do with those documents?

A Provide transparency and release them to the public -- and to Congress, of course.

Q And I believe you said that started immediately upon you assuming office. Is that right?

A I believe within weeks.

Q And as far as providing transparency, was there a specific timeline that you provided the FBI to follow as far as releasing these documents?

A Yeah, it was prior to Director Patel becoming confirmed, I believe, when this process started, and we received from the FBI approximately 300 documents that were released.

Q And, to be clear, you directed this internal review of the Epstein matter. There was no

other review that was occurring prior to you assuming office?

A Not to my knowledge.

Q Also for the record, the Epstein and Maxwell investigation was considered closed upon you taking office?

A To my knowledge, yes.

Q When were you first briefed on the Epstein and Maxwell matter?

A Initially, after we received, again, approximately 300 documents, and those were released, and we believed that that was the tip of the iceberg, that that -- the FBI had not turned over all of the documents. Director Patel eventually was confirmed, and I sent him a letter asking him to look into that and to give us any other documents in the FBI's possession anywhere in the country.

And, ultimately, we received much more.

Q And, for the record, who would've been briefing you on the Epstein matter as far as when you took office?

A Todd Blanche.

Q What specific concerns did the Department have as it related to Epstein and Maxwell when you assumed office?

A That nothing had been released. And, again, to my knowledge, no one that spanned the Biden administration or previously had sought to release any of this information. And I believe it was within weeks of me assuming office that we asked for and demanded all of these documents.

Q Do you recall whether there were concerns that there were potentially unindicted co-conspirators?

A Always, yes.

Q So, at the time that you directed this review, was there any sort of plan of what that review would consist of?

A Well, initially, again, we only received several hundred documents, and they were released upon redaction by the FBI. Then, once Director Patel assumed his position, we found many more documents. And, as we received those, those were reviewed and released.

And we have always made it very clear that if anyone is the victim of Jeffrey Epstein -- and I count Ghislaine Maxwell in there too. She is just as evil as Jeffrey Epstein was -- that they come forward to us, to the FBI -- many of these victims are represented by lawyers -- and talk to us.

Q Upon taking office, did any victims or victims' attorneys reach out to the Department?

A Yes.

Q How many?

A I can't recall how many. I know multiple -- there were multiple victims, and many of which, I believe the majority, are represented by attorneys.

Q Did you meet with them personally, or would that have been something that Todd Blanche would've done?

A No. I spoke to one attorney. I cannot recall her name. She was a former prosecutor. And she seemed to deeply care about these victims, of course. And I spoke to her, and I believe I referred her to the FBI. You know, when a victim is represented, you go through their attorney. And I spoke to her directly.

And then I know many of the lawyers in my office spoke to other attorneys. And I believe the FBI spoke to multiple victims as well, but I would direct that to Deputy Attorney General, now-Acting Attorney General Blanche and also Director Patel.

Q You would've been briefed on these meetings with the victims and their attorneys. Is that right?

A I have not been after the fact.

Q Okay. Do you have any idea what the victims and their attorneys were concerned about during this time period of February and spring of 2025?

A Only the attorney that I spoke to, and she was just concerned about being heard and these victims being heard.

Q Uh-huh. Were they interested in files being released at that time?

A I don't recall.

Q Okay.

You mentioned Director Patel and the FBI. Were there any other agencies that were involved in the review of documents during this period?

A The FBI, DOJ -- multiple components at DOJ, my National Security Division at the time. And then, ultimately, when we received multiple documents, we used attorneys from around the country, including Florida and New York.

Q And I know I asked you about potential co-conspirators earlier, but when you were reviewing these initial documents in the spring of 2025, were there ever any plans to pursue investigations into potential co-conspirators?

A I'm sorry. What month did you say?

Q Upon assuming office and during the spring of 2025.

A If there were co-conspirators or evidence that anyone committed a crime that could be proven in a courtroom, it's any prosecutor's duty to pursue that.

Q Attorney General Bondi, on February 21st of 2025, just over 2 weeks after you were sworn in as AG, you responded to a question in an interview about a purported list of Epstein's clients by saying, "It's sitting on my desk right now."

Is that an accurate characterization of your statements during that interview?

A If you listen to the entire interview, I was referring to the file. And I also included -- I don't have a copy of the transcript of that interview, but I kept going and said -- the question was, I believe, a list of clients, and I said, "It's sitting on my desk to review, along with JFK files, MLK files." I wasn't -- I meant the files, to review. I had not reviewed them at that time. And I made that

clear.

Q And I'm assuming you did ultimately review those files. Is that right?

A Yes, along with multiple attorneys in my office.

Q And were those files the ones that you referred to previously that the FBI produced to DOJ and --

A Yes.

Q -- upon assuming office?

A Yes.

Q Thank you.

A And I think you clarified something for me. It was within 2 weeks of assuming office that I received those. So, really, within just a week or more, I had requested all the Epstein documents.

Q And during this period upon assuming office, you were interested in whether or not there was a client list of Epstein?

A Yes.

Q And you directed the Department to review whether there was a client list?

A Yes.

Q And those documents that you refer to that were sitting on your desk, were those ultimately produced publicly?

A Yes.

Q A week later, on February 27, 2025, a group of select individuals left the White House holding white binders that contained the DOJ seal and were labeled "The Epstein Files: Phase 1."

Do you recall this occurring?

A Yes. And that would include the approximately -- I'm saying "approximate" -- 300 pages, and I believe that included flight logs and other things. But those were the initial documents

we received.

Q Were you involved in providing these documents to these individuals?

A Yes.

Q And ultimately whose decision was it to release these documents?

A Ultimately mine, to release as much as we could while protecting victims' identities.

Q How were the recipients of this phase-one release selected?

A We were seeing them that day; they were in the White House. And we handed them the binders. And then it was released to the general public as well.

Q Were these recipients of the phase-one release also provided an opportunity to review the documents at DOJ headquarters?

A I don't believe so.

Q So the label "Epstein Files: Phase 1" -- at that point, was it presumed that there would be a phase two?

A Yes, because I didn't believe there were only 300, approximately, pages of Epstein documents. And I had sent the FBI a letter demanding everything they had -- and that meant around this country -- on Epstein, and that was all we received.

Q And, to be clear, was there any other release of documents prior to this Committee's investigation or the Epstein Files Transparency Act?

A Yes, multiple ones. Multiple ones.

Q At this time, I'd like to introduce what will be marked as majority exhibit 1.

[Bondi Majority Exhibit No. 1
was marked for identification.]

BY MR. EMMER:

Q And I'll give you a moment to review.

Attorney General Bondi, do you recognize this letter?

A Yes. This is the letter that I referred to earlier, dated February 27th, 2025, that I sent to Director Patel.

And, to clarify, I had said we released approximately 300, maybe, earlier, documents. There were about 200 pages, according to the letter I sent him.

Q So, in the letter, you claimed that you learned from a source that the FBI field office in New York was withholding thousands of pages of Epstein documents despite the FBI's assurances that all relevant documents had been delivered to the Department of Justice already. In this letter, you say that you only received about 200 pages and requested an investigation into the document shortfall.

Is that an accurate summary of what occurred?

A Yes.

Q Why do you think that this field office was withholding documents?

A I asked Director Patel to look into that.

Q Who told -- or -- who told you or brought these concerns to you that they may have been withholding documents?

A I believe it was one of the attorneys in my office who said -- I believe it was a career prosecutor -- who said, "I think there are more documents, and they're in New York." I don't believe it was an FBI agent.

And then that's when I contacted Director Patel --

Q Uh-huh.

A -- who, by that time, had assumed office.

Q You also stated in the letter that the FBI failed to disclose the existence of these documents after your repeated requests to turn over all documents. Is that correct?

A That is correct.

And I said, "By 8:00 a.m. tomorrow, the FBI will deliver the full and complete Epstein files to

my office, including all records, documents, audio and video recordings, and materials related to Jeffrey Epstein and his clients, regardless of how such information was obtained. There will be no withholdings or limitations to my or your access. The Department of Justice will ensure that any public disclosure of these files will be done in a manner to protect the privacy of victims and in accordance with law, as I have done my entire career as a prosecutor."

And the letter continues.

Q And you already mentioned that you discussed this with Director Patel. Did you also discuss it with Deputy Director Bongino?

A I don't know if Deputy Director Bongino had assumed office at that point.

Q And pursuant to your letter, did Director Patel initiate an investigation into that field office?

A I believe he did.

Q Do you know what the results of that investigation were?

A I don't recall.

Q Given this letter, what other steps did you take to ensure the FBI turned over any and all of the remaining withheld documents?

A I relied on Director Patel and Deputy Attorney General Blanche.

Q So you, yourself, did you ever confirm that the FBI turned over all relevant documents following this incident?

A You would have to ask Director Patel.

Q At this time, I would like to introduce what will be marked as majority exhibit 2.

[Bondi Majority Exhibit No. 2
was marked for identification.]

BY MR. EMMER:

Q Attorney General Bondi, do you recognize this statement?

A Yes.

Q What role did you have in issuing this statement?

A This was -- I did not have a role in issuing this statement. I believe this was done by Deputy Attorney General Blanche in conjunction with the FBI, I believe.

Q And, for the record, this is the July 7, 2025, DOJ and FBI joint statement.

A Yes.

Q The statement said that there was no evidence that Epstein kept a client list of associates whom he blackmailed or conspired with to victimize dozens of women.

Do you know which documents the DOJ and FBI relied on in issuing this statement?

A I do not. You'd have to ask Deputy Attorney General, now-Acting Attorney General Blanche and Director Patel.

Q Prior to this statement being issued, were you briefed on the review's findings that informed this statement?

A Yes.

Q What were you told?

A I don't recall, other than what's in this letter.

Q As far as the conclusions of the letter itself, did you have concerns?

A At that time, no. We relied on the documents that the FBI and DOJ received.

Q And the letter says that there was -- DOJ was not able to locate a client list.

Did DOJ compile a list of individuals, as far as its review, that may have been associated with Epstein and Maxwell?

A Not to my knowledge. They didn't compile a client list, to my knowledge.

Q So, for the record, is it your testimony today that the Department of Justice never had a list of Epstein's clients or associates in its possession?

A Not to my knowledge.

Q The joint statement also said neither the DOJ nor the FBI uncovered evidence that could predicate an investigation against uncharged third parties.

What process did the Department of Justice undergo to determine there was no evidence to investigate any third parties?

A I believe the FBI thoroughly reviewed all the documents in its possession to make that determination. They are the investigative agency.

Q Uh-huh.

During this time when this statement was issued -- you've mentioned that Blanche was heavily involved -- were you ever briefed on individuals of concern related to Epstein or Maxwell?

A I don't recall, other than they were scouring through the documents, and I believe there were multiple videos as well.

Q As far as this initial review, did the Department of Justice conduct any interviews or meetings with any individuals in its efforts to determine whether further investigation was necessary?

A Could you repeat that?

Q As part of its review that informed the July 7th joint statement, did the Department of Justice interview any individuals outside of the DOJ to inform its conclusions?

A I believe the FBI did, but that's a question for Director Patel.

Q On July 24th and July 25th of 2025, Deputy Attorney General Todd Blanche interviewed Ghislaine Maxwell, and the DOJ released the transcript a month later.

Attorney General Bondi, why did the Department of Justice conduct this interview?

A I believe Deputy Attorney General, now-Acting Attorney General Todd Blanche has said on several occasions that Epstein, by that time, was dead and no one had taken -- had made an effort to interview Ghislaine Maxwell to see if she had evidence of co-conspirators and other crimes, and that was why he interviewed her.

Q Are you aware of whether Maxwell reached out to the Department of Justice to request this interview?

A I don't recall how that was initiated.

Q So would it be safe to assume that you had no role in the determination that then-Deputy Attorney General Todd Blanche would perform this interview?

A Oh, I knew Todd Blanche was going to interview her, yes.

Q Uh-huh.

A I believe -- I don't believe who initiated it. If she reached out to us, I believe -- I don't want to speculate, but I believe Deputy Attorney General Blanche, at the time, reached out to them because there was someone, still living, in prison, who had potential information about other co-conspirators and crimes.

Q Were there any concerns at the DOJ about conducting this interview with Ghislaine Maxwell?

A No. Not to my knowledge.

Q And based on Maxwell's testimony to Todd Blanche, did the Department of Justice take any subsequent actions that were informed by this testimony?

A I don't believe so.

Mr. Grant. And do you know why or how it became that then-Deputy Attorney General Blanche would be the one to take the interview of Ms. Maxwell?

Ms. Bondi. He was leading the Epstein matter and the release of everything from the beginning. Deputy Attorney General, now-Acting U.S. Attorney Blanche was.

BY MR. EMMER:

Q Maxwell's attorneys stated publicly that Maxwell had provided the names of 100 different people connected to Jeffrey Epstein in the course of her 2-day interview.

Did the Department of Justice investigate any of the individuals named in Maxwell's

testimony?

A And I believe that entire transcript has been released and that the FBI would have looked into all of that. That was the purpose of taking her statement.

Q As far as the transcript itself and what has been released publicly, how did the Department of Justice determine which individuals would be redacted from the transcript?

A Deputy Attorney General Blanche made that determination based on the law and what privileges would apply.

Q Do you know what types of individuals' names were redacted in the Maxwell transcript?

A I don't recall.

Q Are you aware of whether there were any redaction errors in the transcript?

A I don't recall. Ultimately, of course, there were millions of documents released, so I don't recall regarding the transcript. But if there were, I do believe Deputy Attorney General Blanche, now-Acting AG Blanche, did everything to be sure we had complete transparency under the law.

Q Following this interview, Ghislaine Maxwell was moved by the Bureau of Prisons from a maximum-security prison in Florida to a low-security Federal prison in Texas on August 1st, 2025.

Why was that?

A I read about it in the newspaper, or online, after it happened. I had nothing to do with that. I don't want to speculate, but I believe it was for security reasons. You'd have to ask the Bureau of Prisons that question.

Q Would then-Deputy Attorney General Todd Blanche know the answer to that question?

A He may, and I'm not sure if he'd addressed that publicly. Probably.

But transferring a prisoner is the decision of the Bureau of Prisons.

Q To be clear, and to your knowledge, do you know if her transfer had anything to do with her participating in the interview with Todd Blanche?

A I have no knowledge of that. Again, I found out about it after the transfer when it became public.

Q Attorney General Bondi, do you believe that Ghislaine Maxwell should receive a pardon?

A No. I believe she should die in prison.

Q Why?

A She was a monster, just like Jeffrey Epstein. She recruited these young women to a life of prostitution and abuse. And I often think the women that do that are just as bad, if not worse, than the men, because she participated in it.

Q Thank you.

BY MR. GRANT:

Q On August 22nd, 2025, this Committee issued a subpoena to the Department of Justice for documents pertaining to the Epstein matter. The DOJ subsequently produced approximately 33,000 documents to the Committee.

In this production, the DOJ indicated that multiple responsive records must also be withheld or redacted, as required by applicable law, including certain grand jury materials and documents containing personally identifiable information.

Are you aware, Attorney General Bondi, how the DOJ initially gathered or collected the necessary documents under this Committee's subpoena?

A No. And that task, I believe, was -- the 33,000 pages -- was delegated to Associate Attorney General Stanley Woodward. He handled that batch of releases -- release. Excuse me.

Q And so it would be Mr. Woodward that would know more about the process --

A Yes.

Q -- to determine which documents fell under that subpoena?

A Yes.

Q Were you ever briefed on the documents underneath that subpoena?

A Maybe briefly, after they were released. Our goal was to get as much out publicly that was legally permissible as fast as we could.

Q And would the redaction process for those documents be similar to what the Department of Justice was already doing as far as making sure no personal information was getting out there because it was required by law?

A Yes. And I believe Stanley Woodward was the one, again, who supervised that release.

Q And, in this matter, who at the Department of Justice would've been actually doing those redactions? Staff attorneys? Other attorneys at Main Justice? Someone else?

A I believe it was attorneys, multiple attorneys, at the Department of Justice, even some, again, from the National Security Division.

And, again, ultimately, attorneys from all over the country were pulled in to help, once we received the millions of pages of documents. But, initially, we did have attorneys from within the Department of Justice and the FBI, I believe, working on those redactions.

Q And are you aware of attorneys at the Department of Justice having to undergo any type of training as far as redactions go?

A I believe they did. And that would've been supervised by Todd Blanche.

Q Was there any criteria for which attorneys get selected to do a redactions process that you're aware of?

A I recall we used attorneys from the National Security Division as much as we could, because they have top security clearance, and the goal was to protect the victims' identities.

Q And are you aware of why the DOJ only produced 33,000 documents pursuant to this Committee's subpoena?

A I believe because that was what they had at the time. And we would have to ask Associate Attorney General Stanley Woodward that question.

BY MR. EMMER:

Q Let's talk about the Epstein Files Transparency Act. And, for the record, the EFTA was signed into law November 19th of 2025, requiring you, the Attorney General at the time, to release all documents related to the prosecution of Jeffrey Epstein within 30 days and making them publicly available in a searchable format.

What was your role in carrying out the Epstein Files Transparency Act?

A Todd Blanche supervised that entire process.

To back up for a minute, though, the office did ask that files, prior to the Transparency Act, be unsealed by courts in multiple jurisdictions -- I believe it was SDFL and SDNY -- and those requests were denied. And it was not until the Transparency Act that we were able to receive those documents.

Q So there were existing efforts to release documents prior to the Epstein Files Transparency Act.

A Yes.

Q So what was your response to the Epstein Files Transparency Act being passed?

A We were able to receive many more documents based on the act. We were able to unseal the grand jury -- we made a motion to unseal the grand jury documents in Epstein and Maxwell. And that also included the Epstein, when he died -- excuse me. That also included when Epstein died in prison. It included, I believe, a prison guard case somewhere, Epstein's cases in both jurisdictions, and Maxwell's cases.

Q And you said this effort was directed to Todd Blanche. Is that right?

A Yes.

Q How frequently did you meet with Todd Blanche after the Epstein Files Transparency Act was passed, as it relates to that --

A I spoke with the Deputy Attorney General practically every day about countless issues

around not only the country but the world that we were dealing with. As to details on it, I don't know how -- I don't recall how often.

Q In relation to EFTA and the Department's obligations thereunder, what concerns was -- or, did Todd Blanche express concerns as far as releasing documents? What was he saying?

Ms. Dhillon. I'm just going to point out that you can answer that to the extent that it doesn't reveal protected communications.

Ms. Bondi. I can say I believe everyone was concerned about protecting victims' identities, given the 6 million pages of documents that was received and a 30-day timeline to comply with that process.

BY MR. EMMER:

Q And we're going to talk in more detail about what was produced.

But, to start, how did the Department of Justice initially gather or collect the necessary documents or materials that complied with the Epstein Files Transparency Act?

A Can you repeat that?

Q How did the Department of Justice initially gather or collect the necessary documents or materials that complied with the Epstein Files Transparency Act?

A Well, as I stated earlier, we -- the Department made motions to unseal things that were previously withheld from us by the courts and requested everything we possibly could, which is why there was an over-collection in documents, as well, from all the jurisdictions. And, again, that included the death of Epstein, Ghislaine Maxwell's case, both of -- all of Epstein's cases in the multiple jurisdictions.

Q To the best of your knowledge, what was the process to determine which documents or materials fell under the Epstein Files Transparency Act?

A I believe we collected everything possibly out there related to Epstein, which is why there was such an over-collection as well.

Q And, again, then-Deputy Attorney General Todd Blanche was overseeing these efforts. Is that right?

A Yes. Todd Blanche oversaw the entire investigation, and he has made multiple statements and done multiple interviews regarding that.

Q So let's talk about the 30-day timeline. Was the Department of Justice able to produce all documents within the 30 days?

A No. And that is when I became more involved. Because we had over 500 attorneys, I believe, working around the clock to do the best we could, in good faith, to release as many documents as we could within 30 days while protecting the identity of victims. And I do recall very vividly that these lawyers were working over Christmas, New Year's, holidays to get that done, some late into the night -- I mean, 1:00, 2:00 a.m.

Q And you mentioned 500 attorneys.

A Plus.

Q Where did they come from?

A They came from our National Security Division. They came from, I believe, SDNY, the Northern District of New York, and Florida. Todd Blanche recruited attorneys within our office to come in and complete this Herculean task of millions of documents within 30 days to the best that we could to protect victims.

Q I would presume that the 500 attorneys had other roles and responsibilities that they were to handle at the Department during this period?

A They absolutely did, yes.

Q Were there concerns about diverting resources?

A Yes.

And, to clarify, some may have taken this on full-time, but I believe many of them had other roles going on at the same time as well.

Mr. Emmer. We've had another Member join us. Can he please identify himself for the record?

Mr. Khanna. Ro Khanna, California 17.

BY MR. EMMER:

Q I know that you've already mentioned how many documents were produced, but, again, for the record, how many total documents or materials did the Department of Justice produce to the public pursuant to the Epstein Files Transparency Act?

A Approximately 3 million.

Q And there has been public statements, I believe, that then-Deputy Attorney General Blanche had said that, at one point, there were 6 million total potentially responsive materials. Is that right?

A He did. And he has clarified that multiple times, I believe, publicly, indicating that a lot of -- much of it was duplicative because it was coming from two districts and some was privileged. And, also, he stated that some of the material had absolutely nothing to do with Epstein, Jeffrey Epstein. It was over-collection, in an effort to ensure radical transparency for the country.

Q So, to be clear, there has been a lot said and accusations that the Department didn't produce everything. Attorney General Bondi, are there any documents remaining in possession of the Department of Justice that are required to be released pursuant to the Epstein Files Transparency Act?

A To my knowledge, they've all been released. To my knowledge.

Q Why do people keep asking for the files to be released then?

A The unredacted versions are also available to Members of Congress, including the duplicative material, so -- and I believe that's still available -- so people can -- so Congress can go in and see for themselves the 6 million pages versus why 3 million was released, and much of it was duplicative or privileged or completely unrelated to Jeffrey Epstein.

Q At this time, I would like to introduce what will be marked as majority exhibit 3. And this is a letter that was sent from the Department of Justice to Senators and Members of Congress on January 30th.

[Bondi Majority Exhibit No. 3
was marked for identification.]

Mr. Emmer. I would also like to introduce what will be marked as majority exhibit 4. This is also a letter that was sent on February 14th of 2026.

[Bondi Majority Exhibit No. 4
was marked for identification.]

BY MR. EMMER:

Q And I will give you a moment to review.

Attorney General Bondi, you've had a chance to review the documents. These are the notifications that you provided Congress pursuant to the Epstein Files Transparency Act?

A Yes.

Q And, again, you touched on it previously, but there were certain categories of documents that were not produced. Isn't that right?

A Yes.

Q And, again, you -- I believe one class was duplicative documents. And for the record -- I know you've been an attorney for many years, but can you just explain again what qualifies as a duplicative document?

A Sure. The same document being released twice.

And that occurred, I believe, because there were documents in multiple districts within the country -- specifically, I believe, the Southern District of Florida and the Southern District of New York.

Q And understanding that then-Deputy Attorney General Todd Blanche was overseeing

these efforts, did he ever brief you on how many documents were considered to be duplicative?
A Not specifically, but I believe it was approximately 3 million, I believe -- oh, duplicative. No, I don't -- I'm sorry -- I don't recall how many were duplicative.
Q And there were certain documents that were privileged.
A Yes.
Q Can you elaborate more on why those cannot be produced?
A I can give you an example, which would be, a prosecution memo is privileged.
Q And who made the determination whether a document was considered to be privileged?
A Todd Blanche, while following the law.

[10:05 a.m.]

BY MR. EMMER:

Q And Todd Blanche never approached you about any specific documents as it relates to privilege?

A Probably. I don't recall specifically, but we probably talked about it. I talked to him every day about multiple issues around the country and the world.

Q And I know you touched on this previously, but the Department of Justice, according to these letters, said that there were certain files that were withheld because they are not a part of the case file for Epstein or Maxwell and were completely unrelated to these cases. Is that right?

A Yes.

Q Can you give us an example of what that would -- what would've been captured by that?

A I believe an example that Todd Blanche used was there was someone else in south Florida with the name of Epstein, an entire case that had nothing to do with Jeffrey Epstein. That would be an example of it.

Q And, for the record, recognizing that you had to conduct a search and it produced millions of documents, if those documents were determined to have nothing to do with the Epstein or Maxwell cases, why were they originally included in this search that the Department of Justice conducted?

A We wanted to have radical transparency and find everything that was related to Jeffrey Epstein, and that's why the search was overbroad.

Q Thank you. I want to talk about the redactions that were in the files. What was the Department of Justice's redaction process for documents released under the Epstein Files Transparency Act?

A I believe that is listed in one of Todd Blanche's memos, and he was in charge of the process and the entire release of the Epstein files.

Q And, during this process, when you were preparing documents to be produced, were there concerns about what should or should not be redacted?

A I believe so.

Q Did you have concerns?

A Yes. I had grave concerns about victims' names being released because of the volume of documents and the timeframe in which those documents had to be released, and I believe most people in my office shared those same concerns.

Q And were there guidelines in place for DOJ employees on how to make redactions?

A I believe Deputy Attorney General Blanche, now Acting Attorney General Blanche, laid out those guidelines for the reviewers, the attorneys who reviewed the material. And I believe some of it -- the protocol is listed in these memos as well.

Q Are you aware of whether the DOJ employees tasked with conducting redactions, whether they had to undergo any kind of training?

A I don't recall. I believe so. I'm not certain.

Q And I recognize that you may have briefly touched on this, but were there any criteria for the attorneys that were selected to make redactions?

A Criteria about the attorneys themselves?

Q As far as the 500 attorneys that were selected to contribute to this effort.

A Yeah. As I recall, we used many from our National Security Division because they are highly qualified and also deal with protecting victims and confidential information on a routine basis, but as well as prosecutors from multiple jurisdictions. But how they were specifically chosen, I'm not sure.

Q Attorney General Bondi, did you, yourself, ever redact documents produced under the Epstein Files Transparency Act?

A No.

Q Were you consulted as to whether or not something should be redacted?
A I don't believe so.
Mr. Emmer. I would now like to introduce what will be marked majority exhibit 5, and I will give you a moment to review.
[Bondi Majority Exhibit No. 5
was marked for identification.]
BY MR. EMMER:
Q This is a Department of Justice memorandum dated January 4, 2026, entitled "Attorney Review Protocol for Epstein Files?"
A Yes. And this is from the Deputy Attorney General's Office, yes.
Q Attorney General Bondi, do you recognize this document?
A Yes. I have not read it in its entirety.
Q Is this the document that you were referring to when I asked you whether there was a process for DOJ employees to redact?
A Yes. You asked about training, yes, and this is a very detailed memo as to what specifically, under the law, can be released and what should be redacted.
Q According to this document, and specifically on the top of page 6, there is a highly confidential list of victim names that must be redacted. Are you aware of a list of victim names that needed to be redacted?
A Yes, not specifically what victims, but I believe that list kept growing as well.
Q And I believe that you mentioned this before, this was one of your main concerns as part of producing the documents under the EFTA. Is that right?
A Yes.
Q Were any victims or their attorneys contacted for the creation of this list?
A I believe so.

Q Was the Department of Justice contacted by victims or their attorneys to create this list?

A I believe so. I also believe the list was ongoing, and while the redactions were being done, I recall we would receive more victims' names. Therefore, the attorneys doing the redactions would have to go back and search for the additional names as well.

Q What information would have been used to inform the list of victim names for redactions?

A I don't recall.

Q Is it safe to assume that Todd Blanche would've been the individual who would've approved --

A Yes.

Q -- this list?

A Yes.

Q Understanding the time constraints related to 30 days of redacting millions of pages of documents, it seems that there were still some redaction mistakes.

A Yes.

Q Is that correct? And these redaction mistakes were both underinclusive and overinclusive. How did that happen?

A I believe, given the volume of documents and, again, the intense, short timeframe in which hundreds of lawyers were working around the clock even on holidays to get these documents out, there were mistakes. I believe Todd Blanche said it was about a 1 percent error rate. But I would say we all believed if one victim's name is inadvertently released, that's a failure.

Q If the Department was made aware of a mistake, how did it respond?

A By correcting that mistake as fast as we could.

Q And, again, would that have been -- fallen to then-Deputy Attorney General Todd Blanche?

A Yes.
Q Did he brief you on certain mistakes?
A Not specifically, just that I recall when a victim's name -- everyone was upset when a victim's name got released inadvertently.
Q As far as the victims themselves and those that may have been inadvertently unredacted in the files, did any reach out to you directly?
A I don't believe so. And I believe I saw online once a victim's name, and that she said she had -- her name had been released, and that was really the extent of my involvement on that. I called Todd right away and said, "A victim is saying her name was released, and it shouldn't have been." But it would've been something that I saw online.
Q Did the Department of Justice have any avenues for individuals whose names may have been unredacted in the files to reach out to the Department and remedy the situation?
A I don't recall that process -- how that process worked, and that could've also been done with the FBI.
Q Was there a team in charge of checking for and correcting any errors made in the release of the files?
A Yes, done at the direction of Todd Blanche.
Q Do you have an idea of how many corrections were made?
A I don't.
Q Before you left your position as Attorney General, were there attorneys or other DOJ employees still working to rectify redaction errors in the files?
A I believe so, especially if anyone reached out to us saying there was an error, including Members of Congress, who have the ability to look at the unredacted versions. I believe they still have that ability.
Mr. Emmer. We are at the end of the majority's hour, so we will go off the record.

[Recess.]

[redacted]. We can go back on the record.

Before we get started, I understand the witness has a clarification that she would like to make.

Ms. Bondi. Yes. I believe one of the questions that was posed to me pertaining to Ghislaine Maxwell being transferred from a prison was phrased -- the question was phrased that she was transferred from a maximum-security prison to a low-security prison, and I don't believe she was ever in a maximum-security prison. I believe it was a lower facility prison that she was initially in, and when she was transferred, it was to a comparable prison. But, as my answer was, that would have to be for Bureau of Prisons to answer that.

[redacted]. Thank you for the clarification. We appreciate it. With that, we can start the hour for our round of questioning.

EXAMINATION

[redacted]:

Q Good morning, Ms. Bondi. I'll be doing most of the questioning for the minority today. Before we get started, I want to say that we are aware of your recent health diagnosis. We wish you a full and speedy recovery.

A Thank you.

Q If you need a break at any point today, please just let us know. I also want to thank you for your long career in public service.

A Thank you.

Q As you know, our conversation today will focus on the DOJ's investigations of Jeffrey Epstein and Ghislaine Maxwell and on DOJ's compliance with this Committee's subpoena and the Epstein Files Transparency Act.

Just a few things before we get started. First, I will note for the record that today's

interview is not being videotaped. Committee Democrats strongly disagree with that decision. We believe that Jeffrey Epstein survivors and the American people deserve to watch today's interview and reach their own conclusions, and the lack of video here today is another failure in transparency and accountability for the survivors of Jeffrey Epstein's crimes.

[redacted]. To that end, I will introduce as minority exhibit A, this letter from a group of Jeffrey Epstein's survivors to Chairman Comer, dated May 20th, requesting that this interview be videotaped.

[Bondi Minority Exhibit A
was marked for identification.]

[redacted]:

Q Ms. Bondi, I know you may have discussed today's questions in other forums. Our goal here is to create one single record that addresses as many of these issues as possible. We appreciate your patience, and we'll try to have you repeat yourself as little as possible.

To the extent that any of my questions or your answers involve survivor names or other survivor identifying information, we would ask that the majority redacts that information prior to releasing the transcript publicly. And with that, we can get started.

I just had sort of a preliminary global question. We will ask everything today to the best of your recollection, but the impression I got from the last round was that in a general sense on a day-to-day basis, then-Deputy Attorney General Blanche, now Acting Attorney General Blanche, had a more direct, day-to-day supervisory role over the Epstein files and related matters. Would you tend to agree with that?

A Yes. He supervised the Epstein files release.

Q And, with respect to Epstein files related matters that link directly to the FBI, is it correct that Director Patel would have a more intimate, detailed understanding of that than you probably would?

A Yes.
Q And I think, if I heard correctly, it sounded like, with respect to this Committee's subpoena, a DOJ official named Stanley Woodward was the person to whom that topic was generally delegated. Is that right?
A On a portion of the documents being released. I believe it was when 33,000 documents were released, Stanley Woodward supervised that release.
Q Okay. I can ask later when we get to it, but is there a different official who has sort of been the person in charge of this Committee's subpoena since then other than Mr. Woodward?
A No. Todd Blanche, I believe.
Q Okay. To the extent that this is the case for other topics we discuss today, where you yourself are not sure but there's somebody else that either was managing it or in charge of it, if you could just let us know when that's the case. That's very helpful for us, and we'd appreciate it.
Ms. Bondi, have you ever met Jeffrey Epstein?
A Not to my knowledge.
Q Is there any uncertainty on your part about whether you may have without knowing?
A I was Attorney General for the State of Florida for 8 years and probably met thousands and thousands of individuals at events, but to my knowledge, I have never met him.
Q Have you ever met Ghislaine Maxwell?
A To my knowledge, no. Same answer.
Q I'd like to ask about some potential investigative leads linked to the Epstein files that DOJ has released. During your tenure at DOJ, were you aware of any open investigations into any individual or entity related to participation in Mr. Epstein's crimes?
A At one point, we asked Jay Clayton in the Southern District of New York to open an investigation, and I don't know whether that's still open or not.
Q What was the extent of your knowledge of the status of that investigation as of your last

day as Attorney General?

A I don't recall my last day, what was the status of it.

Q Was it open as far as you knew?

A I don't recall.

Q Who would be most likely to know that one? Would that be Mr. Clayton?

A Mr. Clayton. And we very publicly asked him to look into any other crimes committed as a result of the Epstein files. I don't know the status of that.

Q During your tenure as Attorney General, did DOJ ever contact any Epstein survivors to follow up on any investigative leads contained in the Epstein files?

A That would be a question for Director Patel and deputy director -- excuse me, Deputy Attorney General at the time, now Acting Attorney General Todd Blanche.

Q To your knowledge, did the Department of Justice ever investigate Steve Tisch for any potential crimes related to Jeffrey Epstein?

A To my knowledge -- I don't know.

Q To your knowledge, did DOJ ever investigate Jes Staley for any alleged crimes related to Jeffrey Epstein?

A I don't know.

Q To your knowledge, has DOJ questioned Secretary Howard Lutnick, Secretary Robert F. Kennedy, Jr., former Navy Secretary John Phelan, or any other administration official about their ties to Jeffrey Epstein?

A I don't recall. That would be a question for Deputy Attorney General, now acting U.S. attorney -- excuse me, Acting Attorney General Todd Blanche.

Q I'm just going to call him Mr. Blanche today. It's no disrespect; I just don't want to get tangled up with all the different titles.

To your understanding, or I should say, do you have any understanding of DOJ's decision to

investigate or not investigate Les Wexner as a coconspirator of Jeffrey Epstein?

A Not to my knowledge. That would be a question for the FBI.

Q Is Director Patel a reasonable starting place for that type of question?

A Yes.

Q In the 2019 Epstein SDNY case, FBI officials identified ten alleged coconspirators to interview in connection with Mr. Epstein's crimes.

[redacted]. There's an email reflecting that fact, which I will introduce now as minority exhibit B.

[Bondi Minority Exhibit B
was marked for identification.]

[redacted]:

Q And I'll give you a moment to look it over.

A What was the date of that?

Q I'll give you a copy, but the date is July 7th of 2019.

Ms. Dhillon. Look at the document, but I'll make an objection.

[redacted]. To your knowledge, who are these ten individuals?

Ms. Dhillon. And I'm going to object to this question. It's beyond the scope of the witness' voluntary interview here today, which is concerning the things that she did or was responsible for during her tenure as Attorney General.

[redacted]. Well, this goes directly to the Epstein investigation, and I think the 2019 investigation was also discussed in the previous round. So I'd be hard pressed to understand the nature of that objection.

Ms. Dhillon. I don't know what to do to help you understand it, but it is my objection.

[redacted]. If you could just use the microphone so folks can hear, and I think the button there.

Ms. Dhillon. Yeah. I understand your question, and it's beyond the scope.

[redacted]. Would it be your view that the 2019 Epstein investigation in its totality is beyond the scope of today's conversation?

Ms. Dhillon. The scope of today's transcribed interview is what the former Attorney General sitting next to me did regarding the Epstein transparency files and related matters during her tenure, and that's the scope of it.

[redacted]. So, just sort of in a yes-or-no way, would it be your understanding that, for example, the 2019 Epstein investigation in its totality would be outside the scope of today's conversation?

Ms. Dhillon. Yes.

[redacted]. Okay. Would it be your understanding that any Epstein-related fact or question that does not live inside the witness' date range as Attorney General would be outside the scope of today's conversation?

Ms. Dhillon. Generally, yes, unless she has personal knowledge that comes from that time, i.e., postdates that time period.

[redacted]. Could you -- because we've had some confusion about this -- just articulate for us and for the record, the link between that objection and the agency's interest? Because our understanding is obviously you're not here as personal counsel. So I would expect to hear something like that from the witness, but why is it coming from you?

Ms. Dhillon. Because we want clear testimony coming from the Department of Justice concerning what -- any witness from the Department of Justice, and that is the basis on which this witness is here, concerning her tenure as Attorney General, and so that's the scope that we've agreed to today.

[redacted]. The witness is perfectly capable, it sounds like, of saying she's not sure if she's not sure. So I'm not following why that would be some kind of insurmountable problem.

Ms. Dhillon. Yeah, I can't help you follow it, but that is our objection and limitation today.

[redacted]. Okay. It's not even necessarily clear to me that that would be your place to draw that line. So we'll phrase it this way: I'll re-ask the question and, if the witness does not want to answer, we'll have the witness say that she does not want the answer and state the basis for that.

Ms. Dhillon. You're not going to dictate the objections that I make, but you can ask your questions, and I will instruct the witness to answer or not accordingly, because she is here on behalf of the United States Department of Justice because her testimony is concerning that time.

[redacted] Yeah. It's kind of a non sequitur, but, yes, I agree. But I'm going to set up the way that this is reflected on the record just so we get that clarified.

So, Ms. Bondi, with respect to exhibit B that I just provided -- and if you don't mind, it sounds like, if you could get a little closer to the microphone, there's been some problems. So with respect to exhibit B, who are the 10 individuals, coconspirators of Mr. Epstein reflected in this email?

Ms. Dhillon. She's not going to answer that.

[redacted]. Ms. Bondi, are you refusing to answer the question?

Ms. Bondi. May I have a moment to confer?

[redacted]. Of course.

[redacted]. We can go off the record if you need a minute to confer. Please go off the record.

[Discussion off the record.]

[redacted]. We can go back on the record.

Ms. Bondi. I don't recall ever reviewing this document, so I don't know who's in it, and that came from the FBI New York.

[redacted]:

Q That's helpful. Thank you. Would Director Patel be a logical starting point for those

of us who might be interested in this question?

A Or someone at the FBI New York, because that's who's on the bottom of this document.

Q And so is it correct that not having knowledge of who the individuals are, you would not have knowledge of which of these folks was interviewed or not interviewed; is that right?

A Correct.

Q Okay.

A Also, to clarify, that was 2019 and I was not the Attorney General at the time.

Q Yeah. And, when that's the case, just feel free to clarify that for me. Thank you.

I'd like to ask some questions about President Trump. What is your understanding of the extent to which President Trump was aware of Mr. Epstein and Ms. Maxwell's crimes prior to those crimes becoming public?

Ms. Dhillon. You can certainly answer if you have any knowledge of that.

Ms. Bondi. Can you ask that again?

[redacted]:

Q Of course. What is your understanding of the extent to which President Trump was aware of Mr. Epstein or Ms. Maxwell's crimes prior to the crimes being public knowledge?

A I don't know.

Q During your tenure --

[Discussion off the record.]

Ms. Bondi. Wait, can you repeat that again?

[redacted]:

Q Yeah. I can phrase it again, absolutely.

A Yeah.

Q I just want to make sure it's clear for both of us.

A Because you're talking about Ghislaine Maxwell too.

Q Yeah. And I can split them up and do them one at a time if you want.

A No. Go ahead.

Q What is your understanding of the extent to which President Trump was aware of Jeffrey Epstein or Ghislaine Maxwell's crimes prior to the crimes becoming public? So when nobody else --

A I'm not certain of the extent of his knowledge.

Q Okay. During your tenure, did President Trump direct you or any of your subordinates to take any official action related to Jeffrey Epstein or Ghislaine Maxwell?

A I'm not going to discuss any conversations that I've had with the President of the United States.

Q It would be helpful for us just to understand whether that's just a refusal to discuss it full stop or whether that's an invocation of some version of executive privilege.

A Privilege.

Q And can you or counsel elaborate a little bit on the nature of the privilege for the record?

Ms. Dhillon. We're not going to get into any conversations that the former Attorney General had with other senior members of the -- executive members of the White House and the immediate staff of the President. That's covered by privilege.

Mr. Guynn. I'll also add, we don't even need to formally assert the privilege in this context given the voluntary nature of these proceedings. So we're just going to refuse to provide answers about conversations with the President or his advisers.

[redacted]. Thank you. And, as I think you just said, those are two different concepts. So, just for clarity one more time, is this just a voluntary refusal to answer or a formal assertion of executive privilege?

Ms. Dhillon. This is a voluntary interview and assertion of privilege is not legally required,

and so just telling you what's out of bounds. You're not going to get answers on those issues.

[redacted] It's just a choice not to answer that question, correct?

Ms. Dhillon. I'm not testifying here, so I'd say, [redacted], I think you can go ahead and ask your next question.

[redacted]. Well, we'll just clarify with the witness. Thank you. That's a great point.

[redacted]:

Q That's just a choice on the witness' part to simply not answer questions in the category you describe, which is conversations with the President or his close advisers. Is that correct?

A And I've said that in the past on a multiple range of topics.

Q But that is the case here today?

A Yes.

Q Yes? Sorry, I just need that last yes.

A Yes.

Q Thank you.

To your knowledge, has DOJ released all Jeffrey Epstein-related files and documents that relate to President Trump?

A To my knowledge, yes.

Q It was reported by The Wall Street Journal that, in September of last year, President Trump told Congresswoman Marjorie Taylor Greene that, if she tried to expose the names of Epstein abusers that, quote, "My friends will get hurt." Were you present for that conversation?

A Not to my knowledge.

Q Were you aware of that comment being made at the time?

A Not to my knowledge.

Q Do you have any knowledge of which friends President Trump was referring to?

A Not to my knowledge.

Q Did President Trump ever tell you that he had friends who could be exposed as abusers by the Epstein files release?

A I'm not going to discuss any conversations that I've had with the President on any matter.

Q There may be time -- I'll try to minimize it, but there may be times where it's appropriate for you to say that again for the record, and I appreciate your patience.

I'd like to discuss some chronological events, starting with President Trump's 2024 campaign. During that campaign, then-candidate Trump promised to release the Epstein files. Did you speak with then-candidate Trump or any of his advisers about Jeffrey Epstein or Ghislaine Maxwell during the 2024 presidential campaign?

A Not to my knowledge. But, again, he wasn't the President.

Ms. Dhillon. It's beyond the scope of this interview.

Ms. Bondi. And, yeah, it's beyond the scope and -- but I --

[redacted]:

Q So it's helpful for us, does that boundary extend beyond President Trump's time in office?

A Right.

Q Yes?

Ms. Dhillon. I don't understand your question.

[redacted]. I'll redo the question. It's whether, during the 2024 presidential campaign, whether you, Ms. Bondi, had any conversations with then-candidate Trump or his advisers about Jeffrey Epstein or Ghislaine Maxwell?

Ms. Dhillon. And, to repeat, this witness is here voluntarily to talk about her time as Attorney General, and that is an overarching limitation so that we can not be here all day, and those are the ground rules that we agreed to when we came here. So that is our limitation. Your

question goes beyond that. I'm just noting that for the witness.

[redacted]. Just to clear it for the record, we never agreed to that or were informed of that.

Ms. Dhillon. Fine.

[redacted]. And, separately, it would be helpful for me to understand, with the question relating to candidate Trump, is that still part of the previously described concern of not discussing conversations with Donald Trump or President Trump? In other words, is it no conversations with him at any time whether or not he was in office?

Ms. Dhillon. This is a separate limitation regarding the -- a temporal limitation, [redacted] which has previously been articulated to you. Her testimony here today is limited to what she said or did during her time as the Attorney General.

[redacted]. Well, we --

Ms. Dhillon. That's the basis on which she's here today.

[redacted]. We blew through that one on the 2019 email, but it sounds like maybe it's a separate limitation on conversations with -- I mean, you tell me. It's just helpful for us and for the record to understand where the limitation is.

Ms. Dhillon. Yeah. This is a voluntary interview. The fact that she answered a question is not relevant to the overall limitation. And we're going to be here all day if there are no limits. So that's a limit.

[redacted]. Definitely. This will go so much quicker if there's clarity in describing what the limits are. So let me just do the question again and --

Ms. Dhillon. [redacted], you seem determined to eat up all of your time on repeating yourself. That's your choice. But she's going to stick to the limits that have been articulated.

[redacted]. That's great, but we can't walk out of here confused about what the limits are. So let me just repeat this one question, and if the limit is no conversation with

President Trump in or out of office, then that's the limit. As you said, it's a voluntary conversation. We just need it on the record.

So, when President Trump was a candidate during the 2024 presidential campaign, did you have any discussions with him or his close advisers about Jeffrey Epstein or Ghislaine Maxwell?

Ms. Dhillon. It's beyond the scope, so --

Ms. Bondi. It's beyond the scope of the -- I was subpoenaed as Attorney General -- or asked to come in as Attorney General.

[redacted]:

Q Sorry, just a little closer to the microphone.

A Beyond the scope.

Q Okay. In what sense? I don't want to lose all day on it, but in what sense do you view it, as a witness, as beyond the scope?

A I was not Attorney General at the time.

Q Okay. You were sworn in as Attorney General on February 5th of last year. When was your first conversation with President Trump about the Epstein investigations?

A I don't discuss any conversations, whether I've had them or not had them, with the President of the United States.

Q With respect to the February 21st comment about the DOJ may be releasing the list of Jeffrey Epstein's clients -- sitting on my desk -- we heard the discussion in the previous round and we've heard a discussion of this previously. Just for the very last piece of clarity, to your knowledge, is the Department of Justice currently withholding a document that lists Jeffrey Epstein's clients?

A To my knowledge, no.

Q With respect to the February 27th meeting that was discussed in the previous round, that grouping of files, to the best of our understanding, was mostly already public at the time. Do you recall whether at the time you knew whether these files were already public or not already

public?

A No.

Q No, you don't recall?

A Don't recall. Don't believe I knew they were public at the time.

Q Our understanding is that none of those files were classified in the legal sense of the word. Do you recall why the word "declassified" was stamped on top?

A I don't recall whether they were or weren't.

Q You may have said this already, but were these materials the same files that you had said were sitting on your desk a few days earlier? Are those the same packet of files --

A Yes.

Q -- that you were referring to?

A That had not been reviewed at the time.

Q The Wall Street Journal has reported that you told President Trump last May that he was in the Epstein files and that the Department did not plan to release anymore Epstein files. Deputy Attorney General Blanche was also reportedly in that meeting. What did President Trump say when you told him he was in the files?

A I won't discuss any conversations that I had or did not have with the President of the United States.

Q I'll note, just for the transcript's purposes, that I think the Department of Justice publicly confirmed the nature and scope of that meeting. So that would seem to us like something that is reasonable to discuss in this forum. But I understand your position, and I'll move forward.

With respect to the July 2025 memo that I think the majority handed out in the previous round, I think I heard but I just want to confirm that Mr. Blanche was managing the process for putting together that memo. Is that correct?

A Which memo?

Q The July 2025 FBI, DOJ, "no further disclosures are warranted."

A I don't recall who was managing that because I don't think it's signed. I was just looking at that. I don't recall who managed that. But AG Blanche was managing the entire investigation.

Q Okay. That memo stated, quote, "We did not uncover evidence that could predicate an investigation against uncharged third parties." I think a lot of folks now, having seen the files, have trouble accepting that claim. Would you tend to -- I can just read it. It's just the one sentence. I can read it back, if that's helpful.

A Go ahead.

Q It was just the quote, "We did not uncover evidence that could predicate an investigation against uncharged third parties." So I think a lot of folks now, having seen the releases, struggle with the logic of that claim. Do you tend to agree with that statement as you sit here today?

A What was the date of this memo?

Q I think it was July 7th when it was released, although I don't think it has a date on it.

A I would refer any of that to AG Blanche.

Mr. Guynn. [redacted], can I just clarify too --

[redacted]. Yeah.

Mr. Guynn. -- your question. Are you referring to the public's perception of that sentence at the time that the very limited number of files the Department was aware of at this -- the time this letter was drafted, or later after many more documents were reviewed?

[redacted] The latter, which I think and hope was clear in the question.

Mr. Guynn. Okay. I don't think that was clear, so in case that's helpful.

[redacted]:

Q I can do the lead in. I think folks who have now seen the releases of the Epstein files

struggle with that claim looking back on it last July. Do you have a view on that statement sitting here today?

A As AG Blanche has said multiple times, and I believe Director Patel has said multiple times, and I would agree, if there is any evidence of a crime, they would ask now that people contact the FBI. So anything can be fully investigated. Also, as I stated earlier, I believe U.S. Attorney Jay Clayton had an investigation in the Southern District of New York, and I don't know the current status of that as well.

Q Thank you. With respect to that memo's assertion that no further disclosure of files would be appropriate or warranted, do you recall who made the decision at the time that no further Epstein files should be released?

A Can you --

Q Yeah, it was just a sentence --

A -- point out where you're reading that?

Q Sure. Down at the bottom of the first page, there's just one sentence. It says, "It's the determination of the DOJ and the FBI that no further disclosure would be appropriate or warranted."

A I can't answer that, other than that was in July, and we had sought, meaning the Department of Justice, to unseal in July documents from courts in the Southern District of Florida and Southern District of New York, and that was denied, I believe, by both judges, the release of those documents.

Q If you know, would the Department have been aware of the content of the 3 million or so pages that we now have seen at the time that this memo was written in July?

A I don't believe so.

Q Okay. Okay. So that judgment about no further disclosure of files would be warranted was made on a lesser understanding of what the files were than as we sit here today?

A Well, clearly, they did not know there were 3 million-plus -- approximately 3 million pages of documents at that time.

Q As far as you know, was that July memo written and formed exclusively within DOJ and FBI, or did the White House have any role in crafting that memo?

A I don't recall.

Q The month prior, in June, Elon Musk had tweeted that, "Time to drop the really big bomb: @RealDonaldTrump is in the Epstein files, and that's the real reason they have not been made public." Did you have any conversations with any agency or administration staff about that tweet?

A I'm not going to discuss any conversations that I had within the Department or the administration.

Q I think inter -- or conversations inside the Department I think have been discussed to a pretty good extent here today. So is there some more nuance to that idea?

A No.

Q Okay. Is it that you will not answer that particular question, for the record?

A Will you repeat the question?

Q Yeah. The Elon Musk tweet, which was last June, Mr. Musk said, quote, "It's time to drop the really big bomb: @RealDonaldTrump is in the Epstein files, and that is the real reason they have not been made public." The question was just, whether you had any conversations with subordinates, colleagues about that tweet?

Ms. Dhillon. That question calls for communications that she's already said she's not going to testify about, and she already answered that, so --

[redacted]. I definitely don't think it does, but can you help me understand in what sense? In other words, it's not a conversation with the President. It's during her time as Attorney General.

Ms. Dhillon. She has stated that she's not going to testify about executive branch communications and your question elicited that. It was broader than the President.

[redacted]. Definitely. I'm not asking about a presidential communication. So is the category not just President or close aides to President but inside of DOJ conversations?

Ms. Dhillon. That question -- [redacted], you're kind of changing the scope of your question actually.

[redacted]. I don't think I am. The question is --

Ms. Dhillon. I think you are.

[redacted]. I'm definitely not. The question is just whether Ms. Bondi -- and I'll direct it to Ms. Bondi -- had any discussions that you can recall with colleagues at DOJ about the tweet that I just described?

Ms. Dhillon. So that's a different question --

Ms. Bondi. Yes.

Ms. Dhillon. -- than the one he originally asked. You can answer that question if you can without revealing privileged communication.

Ms. Bondi. Sure. I'm sure we did because that was quite a post, yes. But I can't recall the extent of the conversations or other than, "Did you see this?"

[redacted]:

Q To your knowledge, did that tweet have any impact on the Department's decision to release the July memo we previously discussed?

A To my knowledge, no.

Q All right. I would like to ask a few questions about Ghislaine Maxwell and the conditions of her incarceration. This topic was discussed to some extent --

A Can I have a minute to confer?

Q Sure, of course.

A There's something I might want to --

[redacted]. We can go off the record for a moment.

[Discussion off the record.]

[redacted]. We can go back on the record.

Did you have a clarification?

Ms. Bondi. No.

[redacted]. Okay. We're actually going to do a few questions from members that are here, and so I will turn it over in that direction.

Mr. Garcia. Ms. Bondi, thank you for being here again. And, again, we just want to reiterate we wish you a full, speedy recovery. So thank you for being here.

Ms. Bondi, a couple questions. I want to start first, there's been reporting that indicates that you had informed President Trump in May of 2025 that his name appeared multiple times in the Epstein files that were reviewed by the DOJ. A couple months later, on July 7th of 2025, which was discussed earlier, the DOJ and the FBI released a memo saying that no further disclosure would be appropriate or warranted. We just discussed that. Now, looking at the conversation that was reported back in May, why did you tell President Trump he was in the files?

Ms. Bondi. I'm not going to discuss any conversations I did or did not have with the President of the United States, and I've said that multiple times on multiple topics throughout my tenure.

Mr. Garcia. What was President Trump's reaction when you had that conversation with him? No response?

Ms. Dhillon. Asked and answered.

Mr. Garcia. Did President Trump at any time tell you not to disclose what was in the files?

Ms. Dhillon. Asked and answered.

Mr. Garcia. Let me go on to Ghislaine Maxwell. It's clear that you're not answering any

questions about President Trump, about any conversations with President Trump, what he may have directed you to do. Is that correct?

Ms. Bondi. I'm not going to answer any questions -- any conversations that I have had with the President of the United States, whether we had them or didn't have them, or the substance.

Mr. Garcia. So let's look at the handling of Ghislaine Maxwell. Obviously, a convicted sex trafficker. She is sentenced to 20 years in Federal prison. You earlier today called her evil. We can agree on that. I wonder, just to reclarify, Ms. Bondi, do you think Maxwell deserves a pardon for her crimes?

Ms. Bondi. No.

Mr. Garcia. Okay. Thank you. We agree on that as well. Now, I also want to talk about the prison. She was moved to a less secure prison. You mentioned earlier that it was comparable. In fact, that's not correct. There are four levels of prisons within the BOP. She was moved to the minimum level from another level. So she was actually moved to a lower level, less secure facility per BOP. We have an exhibit on that. If we need to also share that, our counsel can pass it around. Do you think she should've been moved to a less secure prison?

Ms. Bondi. I think any inmate should be moved somewhere where they can be safe, regardless of what crime they committed. That would be a question directed to the Bureau of Prisons, and I have full faith in Billy Marshall, who is Director of Bureau of Prisons.

Mr. Garcia. But will you acknowledge that she was moved to a less secure facility?

Ms. Bondi. No, because I have no knowledge of that.

Mr. Garcia. Okay. I do want to make sure we get that exhibit out. But that is the case; she was moved to a less secure facility.

Do you know if Acting AG Todd Blanche ordered the move to the less secure facility?

Ms. Bondi. I have no knowledge of that.

Mr. Garcia. Did you ever ask anyone to move Ghislaine Maxwell to a different prison?

Ms. Bondi. As I stated earlier, I knew she was moved when I read it, I guess, online or saw it.

Mr. Garcia. Okay. Did you talk to the acting AG, Mr. Blanche, after you read it online?

Ms. Dhillon. On any topic?

Mr. Garcia. On the actual move Ghislaine Maxwell to the less secure facility.

Ms. Bondi. I don't recall. I would direct that though to Bureau of Prisons. I don't recall.

Mr. Garcia. Okay. I just think, obviously, the "move Ghislaine Maxwell to a less secure facility" was everywhere, was being discussed in the news, a massive obviously move that the Bureau of Prisons ended up making, under whose direction we still have yet no answer on. And so it's interesting, of course, that you don't recall if there was ever a conversation. Did you have a conversation with the Bureau of Prisons about the move after the move happened?

Ms. Bondi. I believe I ran into them and -- at an event, and I ask if she was moved to a similar level, and they said yes -- I believe. But this is why it's not unusual. As a career prosecutor, she was top of the news, and if she was getting threats -- I don't even know where she was moved, where she's housed now. But, if any defendant at any level is getting threats, it's common to move people within the prison system. That's why it wasn't that unusual to me --

Mr. Garcia. Thank you. And would you agree that --

Ms. Bondi. -- at all.

Mr. Garcia. -- perhaps the questions also should be directed at the Bureau of Prisons and to the Acting AG Todd Blanche?

Ms. Bondi. Yes.

Mr. Garcia. Okay. And so Mr. Blanche, Bureau of Prisons, that's where that information is at. Knowing what you --

Ms. Dhillon. And I would just note, Congressman, that Mr. Blanche actually made those remarks and said that during the briefing that you walked out of.

Mr. Garcia. So, knowing what you know today, do you think that Ms. Maxwell should've

been moved to that facility?

Ms. Bondi. Anytime -- I don't have details on if she received death threats, what kind of threats, but any time any inmate at any level is threatened, they will be moved. It's very common among prisons, State and Federal, to move inmates. And she had just recently given a very public interview.

Mr. Garcia. Thank you. Last question. You are aware that, of course, there was the Epstein Files Transparency Act that passed in Congress, but there was also an active subpoena that the DOJ did actually not fully respond to. Are you aware of that?

Ms. Bondi. I'm sorry, could you slow down and repeat that again, please?

Mr. Garcia. So you are aware that, besides the Epstein Files Transparency Act that passed the Congress, signed by the President, prior to that, there was an active subpoena passed by an Oversight Committee for the full release of the files and that those two are separate?

Ms. Bondi. Yes. And that's when we released, I believe, approximately 33,000 or over 30,000 documents --

Mr. Garcia. Thank you. And we'll continue --

Ms. Bondi. -- at that time.

Mr. Garcia. Thank you. We'll continue with some additional questions on that.

With that, I'm going to turn this over to Representative Frost.

Mr. Frost. Thank you so much. One quick question for clarification for the record. The counsel kept referring to your participation here as a voluntary interview. Are you aware that this Committee issued a subpoena to you?

Ms. Bondi. Yes.

Mr. Frost. Do you not consider this sit-down to be complying with that subpoena?

Ms. Bondi. I am no longer Attorney General. The subpoena was regarding when I was Attorney General. I'm here voluntarily today --

Mr. Frost. So your opinion is that the sit --

Ms. Bondi. -- to comply with you.

Mr. Frost. So, just to make sure for the record, in your opinion, the sit-down is not to comply with that subpoena, but it's a voluntary interview having nothing to do with the subpoena issued by the committee?

Ms. Bondi. I'm here to answer any questions that you have that I can answer regarding Jeffrey Epstein. I also came in while I was Attorney General to this Committee voluntarily with Deputy Attorney General at the time Blanche, who answered many of the questions that you're asking now. However, during that hearing, I believe many of you, if not all of you, left -- left when --

Mr. Frost. Yes, ma'am.

Ms. Bondi. -- we were here discussing this.

Mr. Frost. Yes, ma'am. Thank you. And just for clarification for the record --

Ms. Bondi. So many of those -- excuse me, I'm sorry. I didn't mean to interrupt you. Many of those have been asked and answered by at the time the Deputy Attorney General.

Mr. Frost. Yeah. Thank you, ma'am. And so, just for clarification for the record, you do not see this sit-down, this voluntary interview as you call it as complying with this subpoena this Committee issued. You see this as a separate thing?

Mr. Guynn. I'm sure -- I'm confident that you are aware that the answer to that is actually that there was a robust discussion between the Department of Justice and this Committee about how the Department of Justice would fulfill its obligations in responding to that subpoena, and this sit-down interview right now is the Department of Justice's compliance with this Committee's request to have time to speak with the Attorney General.

Mr. Frost. So, Ms. Bondi, just for clarification for the record, is the answer, yes, you do see this sit-down as complying with the subpoena?

Mr. Guynn. The contents of former Attorney General Bondi's testimony does not overlap

with the content of counsel's negotiations with you all. So, I mean, I think the answer to that information is really directed at Ms. Dhillon and myself and the Attorney General.

Mr. Frost. Okay. So, Ms. Bondi, you don't have an answer for that on whether or not you see this as complying with the subpoena?

Ms. Dhillon. She's not going to answer that.

Mr. Frost. Okay. So she won't answer that question.

Back to the Ghislaine Maxwell transfer. Are you aware if President Trump was informed about the transfer before it happened?

Ms. Bondi. I'm not going to discuss any conversations that I have had or did not have with the President of the United States on this topic or others.

Mr. Frost. Yes, I understand that. But it's not about a conversation that you might've had with him. My question is, are you aware if he knew about it before it happened?

Ms. Bondi. I'm not going to discuss any conversations that I've had or have not had with the President of the United States.

Mr. Frost. So, just for clarification, it seems like you won't answer any questions relating to conversations you've had with the President but also any conversations you've had about the President. Is that true?

Ms. Bondi. No.

Mr. Frost. Okay. So my question has to do with if you're aware that he knew about it, not if he told you he knew about it.

Mr. Guynn. I'm just going to object to this entire line of questioning. It's just argumentative and completely unproductive, but --

[redacted] Counsel, this is a transcribed interview. There are no objections --

Mr. Frost. Yeah. I'm just asking a question, and I'm just trying to understand the scope of things.

Ms. Dhillon. If members are chewing up their time repeating themselves, that's not our problem.

Ms. Bondi. And I am not aware of the President having any knowledge of it, whether it be from reading it in the paper or people reporting that he did or talking to anyone about it. I have no knowledge of that.

Mr. Frost. Okay. Thank you, ma'am. Did anyone in the administration ever express concern about the transfer or urge BOP to reverse it?

Ms. Bondi. I'm not going to discuss any conversations that I had or did not have with the administration.

Mr. Frost. Okay. Thank you.

[redacted]. Just a really quick clarification, and it's not so much for you all but more just for the record: The reference to the relationship between the subpoena, a deposition, a transcribed interview, related discussions, we have not been part of those discussions, and we haven't been read into those discussions. So we don't actually have any knowledge of that. So that's just for the transcript. Please, continue.

Ms. Ansari. Hi, Ms. Bondi. Thank you. All right. I would like to focus questions on failure to comply with the Oversight Committee's subpoena. On August 5th of last year, Chairman Comer issued a subpoena to the DOJ for all documents and communications from DOJ's Epstein and Maxwell related case files. On August 22nd of last year, DOJ produced approximately 33,000 pages to the committee. Almost all of those materials were already publicly available, and that's all that we have received from the DOJ in the 10 months since the subpoena was issued. Why was that first production in August made of mostly and all publicly available materials?

[11:16 a.m.]

Ms. Bondi. As I said earlier, Associate Attorney General Stanley Woodward managed the release of those documents. And, since then, the Department received and released approximately 3 million documents.

Ms. Ansari. But did anyone in the administration direct you to release materials that were already publicly available pertaining specifically to the subpoena?

Ms. Dhillon. I think we're having some difficulty hearing you --

Ms. Bondi. Yeah.

Ms. Dhillon. -- actually.

Ms. Ansari. Okay. The question is in regards to our subpoena before, prior to, the Epstein Files --

Ms. Bondi. Can I --

Ms. Ansari. -- Transparency Act.

Ms. Bondi. I have to turn. I can't turn my neck, so I have to turn towards you, if that's okay.

Thank you.

Ms. Ansari. So the question is, did anyone in the administration direct you to only release publicly available information in those 33,000 pages?

Ms. Bondi. As I said, Associate Attorney General Stanley Woodward handled that. I had --

Ms. Ansari. I understand that, but --

Ms. Bondi. -- minimum involvement in that.

Ms. Ansari. -- he works for you, so --

Ms. Bondi. Yes.

Ms. Ansari. -- did somebody direct you to only release publicly available information in regard to our subpoena to the Department of Justice?

Ms. Bondi. No.

Ms. Ansari. Okay.

Ms. Bondi. To my knowledge, no.

Ms. Ansari. Do you believe that the Department is obligated to respond to the Oversight Committee subpoena?

Ms. Bondi. Yes.

Ms. Ansari. In November of 2025, President Trump posted on Truth Social about the Committee's subpoena, saying, quote, "The House Oversight Committee can have whatever they are legally entitled to."

Do you agree with President Trump?

Ms. Bondi. Can you repeat that?

Ms. Ansari. In November of 2025, President Trump posted on Truth Social about the Committee's subpoena, saying, quote, "The House Oversight Committee can have whatever they are legally entitled to."

Do you agree with the President?

Ms. Bondi. I agree that you're entitled to everything you're legally entitled to. Yes.

Ms. Ansari. Okay.

And then, finally, does the Committee need to bring you in for a deposition instead of a transcribed interview to get complete answers?

Ms. Bondi. No.

Ms. Ansari. Okay.

Thank you.

Mr. Subramanyam. Thank you for coming in today.

I was just curious if you went through any of the files yourself. Like, did you read through any of the files yourself?

Ms. Bondi. Some of them, prob- -- sure. Some of them. But there were 3 million pages, so very little.

Mr. Subramanyam. Right. And were you looking for anything in particular in the files?

Ms. Bondi. No.

Mr. Subramanyam. And there's rumors of an effort potentially to look through the files for President Trump's name in particular. Are you aware of any sort of effort at the Department or anywhere else in the administration of doing that?

Ms. Bondi. I am not going to discuss anything within the Department or discussions that did or did not take place.

Mr. Subramanyam. I'm asking about your knowledge of any sort of effort to do that, not any sort of discussions that happened.

Ms. Bondi. I'm not going to discuss any conversations that did or did not happen regarding that.

Mr. Subramanyam. I'm not asking for conversations, just to be clear. Just your knowledge of any effort to look for President Trump's name during the redaction process or during the release of the files.

Ms. Bondi. What I do know is, you can go online -- that's why I'm hesitating -- and there are 3 million pages, and I believe you can type in a name and it will come up.

So I'm sure many people did that with many individuals. And I believe Members of Congress's --

Mr. Subramanyam. Yeah.

Ms. Bondi. -- names are also listed in there.

So, to my knowledge, did that happen? Yes --

Mr. Subramanyam. No, absolutely.

Ms. Bondi. -- but with not only President Trump; with multiple people, by many of you as

well, that was done.

Mr. Subramanyam. Absolutely. You're right.

But what I'm asking, though, is, before the release of the files, during the process of releasing the files, was there any effort to look through for President Trump's name or any other administration official's name before the release of the files?

Ms. Bondi. I don't recall.

Mr. Subramanyam. And are you aware of any effort to do that? You don't recall?

Ms. Bondi. I don't recall.

Mr. Subramanyam. Okay.

And you suggested --

Ms. Bondi. Again, there were 3 million pages --

Mr. Subramanyam. It's not about what's in the files. I'm asking, any effort to look for President Trump or any other administration official's name in the files up to the release of the files and in the process of releasing the files?

Ms. Bondi. I don't recall.

Mr. Subramanyam. You don't recall. Okay.

And then, at various points, you suggested that DOJ holds a significant volume of child sexual abuse material within the Epstein files. Can you clarify what that means and what you meant by that?

Ms. Bondi. Sure. It's called "CSAM."

Mr. Subramanyam. Uh-huh.

Ms. Bondi. And that is protected, as you all know, under the law, highly protected. Child sexual abuse material.

And, yes, I'm aware of that, and I'm aware that there was much of that contained in the Epstein files.

Mr. Subramanyam. And would you say that some of the files that have been withheld are those types of materials?

Ms. Bondi. To my knowledge, yes.

Mr. Subramanyam. Okay.

And, last month, Mr. Blanche said on a podcast that, quote, "the FBI did not collect any video of Mr. Epstein or others participating in sex acts." Would you agree with that statement?

Ms. Bondi. I don't have direct knowledge of that. But I do know that, initially, when all of those videos were obtained, they were scoured through by attorneys and probably agents to be sure no victims were released, and much of it, if not all of it, ended up being child sexual abuse material that he had downloaded --

Mr. Subramanyam. Okay.

Ms. Bondi. -- if that makes sense.

Mr. Subramanyam. That makes sense. Thank you. That's very helpful.

And have you spoken with any of the survivors?

Ms. Dhillon. You've answered this, but you can answer it again.

Ms. Bondi. I spoke with one of their attorneys. I believe most --

Mr. Subramanyam. One of their attorneys?

Ms. Bondi. -- of them are represented. I spoke with one of the attorneys. I believe -- I know attorneys in my office have spoken with multiple attorneys who represented or represent the survivors. And, as you know, it's not appropriate for us to talk to someone who is represented directly without talking to their attorney.

I've spoke with one of the attorneys.

Mr. Subramanyam. Were they or their attorneys at all consulted in the process of releasing the files?

Ms. Bondi. I don't know. I don't recall.

Mr. Subramanyam. You don't recall?

And, at one point, there was talk about giving the survivors access to their own files or statements that they made. Was there any discussion about that -- or, sorry. Do you have any knowledge of any sort of -- or understanding of any sort of effort to do that?

Ms. Bondi. Can you repeat that?

Mr. Subramanyam. The survivors have asked for their own files, meaning statements that they gave at the time they were interviewed. Do you have any awareness of this request?

Ms. Bondi. I would direct that to the current Attorney General.

Mr. Subramanyam. But while you were Attorney General --

Ms. Bondi. I don't recall.

Mr. Subramanyam. -- I believe they made this request. You don't recall them requesting that publicly or directly?

Ms. Bondi. Access to their files?

Mr. Subramanyam. Yes.

Ms. Bondi. Meaning?

Mr. Subramanyam. They have asked for their own statements, their 302 statements. And so they have said that they requested this. I believe it was in a public letter too. And I'm wondering if you would have any knowledge of that request.

Ms. Bondi. I don't recall. I would direct that to Deputy Attorney General Blanche.

Mr. Subramanyam. In your opinion, would you have been willing to fulfill this request?

Ms. Bondi. We have asked multiple times if any victims want to meet with us, that we would meet with them. And that would include that information, to give them that information or to discuss it with them, in my mind.

Mr. Subramanyam. Great.

And then I believe you answered this earlier, but based on everything you've seen, do you

believe that the Department should move forward with any further efforts or prosecutions related to this matter?

Ms. Bondi. As I said, we had Jay Clayton in the Southern District of New York open an active case on matters around Jeffrey Epstein and other individuals, but that -- when I left office, I believe that was still a pending investigation. So I can't answer -- I would direct that to Todd Blanche or Jay Clayton.

Mr. Subramanyam. Thank you.

Mr. Frost. Thank you.

I just have one more question for clarification.

In response to one of the questions he just asked about people name-searching Donald Trump, you mentioned that maybe he was name-searched or Members of Congress had been name-searched, but then you looked at us and said "y'all," which leads me to believe -- I just want a clarification.

Are you saying that you know that Members of Congress searched for President Trump's name or searched for people's names in the files?

Ms. Bondi. Can you repeat that?

Mr. Frost. So, when he asked you about, was there an effort to search for President Trump's name in the files, you started talking about the fact that, "Well, people can go online and look up anybody's name. You can look up President Trump's name. There's Members of Congress's names in it." Then you looked at us and said, "Y'all have searched this as well."

And I just -- when you said that, did you mean Members of Congress have searched for President Trump's names in the files?

Ms. Bondi. Anyone can. It's public.

Mr. Frost. But by the thing you just told us a little earlier, it seemed like you have knowledge of Members of Congress name-searching for President Trump's name.

Ms. Bondi. Oh. No. That I don't have knowledge of. I don't recall that. But anyone can go in and search for any name on there, and hopefully the system is working where it will pull it up.

Mr. Frost. The reason I ask is because there was reporting of, when you were testifying to the Judiciary Committee, that you had information on our search history for when we went to Department of Justice.

Was that something you were told to do or keep -- were you told to keep that information, the spying on Members of Congress as they were looking through the Epstein files?

Ms. Bondi. No one told me to spy on Members of Congress.

Mr. Frost. So is that a decision you made on your own?

Ms. Bondi. Members of Congress weren't spied on. That system downloads anyone who looks at that, because there are millions of pages of unredacted victims' names on there -- faces, names, information that's not public. That's built into the program.

In fact, when you go and review it, we also have had -- I don't know if it's still happening -- people in the room watching what was happening, to be sure no one was walking out with unredacted --

Mr. Frost. Uh-huh.

Ms. Bondi. -- victims' names on a list. And, in fact, they did find someone doing that.

Mr. Frost. I'm aware that's how the system might work, but, obviously, you know, I'm trying to ask if someone asked you to or why you had printouts of it in your hearing at Judiciary Committee.

Ms. Bondi. Oh. A staffer gave me that, a lower-level staffer that gave me a printout.

And I had intended to talk to Representative Jayapal when she was questioning me about it. No one was trying to hide it. I went and I met with her for about an hour and a half after that hearing, as well, in person in my office. And I planned on discussing that with her, but I couldn't get a word in edgewise on that.

And the point of that was to show her there had been a lot of talk about a particular graphic, I believe it was. It was a circle. There had been a lot of talk that we were trying to hide men's names because half the graphic showed men and the other half was redacted -- when, in fact, once anyone went online and saw the unredacted version, you could see that those were women and victims. That's why it had been redacted.

Mr. Frost. Uh-huh.

Thank you.

[redacted]:

Q All right. Ms. Bondi, we've got maybe 3 minutes left in the round. I'm going to try to efficiently hit a few straggling questions, and then we'll take a break.

Just one question, globally. Mr. Blanche previously represented President Trump in a personal capacity. To your knowledge, did anyone at the Department of Justice ever express concern about Mr. Blanche's management of the Epstein-files process given his previous personal representation of the President?

Ms. Dhillon. You can answer that to the extent that it doesn't reveal --

Ms. Bondi. Yeah. I --

Ms. Dhillon. -- internal deliberations of the Department of Justice.

Ms. Bondi. I believe Attorney General Blanche follows all the ethics rules. He's highly ethical and followed the rules of ethics.

[redacted]:

Q Ms. Maxwell has reportedly received preferential treatment at her new prison camp -- special privileges in terms of meetings, private meals, a puppy.

Do you have any understanding of why Ms. Maxwell is receiving those perks?

A I was not aware of that until I read it yesterday somewhere.

Q Would you tend to think that those perks are warranted given the gravity of her crimes?

A I would direct that to the Bureau of Prisons. Including its accuracy.

Q With respect to the Committee subpoena, I think you used a phrase, "The Committee can have what they're legally entitled to." I think the President has previously used that same phrase publicly.

You know, what is your understanding of the scope of that?

Because I think, from our point of view, essentially all 3 million pages of EFTA files would certainly be covered by the subpoena, and I think probably more than that, because the terms aren't the exact same.

What's your understanding of what this committee is legally entitled to pursuant to its subpoena?

A To be able to review an unredacted version of all the documents, which is what is in the Reading Room, including, I believe, the duplicative material, as well, for you to review. And that's why the Reading Room was set up with unredacted materials.

Q To your recollection, at least during your time as Attorney General, was the Reading Room EFTA process viewed by the Department as a fulfillment of the Committee's subpoena?

A Can you repeat the question?

Q Yeah. The Reading Room at DOJ -- to your recollection when you were in office, was the Reading Room a completion of the Department's obligations under this committee's subpoena?

A To my knowledge, everyone was doing everything they could to comply with this committee's subpoena.

Q Okay.

And one last question before we go off the record.

You have mentioned Mr. Clayton's investigations in the Southern District of New York. I think in the buildup to that there was some public back-and-forth.

President Trump posted on Truth Social that he was asking the Department to investigate

Jeffrey Epstein's relationship with Bill Clinton, Larry Summers, Reed Hoffman, JPMorgan Chase, and -- now, this is a quote -- "many other people and institutions."

You've already described your understanding of the investigations. I won't ask about that again.

Do you have an understanding of who the "many other people and institutions" are that the President was referring to?

A No. But I do now recall that I did respond to that, and that's how it became public that Jay Clayton was assigned and looking into that.

Q Yes, totally agree. But you don't have a personal understanding of who those other people and institutions were?

A No.

Q Do you have any sense of why the only individuals included on the President's list were Democrats despite the fact that prominent Republicans also appear in the Epstein files?

A No.

Q Okay.

Thank you.

And, with that, we can go off the record.

[Recess.]

Mr. Emmer. We'll go back on the record.

I understand the witness would like to make a clarification.

Ms. Bondi. Yes. I was asked by one of the Members of Congress --

Ms. Dhillon. Congressman Frost, I believe.

Ms. Bondi. -- I believe Congressman Frost, whether I directed the President's name to be reviewed in -- to see if his name was in the documents.

I don't believe -- I know I didn't dir- -- I did not direct anyone's name to be reviewed to see if it

was in there, but it was done. Because I remember now -- I don't know the timeframe, though -- but I remember being aware, of course, that his name was in it, along with hundreds -- or countless -- countless other individuals. And I think that list ultimately came out, as well, involving high-profile individuals.

So I am aware that his name was searched, but that was among many names that the department searched. I said "hundreds"; I'm not sure if it's hundreds, but many, many high-profile names. And, in fact, that list was ultimately released.

So I was aware of that, but I did not direct it.

Mr. Emmer. Thank you.

BY MR. EMMER:

Q I would like to pick up where we left off during the majority's first hour. We were discussing redactions, the Department's practices as it relates to those redactions.

And I want to discuss -- it's been reported that there were several documents that were produced pursuant to the Epstein Files Transparency Act and were on the online interface on DOJ's website that were subsequently removed.

Are you aware of documents being removed?

A Yes. I believe there were errors where victims' names were inadvertently released that shouldn't have been, and those were removed, and then names or information regarding individuals was redacted that should've been released. And upon learning about it, the Department of Justice corrected both measures.

Q Are you aware of any documents that were removed that were not subsequently produced in their redacted form?

A Not to my knowledge. Unless you want to refresh my memory, but not to my knowledge.

Q Starting on February 9th, 2026, the DOJ allowed Members of Congress to go and review

the unredacted versions of the Epstein files.

I believe that you were asked during the previous hour, but can you elaborate on what process was in place to allow Members of Congress to review unredacted documents at the Department of Justice?

A It's laid out -- I believe it was put in writing -- the hours that they could go in and what they could see, which was unredacted. But there was a process. But I don't have the details in front of me.

Q Were there any restrictions placed on Members of Congress as far as what they could review?

A Not as to what they could review, no. And, again, even the duplicative material was included in there, to my knowledge.

Q When you and then-Deputy Attorney General Todd Blanche appeared before this committee as part of the briefing that you provided in March, I believe that you suggested and invited Members of Congress that were present to come meet with you and Blanche personally. Is that right?

A Yes.

Q How many Members on our committee took you up on that offer?

A Initially, I believe almost all the Members were here.

Oh, I'm sorry. You mean here, when we came to --

Q How many Members that you invited pursuant to the briefing that you were at -- how many Members actually took you up on that offer?

A You mean to come into our office?

Q Correct.

A I don't believe any did.

Q And --

[Discussion off the record.]

Ms. Bondi. Oh, I'm sorry. Yes, some -- I'm sorry. Some of the Republican Members did. Yes. Representatives Boebert, Cloud, and Perry and maybe -- Representative Burchett maybe? No.

Yeah. I'm sorry. Yes, three. I was thinking on the Democrat side. No Democrats took us up on that. I did meet at one point with -- but she's not on this committee -- Representative Jayapal.

BY MR. EMMER:

Q And, to be clear, no Democrats on our committee took you up on that offer?

A No.

Q And during the briefing --

A To my knowledge, no, to meet with anyone in my office, but not with me.

Q Thank you.

And during the briefing in March, did any Democrats ask you substantive questions as it related to the Epstein and Maxwell matter?

A The briefing that we had here in Congress? No.

In fact, one of them yelled they were mad that C-SPAN wasn't here, and then they got up and left, as Deputy Attorney General Blanche and I continued to brief you -- I believe it was for an hour and a half -- and answer any questions we could.

Q And a couple questions.

Do you have any knowledge as to why the Biden administration did not release any files related to the Jeffrey Epstein or Ghislaine Maxwell matter?

A No, nor do I have knowledge on -- nor do I have knowledge whether any of these Members of Congress asked that they be released during the Biden administration. My understanding is, none of them did, to my knowledge. Maybe Representative Khanna.

Q Attorney General Bondi, given the number of times you've testified on the subject and that you are no longer involved in DOJ matters, is there anything you have not been asked today or in any other setting that you believe is relevant to this committee's investigation?

A No.

Chairman Comer. Madam Attorney General, thank you for being here today.

You've answered questions -- going back to the briefing that we had, you've answered 4 hours' worth of questions, been responsive from our requests. So we -- we want to thank you for that.

And I think that concludes the majority's questions. So thank you for, again, being here and answering our questions.

Ms. Bondi. Thank you.

Chairman Comer. That concludes the majority's questions.

Mr. Emmer. We can go off the record.

[Recess.]

[redacted]. Okay. So we can go back on the record.

Ms. Bondi, I understand you have a clarification you would like to make.

Ms. Bondi. Yes.

Regarding the documents in the Reading Room, when I said all 6 million were available, I know I said the duplicative ones were, but I want to clarify -- and I was just informed of this -- that the unresponsive documents that had nothing to do with the case are not in the Reading Room, nor is anything that contains privileged material.

So if I could clarify that.

And then one more point is: Representative Garcia is outside saying that I, quote, threw Todd -- I'm placing blame on Todd Blanche.

That is 100 percent incorrect. Todd Blanche is one of the most highly ethical individuals I

know, and I think he is making an incredible Acting Attorney General. And he managed this investigation -- and it was a Herculean task -- with very little error. And Todd did an excellent job, in my opinion, and is doing an excellent job as our Attorney General. I'm not blaming anything on Todd.

[redacted]. Thank you for that clarification.

Ms. Bondi. Thank you.

[redacted]. I also will clarify for the transcript that Congresswoman Lee was present at the previous round, although we neglected to announce her at the time.

[redacted]:

Q All right. Ms. Bondi, I would like to ask a few questions about the Epstein Files Transparency Act, which has already been discussed to some degree today.

As you know, on November 19th of last year, President Trump signed EFTA -- that's what I'll call it -- EFTA into law.

Just starting with a few questions about the law's passage.

It was publicly reported that, the week before the bill passed here in Congress, President Trump met with Congresswoman Lauren Boebert in the White House Situation Room in an attempt to convince her to vote against the bill.

Were you present at that meeting?

A I was present at the me- -- I was present at the meeting. President Trump was not present at the meeting.

Q That's very helpful. Thank you. What is your recollection of who was present at that meeting?

A Myself; Deputy Attorney General Blanche; Leg. Affairs, which would be James Blair and James Braid, I believe; Kash Patel perhaps. We'd have to ask Representative Boebert.

Q I understand. Thank you.

The public reporting has characterized the meeting as an effort to persuade Ms. Boebert to vote against the bill. Is that your recollection of the meeting?

A I recall the discussion with her was the concern about passing the bill would jeopardize the identity of victims. Which is exactly what ended up happening after the bill was passed; victims' names were inadvertently released. I recall the topic being protecting victims.

And there may have been a couple more individuals in that meeting. I'm sorry, I can't recall. We can ask Representative Boebert and her recollection.

Q Thank you.

A But President Trump was not in that meeting.

[redacted]:

Q Got it. Do you recall any other concerns being discussed in the meeting beyond survivor identity?

A Survivor identity was -- that's a good way of putting it. Survivor identity, victims' identity was the only thing that I recall at this time. But we can ask Representative Boebert.

Q It was publicly reported that at least one other Member may have been pressured by the administration to vote against the Act.

Do you recall or are you aware of similar meetings to the one we just talked about --

A No, not to my knowledge.

Q Let me just finish the question just for the transcript.

Are you aware of or do you recall similar meetings to the one we just talked about involving other Members?

A Not to my knowledge.

Q Thank you.

A I don't recall.

Q You don't recall -- you're not aware of such a meeting either way. Is that right?

A Yes.

Q I'd like to spend a little time on the document releases themselves. So, as you well know, on December 19th, which was with the 30-day statutory deadline, the Department released about 4,000 files. Then, over the next few days, there were three other releases and then, on January 30th of this year, a big release of about 3.5 million documents, which the Department said fulfilled its duties under the act.

You have touched on this today. So I don't want you to repeat yourself. But what do you recall as far as a process for that first production for working with survivors' counsels? Any recollection of how that process functioned?

A No.

Q Okay. Would Mr. Blanche probably have a more detailed understanding of that?

A Or some of his staff.

Q There was a letter from Mr. Blanche on the day of that first production that listed the components of DOJ that were included in the search, in the poll. And that was FBI -- I can give you a minute. It may be one of the exhibits that was already passed out.

A What was the date of that?

Q I think that was the one on December 19th.

Ms. Dhillon. I don't think that's been marked as an exhibit.

[redacted]. I can just -- it's literally just a few agencies. I can just tell you what --

Ms. Bondi. I don't have that document.

Ms. Dhillon. Hasn't been marked.

[redacted]:

Q Okay. Yeah. It was just telling Congress that OIG, of course, inside of DOJ, the Office of Inspector General, the FBI, of course, the Bureau of Prisons, which makes sense, SDNY, and SDFL, the two jurisdictions in which the two Epstein investigations occurred.

We were just wondering whether other components of DOJ, such as the DEA, would have been part of that collection process?

Ms. Dhillon. I think the witness is entitled to see the document before she answers questions about it.

[redacted]. That's fine. We can do that. Give us a second to pull it out.

Ms. Bondi. And I would rely on what Deputy Attorney General Blanche put in writing regarding the components who were involved.

[redacted]:

Q And that will save us time and paper. Would it be your understanding that, if Deputy Blanche listed components, then that would be your best understanding of the components?

A Yes.

Q Okay. In that case, I don't think we have to do the whole exhibit.

A And I don't recall DEA being involved.

Q Okay. Thank you.

A Whether they were or weren't.

Q On December 22nd, DOJ released about 11,000 documents. This was the third production of documents. There were four- or five-day period in which, I think, there were three or four releases. One of them on December 22nd had some redaction-related challenges. You could use software to get around some of the redactions or copy and pasting.

Do you recall whether the Department had an understanding of those problems before those documents were released?

A Oh, I don't believe we did. I do recall there were problems after the fact.

Q On December 23rd, about 30,000 additional pages were released. That's the fourth production.

That production included a higher volume of materials related to President Trump. It

included some allegations against President Trump. And so the -- please --

A Can I clarify?

Q Yes.

A I think you said December. Wasn't that in August when the 33,000 pages were released?

Q December 23rd of last year was --

A Okay.

Q -- the Department's fourth EFTA production. And that had about -- that had about 30,000 pages of content is our understanding.

A I don't specifically recall that other than it was a rolling release of documents as they came in because we continued to get additional documents after EFTA was passed while we were attempting to comply within the 30 days.

And I believe a significant amount, almost maybe a million pages, was added from SDNY, Southern District of New York.

Q We were just going to ask, on the day of that release, December 23rd, the Department released a statement calling the claims against President Trump that were in that release untrue and sensationalist and unfounded and false.

We just wanted to ask, to the best of your knowledge, were any of the allegations against President Trump that were included in that release investigated by the Department of Justice?

A I don't believe they were investigated by any Department of Justice, and that might be a question for the Biden administration because, if I recall, it all was just before the 2020 election, the salacious allegations.

Q The next day -- and I think you just alluded to this -- the Department tweeted that SDNY and the FBI had discovered a million more documents.

Do you have a recollection of the circumstances of the discovery of those documents?

A No. But it made it very difficult to comply within the 30 days.

Q On January 30th, there was the largest release of documents, about 3.5 million pages, Deputy Attorney General Blanche at the time wrote another letter to Congress. It's been discussed here today there was the phrase that more than 6 million pages had been identified as potentially responsive, and the volume -- the total volume of releases ended up being around 3.5 million pages; 3.5 million and the 6 million, those were page counts.

Do you have an understanding or recollection of how many documents were potentially responsive and documents produced?

A No.

Q Do you have --

A And, to the best of my knowledge, I asked -- I answered that question previously as to why there were so many documents.

Q Do you have an understanding or recollection as to how many documents were ultimately tagged as nonresponsive?

Ms. Dhillon. I think this has been asked and answered, but you can answer it again.

Ms. Bondi. Not an exact amount.

[redacted]:

Q Do you have a recollection or understanding of how many documents were tagged as duplicative?

Ms. Dhillon. Same.

Ms. Bondi. Same. I don't recall the exact number.

[redacted]:

Q There, I think, was a figure in this letter from Mr. Blanche -- and we can just ask him, but I think he had said around 200,000 pages were redacted or withheld for privileges.

A Yes. And I was just looking for that letter that I believe you had provided to me, and I

would refer to that from AG Blanche as to the number of documents that fell into each category, and that's the letter that you provided to me dated February 14th, 2026.

Q And so I would assume, but let me just ask for the record, if Mr. Blanche says, "Hey, around 200,000 pages were redacted or withheld for privileges," if we wanted to understand, well, how many of those were redacted but how many were withheld, that would not be a question that you would have had an involvement with?

A Correct.

Q Mr. Blanche or his staff would have an understanding of that. Is that right?

A Correct.

Q Thank you. And I would assume the same answer would apply for trying to understand how many documents were withheld under the different categories of statutory withholdings. Is that correct?

A Correct. Could I add one more thing?

Q Of course.

A A privilege log was produced to you. I don't believe you've shown me that today in the documents.

Q Thank you.

I'd like to touch on victim-related redaction challenges, which have been discussed to some extent here.

[redacted]. I would like to just introduce as minority exhibit C an example of that problem.

[Bondi Minority Exhibit C
was marked for identification.]

[redacted]. I'll give you a moment to look that over.

Mr. Guynn. Counsel, can I just clarify something.

[redacted]. Yeah.

Mr. Guynn. We're confident that the way this proceeding and these exhibits are going to be treated -- the way that this transcript and these exhibits, you're not concerned with introducing this into the record?

[redacted]. We're not going to read any of the identifying information you see on the document.

Mr. Guynn. Okay. Great.

Ms. Bondi. It was just introduced in the record, though. So that will be sealed?

[redacted]. Yes, exactly. That will not be publicly available.

[redacted]:

Q So, if you've had a moment to look this over, this is an email that was originally included in the January 30th production from the Department. I know that there's been some public discussion of this email previously. You may have discussed this email previously.

I think, from our point of view, this is a difficult email to understand. The subject is Epstein victim list. There is a list of names. The vast majority of those are not redacted.

Do you have a sense or understanding of how this document could have gone unredacted?

A No, but I would believe it's not intentional. We had hundreds of lawyers were working around the clock using their best efforts to protect victims. And that was the fear of human error, working such long hours, to get 3 million pages-plus of documents out within 30 days.

Q Is it your best understanding that every document that was released did experience the full internal review process? In other words, every document benefited from a first-level review and QCs, when appropriate?

A I believe so.

Q Did you ever receive any information or understanding as to how this particular document could have made it through any kind of review process?

A No. I do recall that I don't know which error it was, but one of the reviewers was working, I believe, very long hours and didn't properly hit save after the redactions were done. And I believe Deputy Attorney General at the time, Blanche, addressed that. I don't know if it's this particular document.
Q I was just going -- I think Mr. Blanche also mentioned that at the briefing.
You don't know whether that issue ended up affecting this document or not?
A Yes.
Q I think, from a public point of view, the Department, by its own admission, has taken down several thousand documents that mistakenly implicated survivors' identity or personal information.
Do you have a personal perception of how the Department's victim redaction process performed?
A Well, if one victim's name is released, it didn't perform properly. And multiple victims' names were released, and, of course, that, in my opinion, was done inadvertently. And everyone I knew involved in this process cared deeply about protecting the identity of the victims.
Q Did you gain any understanding of whether there were particular common themes that were emerging in those mistakes, whether it was somebody not hitting save?
I'm not sure why that is so bothersome to you. It helps us to have oversight of the process.
Do you have an understanding whether it was a technical review process issue?
A I'm not aware --
Q Okay.
A -- other than what I just mentioned.
Q Thank you.
A And Deputy Attorney General Blanche at the time addressed, I believe, all of those questions here when he came with me a few months ago to discuss all of these issues, but I don't

think you were present for that.

Q In your view, do you think that the Department owes anything, whether that's an apology or financial compensation, to survivors whose identities were exposed in the document releases?

A We absolutely owe an apology to any victim's name any time it's inadvertently released.

Q I'd like to touch on claims that some materials may have been over-redacted or removed for possibly political reasons.

[redacted]. And so I will introduce as minority exhibit D this photograph.

[Bondi Minority Exhibit D.
was marked for identification.]

[redacted]:

Q You may be familiar with it. This is a photograph that was produced on January 30th. It appears to be -- and the committee's understanding is that it is -- a photograph of Commerce Secretary Howard Lutnick and other individuals with Mr. Epstein on Mr. Epstein's island in the U.S. Virgin Islands.

The photo was reportedly included in the initial production on January 30th, then taken down, and then reposted after there were press inquiries on the subject.

Do you have an understanding of why this image was taken down?

A I do. I believe that Deputy Attorney General Blanche or his staff believed that this was AI for some reason and not real. It was taken down, but it was put back up.

I'm not sure if it was intentionally taken down, but it was put back up because it was confirmed that it was Howard Lutnick and his family.

Q Do you have any direct or indirect knowledge of this photo being taken down for political reasons?

A No.

Q I would like to introduce as minority exhibit E one more similar image.

Ms. Dhillon. Is that D --

[redacted]. -- sorry. That's D.

Ms. Dhillon. No. It's E.

[redacted] It's E. The Lutnick photo is D. This new exhibit is E.

[Bondi Minority Exhibit E.
was marked for identification.]

[redacted]:

Q I don't know whether you've seen this image before. It was part of the first production on December 19th of last year. It shows a series of photographs taken at one of Mr. Epstein's homes. It has a Bates No. of EFTA 00000468.

In the bottom left portion of this photograph, there is another photograph of what appears to be President Trump prior to being President, it would seem, and Ghislaine Maxwell. That's a publicly known photograph. And so it is a question of public record that the First Lady, as well as Mr. Epstein, are obscured in the middle of that photograph underneath on the desk here.

And then there's one more image. It's hard to tell. I think there's a view that the image on top of the image I just described is President Trump prior to being in office with a group of women in bathing suits.

This photograph was -- this photo was originally included in the first December 19th production. Same pattern where it went down, and then it came back up.

Do you have any understanding of why this image was taken down?

A No.

Q Do you have any direct or indirect knowledge of this photo being taken down for political reasons?

A No.

Q I'd like to ask about a woman who was interviewed by the FBI four times and who accused Mr. Epstein and President Trump of sexual misconduct.

The January 30th production contained one of her interview summaries but not the other three interview summaries. And, in those other interviews, the woman had accused President Trump of sexual assault.

The Department subsequently released those other interview notes on March 5th and said that they had been incorrectly coded as duplicative.

Do you have any understanding of how those interview summaries came to be incorrectly coded as duplicative?

A Other than Deputy Attorney General Blanche's statements that it was, I believe he said, incorrectly labeled because they were already mentioned in a summary. So it popped up as duplicative. And then they were, in fact, put back online.

And that's the best of my recollection from his statements.

Q Thank you. And is it your perception that, if we wanted to get more granular and try to understand what exactly happened with these documents, that Mr. Blanche would be a logical starting point?

A Well, I believe he came to this committee, and I think he answered that question. I believe he addressed that in front of this committee already.

Q Do you have any knowledge of any documents related to this woman's claim being withheld from a DOJ production due to political considerations?

A No.

Q Do you have any understanding of the extent to which this woman's allegations were investigated by the FBI or DOJ?

A No.

Q Our best understanding is that there are still a few more documents linked to this

woman's serial number that have not been released.

Do you have any understanding of those documents and their release status?

A That is not my understanding, so no.

Q The woman's friend was also interviewed, and her interview was linked to a different serial number. There's only the one interview summary of the friend as far as we know that has been released.

Do you have any knowledge of any other documents under the friend's serial number being withheld?

A No.

Mr. Guynn. Hold on. Counsel, can I just ask you a question? And I don't know if it's possible to do this appropriately on the record given the nature of this person you're talking about.

But I'm not sure the Attorney General knows the identity of the person you're referring to.

Ms. Bondi. I don't.

Mr. Guynn. And so I think it's hard for her to make sure that she's correctly answering the questions about that person's status and the like.

Ms. Dhillon. Yeah.

[redacted]. Yeah. It's just to the witness's best understanding, whatever that understanding is.

Ms. Dhillon. We're not playing a game here, are we? Do you want to --

[redacted]. I think only you are.

Ms. Dhillon. -- ask her the answers --

[redacted]. I think you're the only one who is.

Ms. Dhillon. -- or do you just want a shell game?

[redacted]. So the question, and every question, is to the best of the witness' understanding. And, if the witness lacks the understanding that you're describing, that's the

answer.

Ms. Dhillon. And, if there's a lack of foundation in this question, that would be a basis not to answer it.

Ms. Bondi. Do you have the document?

[redacted]. No. We may. I think I'm willing to limit it to, do you have an understanding of any documents related to the woman or of any friend of the woman being withheld by DOJ?

Ms. Dhillon. What woman? Lack of foundation.

Mr. Guynn. Who is the woman, [redacted].

[redacted]. We don't have rules of evidence here. But I think the witness understands the initial discussion of the --

Mr. Guynn. I think the witness might think she understands, but I don't know if she does because we don't know who the woman is.

Ms. Bondi. I believe that the Department of Justice released everything legally that they could release under the law. I do not know who you're talking about specifically.

[redacted]:

Q Okay.

A But I believe that the Department, in good faith, complied with the Epstein Act.

Q Thank you. One more, which is in a similar category and to the best of your knowledge or awareness.

There was an interview in the January 30th production of an Epstein survivor who said that, when she was 13, Epstein took her to meet President Trump, and Epstein said to Trump -- not President at the time, so then Donald Trump. But the interview reflects that Epstein said to Trump, quote, "This is a good one, huh?"

That document was taken down and then put back up. Do you have any knowledge of why

the document I just described would have been taken down or put back up?

A Not that specific document unless it was what we discussed earlier, one that was already in a summary, listed in a summary; therefore, it was duplicative, considered duplicative, but then put back up.

Q Thank you.

A And I believe the Deputy Attorney General at the time discussed that already with this committee.

[redacted]. We're going to turn it over to some Members who have questions of their own.

Mr. Min. Thank you very much. I appreciate you being here. And, again, I'm sorry about the circumstances of your current situation.

I wanted to first just ask about the scope of production, something you touched on earlier. As you've said, the DOJ received approximately 6 million documents, and under your and possibly then-Deputy AG Todd Blanche's direction, the DOJ released roughly 3 million of those documents.

And I think you said earlier that the 3 million documents that were not released were withheld because, quote, "much of it was duplicative; some was privileged; and some of the materials had nothing to do with Epstein." Does that sound accurate?

Ms. Bondi. I believe there -- I've answered this previously.

Mr. Min. I'm just recharacterizing what you said earlier.

Does that sound familiar to you, that basically 3 million documents were not produced because it was duplicative, privileged, had nothing to with Epstein?

Ms. Bondi. I would rely on the list that we discussed that Deputy Attorney General Blanche released as to the reason --

Mr. Min. Do you mind speaking in the mic. I cannot really hear you too well.

Ms. Bondi. I would rely on the list that Deputy Attorney General Blanche at the time

released --

Mr. Min. I'm just --

Ms. Bondi. -- giving the reasons why things were withheld.

Mr. Min. I'm just -- actually, just quoting what you said earlier, to the best I was able to transcribe it.

But, again, you've said much of it is duplicative; some was privileged; and some had nothing to do with Epstein.

And I guess I'm just curious, how many fell into each bucket, if you know? How many were duplicative? How many were privileged? How many had nothing to do with Epstein?

Ms. Dhillon. This has already been asked and answered.

Mr. Min. Okay. Maybe I missed it. Would you mind answering the question?

Ms. Dhillon. This has been asked and answered repeatedly if you want to check --

Mr. Min. -- do not know. I think I missed that, and sometimes it's hard to hear. So if you don't want to answer it --

Ms. Dhillon. You may have missed it because you weren't here, but --

Ms. Bondi. I believe you were out doing an interview and missed it.

But what happened, we discussed it, and I said I'm not sure the exact number of documents, but that is listed somewhere.

Mr. Min. Okay.

Ms. Bondi. I believe it's been released to you.

Mr. Min. So I want to drill down on the privilege aspect of that.

Do you know what types of privilege were being asserted, or is that a question for Mr. Blanche?

Ms. Bondi. I would rely --

Ms. Dhillon. Again, this has been asked and answered.

Mr. Min. Okay.

Ms. Dhillon. Again, you were not in the room.

[redacted] The witness can answer that.

Mr. Min. I'm a Member. I'm asking my own questions.

Ms. Dhillon. You're not on this side of the table.

[redacted]. Let her figure it out.

Ms. Bondi. I've answered that multiple times.

Mr. Min. Would you mind answering again?

Ms. Bondi. No. It's in the transcript.

Mr. Min. Okay. I guess I just wanted you -- you had said earlier that a prosecution memo would be the type of evidence that's privileged.

Would the documents or evidence assembled by the -- collected by the FBI and DOJ that went into a decision to prosecute or not prosecute, would that also be considered privileged under the DOJ's view of what was produced?

Ms. Bondi. Somehow your microphone is echoing.

Mr. Min. Okay. When we're talking about what is privileged, you said earlier that a prosecution memo would be the type of document that's privileged.

Would the document or evidence collected by the FBI and DOJ that went into a decision to prosecute or not prosecute, would that also be considered privileged when the DOJ was deciding whether or not to produce evidence -- to produce any of the Epstein files?

Ms. Bondi. I'd have to look at the specific document.

Mr. Min. I'm just asking as a general question. Were there documents withheld?

And, specifically, I guess I want to get to the question, the 302 witness statements, which do not seem to have been produced, and we have had a lot of survivors, as noted -- was noted, ask for those 302 witness statements for theirselves, the ones that were transcribed that they took many

years ago. Those apparently were withheld.

What is the basis of that withholding, and why were they not produced?

[12:28 p.m.]

Ms. Bondi. As I said earlier, I would rely on the basis for any withholding of documents in the memo that Deputy Attorney General Blanche released laying out all the reasons for --

Mr. Min. So you have no knowledge --

Ms. Bondi. -- items not being released.

Mr. Min. You have no knowledge or you were not in charge, you had no direction on these decisions on what to withhold?

Ms. Bondi. I did not do the review. I've said that earlier as well.

Mr. Min. Right. But there seems to have been a systemic policy in place to have withheld certain documents related to the decision to prosecute or not prosecute. I'm just trying to clarify if that was the case.

Ms. Bondi. Well, I don't agree with your assessment of systemic --

Mr. Min. How would you characterize what was allowed to be produced, then, in this case?

Ms. Bondi. I believe that the Department of Justice acted in good faith in releasing all the documents permissible under the law. And I would refer again --

Mr. Min. Okay.

Ms. Bondi. -- to the Deputy Attorney General's memo. And he came in here before this body and -- to discuss all of these topics, and all of you --

Mr. Min. I got it.

Ms. Bondi. -- walked out --

Mr. Min. So we will have to ask Mr. Blanche that. I appreciate it.

Ms. Bondi. Well, you walked out --

Ms. Dhillon. Please don't talk over the witness.

Mr. Min. I'm sorry. I have 1 minute left, so I'm going to reclaim --

Ms. Bondi. If I could finish --

Mr. Min. -- my time, and I apologize.

Ms. Bondi. You walked out. I'm not sure if you were here that day, so I can't --

Mr. Min. I was not.

Ms. Bondi. But all the Democrats walked out --

Ms. Dhillon. They all walked out.

Mr. Min. If I could reclaim my time -- I have 1 minute left --

Ms. Bondi. -- while he was answering this question.

Mr. Min. -- so I am just going to -- I apologize for the interruption, but this is the nature of this, unfortunately.

I have a question about the redactions, or non-redactions, of survivors' personal information. I know you have described this as a situation where you had a lot of documents to produce. I know you have said that Mr. Stanley Woodward was primarily responsible for the review and production of these documents.

I guess my question is this. First of all, there were a number of nude photos allowed to be produced. And, again, I know that was not under your purview. That seems to me to be shocking. Like, this does not seem like something that should ever be produced, and any attorney in a law firm that allowed something like that to be produced to the public in this context would be fired.

And so I guess my question is: Were there any disciplinary proceedings taken against any attorneys or otherwise who allowed for improper identifying information about the victims to be produced or nude photos to be produced?

Ms. Bondi. As I --

Mr. Min. Were there any disciplinary proceedings?

Ms. Bondi. As I said earlier, the Department of Justice, under the law that you voted for, gave us 30 days to release approximately 30 million --

Ms. Dhillon. Three million.

Ms. Bondi. I'm sorry -- 30 days to release approximately 3 million documents.

Six million were reviewed. And, during that time, we were very concerned there would be errors. And that's why we proceeded on a rolling release of documents. But I believe everyone acted in good faith -- I hope they did -- in doing the best they could.

But, yes, there was human error. Yes, we've already discussed that multiple times.

Mr. Min. I will just note that it took you much longer than 30 days to produce. And these were nude photos; these were not, like, a line that was missed. It's really hard for me to imagine that this was done with good faith.

But, with that, I yield back.

Ms. Stansbury. All right. Good afternoon. Thank you guys for being here today.

[Bondi Minority Exhibit F.
was marked for identification.]

Ms. Stansbury. While I get started, I'm going to ask if staff can pass out exhibit F, which is the Epstein Files Transparency Act, because I'm going to refer to a section in my latter question.

But, former Attorney General, I want to ask about some specific individuals who were named in the files as potential perpetrators of crimes associated with Epstein. And I want to ask, during your tenure as the AG, to your knowledge, did DOJ investigate any of the following individuals? And so, if you would answer "yes" or "no," I'd appreciate it.

Prince Andrew?

Ms. Bondi. I am not sure if he's subject of a pending investigation. I'm not sure who is or is not subject of an investigation. As I stated earlier, Jay Clayton had opened an investigation --

Ms. Stansbury. Uh-huh.

Ms. Bondi. -- in New York. So I wouldn't be able to give you any names, whether they were or were not -- are or are not being investigated or have been.

Ms. Stansbury. I appreciate that.

Ms. Bondi. I'd refer all that to Jay Clayton.

Ms. Stansbury. I appreciate that.

I'm going to go ahead and go through the names, notwithstanding the comment you just made, because I do think it's important to have in the record.

Another prominent name is Leon Black. Do you know if there was any investigation pending or open during your tenure?

Ms. Bondi. I would refer, again, to Jay Clayton --

Ms. Stansbury. Glenn Dubin?

Ms. Bondi. -- or Todd Blanche.

Ms. Stansbury. Glenn Dubin?

Ms. Bondi. Do you want to go through the list and then --

Ms. Stansbury. Yeah, I'm going to go through the list.

Ms. Bondi. Do you want to go through it all, and then I can answer if any of them --

Ms. Stansbury. Just for the record, let's do each one.

Glenn Dubin, please.

Ms. Bondi. I would refer it to the Deputy Attorney General or Jay Clayton.

Ms. Stansbury. Okay. Jes Staley?

Ms. Bondi. Same answer.

Ms. Stansbury. Les Wexner?

Ms. Bondi. Same answer.

Ms. Stansbury. Alan Dershowitz?

Ms. Bondi. Same answer.

Ms. Stansbury. Paolo Zampolli?

Ms. Bondi. Same answer.

Ms. Stansbury. Donald Trump?

Ms. Bondi. Same answer.

Ms. Stansbury. When you left the Department in April, had you been briefed on any investigations or any open cases regarding the Epstein case at all?

Ms. Bondi. I can't answer whether there is or is not a pending investigation into anyone, and that includes all the names that you listed.

Ms. Stansbury. So, as the sitting U.S. Attorney General overseeing this case -- and I understand you've referred to Todd Blanche many times as being the managing supervisor of this case and the release of the files -- you were not briefed on any of the prominent names, including the President, and whether or not anyone was investigating their appearance in the files?

Ms. Bondi. It's privileged and protected information, and I'm not going to discuss that.

Ms. Stansbury. And which privilege? Which privilege are you asserting?

Ms. Dhillon. Yeah, we're not having to assert privileges. This is a transcribed interview.

Ms. Stansbury. I'm sorry. The AG just asserted a privilege.

Ms. Bondi. I'm not going to answer that.

Ms. Stansbury. You're not going to answer what kind of privilege you're asserting, or you're not going to answer the question?

Ms. Bondi. I'm not going to answer whether there was or was not pending investigations, again, into anyone. We've said that -- I've asked and answered -- it's been asked and answered, this question, multiple times.

Ms. Stansbury. Well, Madam AG, the reason why I'm asking is because of exhibit F, which is the Epstein Files Transparency Act, which sets out what files were required under the Federal law to be released to Congress and to the public.

And it specifically states in the second page of the act, as signed into law by the President, that all "internal DOJ communications, including emails, memos, meeting notes, concerning decisions to charge, not charge, investigate or decline to investigate Epstein or his associates" were required to

be disclosed by the Epstein Files Transparency Act.

And then it has a list of permitted withholdings. And there is nothing in this law that allows the assertion of any of the kind of privileges that you've discussed today. In fact, the law was very explicit that those privileges could not be asserted.

And so part of why I'm asking you if there was a pending investigation into some of these individuals is because their names were redacted in the publicly released files, and when we looked at them unredacted, as Members of Congress, the only redactions that were permitted were for open cases.

So I'm asking, were there pending investigations into any of these individuals?

Ms. Dhillon. That's asked and answered.

Ms. Bondi. I've answered that question.

Ms. Stansbury. Okay. Well, I would assert, then, that is a breaking of the law, because the law is very clear about what privilege and what materials were supposed to be released.

And my final question is: You know, the survivors have made very clear that the release of their names, their personally identifiable information, home addresses, phone numbers, photographs of many of them when they were minors -- we're talking children -- were released publicly.

How do you answer for that? Do you feel personally responsible for that?

Ms. Bondi. As I said earlier, we were given 30 days to release 3-million-plus documents. And our concern, our primary concern, was protecting the identity of victims. And I believe everyone in the Department of Justice feels horrible when any victim's name or identifying information is released.

Ms. Stansbury. But do you feel --

Ms. Bondi. It was human error.

Ms. Stansbury. -- personally responsible at all?

Ms. Bondi. I believe -- I believe everyone who was involved in the process would. And I

believe you should, too, because you were pressing us to get 3 million pages out in 30 days, and that was virtually impossible.

Ms. Stansbury. Oh, I'm not personally responsible for the Department of Justice. I don't work there.

But my question --

Ms. Bondi. You were telling us --

Ms. Stansbury. My question --

Ms. Bondi. If I could finish, you were telling us to get --

Ms. Stansbury. My question is about you --

Ms. Bondi. -- 3 million pages out in 30 days.

Ms. Stansbury. -- as the sitting Attorney General, you oversaw the implementation. Even if you delegated this, you were responsible. You are the named human in the Epstein Files Transparency Act.

Do you have any remorse over the release of the --

Ms. Dhillon. Okay. This is verging on badgering --

Ms. Bondi. I've --

Ms. Dhillon. -- and tedious.

Ms. Bondi. -- asked -- I've answered this question multiple times, that we feel sorry for any victim whose name was released inadvertently.

Ms. Stansbury. Well, for many of --

Ms. Bondi. It's horrible.

Ms. Stansbury. -- these women, they will not be able to reclaim their privacy.

So I yield to the next Member.

Mr. Walkinshaw. Ms. Bondi, add my name to the list of folks wishing you a speedy recovery.

In March of 2025, FBI personnel -- and we've discussed this already a little bit -- reviewed

100,000 Epstein documents. This was long before the Transparency Act passed, of course, so there wasn't a statutory framework for that review, at least not one specific to it.

Under whose authority was that review conducted?

Ms. Bondi. I'm sorry. What date were you --

Mr. Walkinshaw. In March of 2025. The 100,000 documents. Was that under your authority?

Ms. Bondi. Yes, and I delegated that to Todd Blanche.

Mr. Walkinshaw. Okay. And do you know what instructions were given to those reviewers?

Ms. Bondi. I believe we have released the instructions that were given, but those may have been given later.

Mr. Walkinshaw. Have you released all of -- because I know there was a FOIA request.

Ms. Bondi. Uh-huh.

Mr. Walkinshaw. To your knowledge, have all of the instructions to reviewers been released publicly?

Ms. Bondi. I don't know.

Mr. Walkinshaw. Okay.

Were those reviewers instructed to flag mentions of Donald Trump?

Ms. Bondi. I don't believe so.

Mr. Walkinshaw. Okay. Because it's been reported, there is a whistleblower who came forward, there are documents that the media has cited saying, those reviewers were instructed to flag mentions of Donald Trump. You don't have any knowledge of that?

Ms. Bondi. I have not seen -- I have not heard of a whistleblower saying that. I have no knowledge of that.

Mr. Walkinshaw. Okay. Senator Durbin sent you a letter last year citing that

whistleblower. To your knowledge, have you responded, or did the Department?

Ms. Dhillon, you can feel free to jump in. Did the Department respond to that letter that Senator Durbin sent?

Ms. Bondi. We can ask Patrick Davis, who runs that department.

Mr. Walkinshaw. Okay.

To your knowledge, were any records flagged -- flagged for whatever reason, since you don't recall whether there were flags of mentions of Donald Trump -- any records that were flagged in that process ultimately withheld or redacted from the Transparency Act release?

Ms. Bondi. I don't believe reviewers were asked to flag anything, to my knowledge.

Mr. Walkinshaw. Okay. All right.

Ms. Bondi. There were over 500 attorneys at some point reviewing documents.

Mr. Walkinshaw. Uh-huh. Okay. So there was no flag of mentions of Donald Trump? No one came to you and said, "We reviewed these 100,000 documents, and there are X number of mentions of Donald Trump"? No one ever said that to you?

Ms. Bondi. I don't believe anyone was asked to flag anything.

Mr. Walkinshaw. Okay.

You stated earlier that it's common for the Bureau of Prisons to move prisoners, maybe based on their safety.

Is it common, in your experience, for the Deputy Attorney General to personally interview prisoners? Is that common? Can you recall -- I'm sorry. I'll let you answer.

Ms. Bondi. Go ahead.

Mr. Walkinshaw. Can you recall any other instances of the Deputy Attorney General personally interviewing prisoners?

Ms. Bondi. We were in office a year. Of course not. That was the only prisoner, to my knowledge, that he interviewed. And that was because she was living; Epstein is dead. And his

intent was exactly what this committee is trying to get at, to find out if she had evidence of other crimes.

Mr. Walkinshaw. She was in his inner circle, right? Very close to it?

Ms. Bondi. And you can read the transcribed interview, what he asked her, and it's very clear why he asked it -- to see if there were other --

Mr. Walkinshaw. Thank you.

Ms. Bondi. -- crimes that she knew about that had been committed.

Mr. Walkinshaw. One of the things our investigation has revealed is that other individuals very close to Jeffrey Epstein were never interviewed by the FBI, across multiple administrations -- Kahn, Indyke, the accountant, the lawyer, Les Wexner, whose money financed a lot of Epstein's sex trafficking.

I mean, in your professional opinion as a former prosecutor, do you find it strange that the FBI never interviewed some of those figures very close to Jeffrey Epstein? And do you think they should?

Ms. Bondi. You're going to have to ask the Obama and Biden administrations the exact same thing.

Mr. Walkinshaw. I said it's multiple administrations. I'm asking you, across all those administrations, is it strange to you -- do you think those individuals should have or perhaps still should be interviewed by the FBI?

Ms. Bondi. If there was evidence of wrongdoing, yes. And I would direct that to the FBI. And I would also direct it to the Biden administration --

Mr. Walkinshaw. Okay.

Ms. Bondi. -- who had this for 4 years --

Mr. Walkinshaw. Sure.

Ms. Bondi. -- 4 years --

Mr. Walkinshaw. But it was a memo while you were Attorney General that said, case closed, nothing else to be seen here, we're not going to investigate anything. But those key figures --

Ms. Bondi. You're mischaracterizing that.

Mr. Walkinshaw. -- close --

Ms. Bondi. Can you read that to me, where I said "case closed"?

Mr. Walkinshaw. -- those key figures close to Epstein were not interviewed.

Deputy Attorney General Blanche went and spent a lot of time with Ghislaine Maxwell, but other figures close to Epstein not even ever interviewed by the FBI. Why didn't you say to the FBI, y'all need to go interview some of these folks?

Ms. Bondi. You are mischaracterizing --

Mr. Walkinshaw. I'm asking you a question.

Ms. Bondi. No. You're mischaracterizing something that you've stated was in a document. Can --

Mr. Walkinshaw. No, I'm asking you --

Ms. Bondi. -- you read that back to me?

Mr. Walkinshaw. I'm asking you, why didn't you, as a former prosecutor, a professional who understands these cases, look at it and say, "These folks who were in the inner circle of Epstein's massive sex-trafficking ring were never even investigated. My boss, Donald Trump, ran on this issue. I'm going to make sure that they are questioned and interviewed so we can get to the bottom of it"?

Why didn't you do that, Ms. Bondi?

Ms. Bondi. Deputy Attorney General Blanche interviewed Ghislaine Maxwell to see if she had evidence of any other crimes. To the best of my knowledge, that transcript is widely available.

Mr. Walkinshaw. You asked me to --

Ms. Bondi. You criticized him interviewing her, but his --

Mr. Walkinshaw. I'm asking --

Ms. Bondi. -- he interviewed her to try to answer your question.

Mr. Walkinshaw. I'm asking, why didn't y'all interview anyone else?

You said, "We did not uncover evidence that could predicate an investigation against uncharged third parties." Some people who might have that evidence were Epstein's lawyer; his accountant; the financier, Wexner. Why didn't you direct that they at least be interviewed and questioned?

Ms. Bondi. That statement is very different than the one that you said earlier --

Mr. Walkinshaw. I'm asking --

Ms. Bondi. -- to clarify.

Mr. Walkinshaw. -- you a question. Why didn't you direct that they be interviewed to uncover, perhaps, evidence that could predicate an investigation against uncharged third parties? Why didn't you do it?

Ms. Bondi. I've answered this multiple times.

Mr. Walkinshaw. You haven't answered it. You don't have an answer.

Thank you.

Ms. Bondi. You also misrepresented something and just had to read it back.

[redacted]:

Q All right. We've got a few last questions, and we are coming to the end. I will be brief.

One question is: Some Members have experienced that, in the Reading Room, some documents that they go to see unredacted still have some redactions on them. Do you have any understanding of how or why a document in the Reading Room would still have redactions?

A Yes. I believe that's because some of those documents were sealed redacted by SDNY when we received them. We received them redacted, is my understanding of that. But I would

have to look at the specific document and see where it came from.

Q Do you have any recollection of any other category of redaction other than the one you just described?

A No.

Q As attorney general of Florida, did you ever look into potential co-conspirators of Epstein's crimes?

A That would have been the State attorney in Palm Beach who had jurisdiction over that and the Federal authorities. I was -- I only had the Office of Statewide Prosecutor.

Q A few followups on the topic that was discussed earlier of Members going to DOJ to review files and records that may have existed of Member searches that -- it came up, high-profile, at one of your hearings.

I think -- I just want to make sure I understood correctly. Was your description that that was not a deliberate change in policy at DOJ, that was just a function of how the DOJ system is set up? Is that fair or correct?

A No, I believe this was unprecedented, what we did, putting 3 million pages online, and part of the system included monitoring sensitive information that was on there and people reviewing it. It was built into that system.

Q I guess that's --

A And it's still in that system.

Q That's what I think I'm getting to, is, was a deliberate policy choice made to track or monitor Member searches under the Epstein files?

A Not to my knowledge.

Q Okay.

As far as you know, if a Member went to DOJ to review some other piece, some other document, some other piece of material, nothing to do with Epstein, would that search activity

typically be tracked in the same way?

A I don't believe a Member can go look at anything online. This system was set up with over 3 million to 6 million pages of documents to protect victims' identity to the best we could, and, of course, they all weren't protected.

Q And so, to your knowledge, DOJ's usage of that Member search history, it sounds like, is restricted to protecting survivors' identities? Is that your recollection? In other words, how did DOJ use that information?

A Can you rephrase the question?

Q Yeah, sure. So DOJ has, or at least had, Member search history when Members would come review different files and they'd choose which files they wanted to review. How did the Department use that information, to your recollection?

A Regarding Epstein?

Q Yes, specifically tracking Member Epstein searches.

A I don't know. I don't recall.

Q As far as you know, if a Member went to review an Epstein file unredacted today at DOJ, would their search records be tracked in the same way?

A I believe that's part of the program, and they have to be tracked. I believe. I'm not certain.

Q A couple of last miscellaneous ones.

With respect to Mr. Epstein's death, is your personal view that he committed suicide?

A I would rely on the FBI's investigation.

Q Are you aware of any information indicating that Mr. Epstein worked for a domestic or foreign intelligence service?

A Not personally. I would rely on the FBI's investigation.

[redacted]. That concludes my questions.

I will just state for the record that the minority did have additional questions that would have fallen within one of the parameters that you or your counsel described, specifically with respect to conversations with the President. We withheld some of those questions for your sake, but we want to note for the record that those are important questions to us, and we think they deserve to be answered in this investigation.

With that, I will thank you for your time today, and we can go off the record.

Ms. Bondi. Thank you.

[Whereupon, at 12:50 p.m., the interview was concluded.]

Certificate of Deponent/Interviewee

I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.

________________________________

Witness Name

________________________________

Date