**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW MEXICO,

*Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

*Defendants*.

Case No. 1:26-cv-02762 (AHA)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. Collaboration and Evidence Sharing Between the State and Federal Law Enforcement Agencies is the Norm ........ 3

II. Formal Requests for Information from Federal Agencies Are Governed by *Touhy*. ........ 4

III. DOJ Induced the State to Stand Down Its Own Independent Investigation of Epstein and His Co-conspirators' Crimes in New Mexico in 2019 ........ 6

IV. The State Reopens Its Investigation and Renews Its Requests for Records to DOJ ........ 7

V. DOJ Led the State Down Dead-End Paths While Flip-Flopping on its Commitment to Cooperate with New Mexico's Investigation ........ 8

VI. The State's *Touhy* Requests Are in Aid of Grand Jury Proceedings ........ 9

LEGAL STANDARDS ........ 10

*Federal Rule of Civil Procedure 12(b)(6) Controls* ........ 10

*APA Summary Judgment* ........ 11

*Substantive APA Review* ........ 12

ARGUMENT ........ 13

I. This Court Has Subject Matter Jurisdiction to Review DOJ's Wrongful Denial of the State's *Touhy* Requests ........ 13

a. DOJ cannot escape judicial review by claiming that its *Touhy* regulations place its actions beyond the Court's reach ........ 13

b. DOJ cannot avoid its *Touhy* obligations by denying there is an applicable "proceeding" in New Mexico ........ 17

II. This Court Has Subject Matter Jurisdiction to Review DOJ's Wrongful Denial of the State's *Touhy* Requests ........ 21

a. Summary judgment would be improper on DOJ's incomplete record....22

b. DOJ's conduct in assuring the State that its *Touhy* request would be granted, only to then deny the request, is the definition of caprice....23

c. The State's records request was narrowly tailored, and the State further offered to facilitate the records review to minimize DOJ's administrative burden....25

d. DOJ's remaining reasons for denying the State's *Touhy* requests lack merit....27

III. This Court Should Disregard DOJ's *Post Hoc* Justifications for Denying the State's *Touhy* Request; But Even if Considered, Each is Arbitrary and Capricious....29

CONCLUSION....34

## TABLE OF AUTHORITIES

**Cases**


*Adaya LL v. DEA*, 826 F. Supp. 3d 115 (D.D.C. 2026).............................................................. 31

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*,
118 F. Supp. 3d 388 (D.D.C. 2015) ................................................................ 13, 24, 25

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)............................................ 18

*Baltimore v. Pruitt*, 293 F. Supp. 3d 1 (D.D.C. 2017)................................................................ 23

*Bobreski v. U.S. Envt'l Prot. Agency*, 284 F. Supp. 2d 67 (D.D.C. 2003) .................................. 19

*Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623 (2023)...................................................... 15, 19

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ..................................... 14

*Cobbledick v. United States*, 309 U.S. 323 (1940)...................................................................... 20

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)...................................................... 15, 16, 18, 27

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)........................................................................................................... 14, 31

*Desa Grp., Inc. v. U.S. Small Bus. Admin.*,
190 F. Supp. 3d 61 (D.D.C. 2016) ............................................................................... 13, 24

*Foster v. Mabus*, 895 F. Supp. 2d 135 (D.D.C. 2012) ................................................................ 16

*Gamble v. United States*, 587 U.S. 678 (2019) ............................................................................. 5

*Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020)........................................................................ 15

*Heath v. Alabama*, 474 U.S. 82 (1985) ..................................................................................... 5, 30

*Houston Bus. J., Inc. v. Office of the Comptroller of Currency*, 86 F.3d 1208 (D.C. Cir. 1996) ... 7, 21

*Kimbrough v. United States*, 552 U.S. 85 ...................................................................................... 32

*Kirwa v. DOD*, 285 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................ 30

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
606 U.S. 146 (2025)..................................................................................................................... 16

*Michigan v. EPA*, 576 U.S. 743 (2015) .... 14, 19

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .... 14

*Nat. Res. Def. Council v. Daley*, 209 F.3d 747 (D.C. Cir. 2000) .... 14

*New Mexico v. Garcia*, D-1113-CR-202400090 (N.M. 11th Dist. Ct. April 9, 2024) .... 6

*Ohio v. EPA*, 603 U.S. 279 (2024) .... 14

*Powers v. Donley*, 844 F. Supp. 2d 65 (D.D.C. 2012) .... 13

*Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) .... 5

*R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agriculture*, 130 F. Supp. 3d 356 (D.D.C. 2015) .... 24

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996) .... 16

*Schroeder v. U.S. Dep't of Veterans Affs.*, 673 F. Supp. 3d 1204 (D. Kan. 2023) .... 30

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011) .... 12, 13

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) .... 13

*State v. Rogers*, 566 P.2d 1142 (N.M. 1977) .... 5

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) .... 22

*United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) .... 4

*United States v. Jackson*, 187 F.4th 1198 (9th Cir. 2026) .... 10

*United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) .... 23

*United States v. Zhang et al.*, 25-cr-03104, Doc. 2 (D.N.M. May 29, 2026) .... 6

*Watts v. SEC*, 482 F.3d 501 (D.C. Cir. 2007) .... 7

*West Virginia ex rel. Morrisey v. U.S. Dep't of Health & Human Servs.*, Civ. No 14-1287 (RBW), 2014 WL 12803229 (D.D.C. Nov. 3, 2014) .... 25

**Statutes**

Epstein Files Transparancy Act ("EFTA")
Pub. L. 119-38, Nov. 19, 2025, 139 Sta. 656 ........ 8, 28

EFTA §2(a) ........ 18

EFTA §2(a)(1)-(9) ........ 28

EFTA § 2(c)(1)(A)-(E) ........ 18

EFTA § (3) ........ 18, 28

5 U.S.C. §2(c)(1)(A)-(E) ........ 18

5 U.S.C. § 301 ........ 7, 16

5 U.S.C. § 552a(b) ........ 17

5 U.S.C § 552a(b)(7) ........ 17, 29, 33

5 U.S.C. § 552 (a)(2) ........ 17

5 U.S.C. § 552 (g)(1) ........ 17

5 U.S.C. § 701(a)(2) ........ 15

5 U.S.C. § 706(2)(A)–(D) ........ 14

18 U.S.C. § 2123(d) ........ 34

18 U.S.C. § 3509(d) ........ 33

28 U.S.C. § 1653 ........ 23

31 U.S.C. § 5319 ........ 34

N.M. Stat. Ann. § 31-6-1, et seq. ........ 12

N.M. Stat. Ann. §§ 31-6-1, -6-12 ........ 20

Pub. L. No. 85-619 (1958) ........ 7

H.R. Rep. No. 85-1461 (1958) ........ 7, 16

**Other Authorities**

U.S. Dep't of Justice Manual, § 1-6.240 .......... 8

**Rules**

Fed. R. Civ. P. 15(d) .......... 23

Fed. R. Civ. P. 12(b)(1) .......... 12

Fed. R. Civ. P. 12(b)(6) .......... 13, 20, 24

Fed. R. Civ. P. 56(a) .......... 24

**Regulations**

28 C.F.R. § 16.21 .......... 8, 33

28 C.F.R. § 16.21(c) .......... 7

28 C.F.R. § 16.26(c) .......... 7

## INTRODUCTION

This case challenges the latest federal action in the sprawling and horrific saga stemming from the crimes of Jeffrey Epstein. For decades, Epstein and his associate, Ghislaine Maxwell, regularly visited the Zorro Ranch, a large rural property outside Santa Fe, New Mexico, that provided the type of privacy necessary to sexually abuse and traffic girls and young women. The State of New Mexico, through its chief law enforcement agency, the New Mexico Department of Justice and Attorney General Raúl Torrez ("AG Torrez") (collectively, the "State"), has long sought to hold those who participated in Epstein's criminality accountable for crimes under New Mexico law.

Epstein ultimately escaped accountability when he died in federal custody in a Manhattan jail. Maxwell—his closest accomplice—was tried before a federal jury and convicted of wide-ranging sex crimes arising from her role in Epstein's sex trafficking activities.

Epstein and Maxwell were not alone. Their network included the wealthy, the powerful, and all manner of individuals who willingly enabled Epstein's abuse. It is an open question how many of those people facilitated or had knowledge of Epstein's crimes in New Mexico.

Because Epstein used his New Mexico property as an instrumentality of his sex abuse and trafficking schemes, the State has worked to uncover the individuals who visited Zorro Ranch and willingly took part in or knew about the crimes that occurred there. The State intends to exercise the full breadth of its criminal investigative and prosecutorial authority to bring those individuals to justice and provide closure for Epstein's victims, and there are open proceedings to do just that.

The United States Department of Justice[1] ("DOJ") has information related to Epstein, Maxwell, and their co-conspirators' activities in New Mexico. In 2019, DOJ promised to share that information with the State under the longstanding practice of collaboration and sharing evidence between state and federal law enforcement agencies.

DOJ reneged on that promise. In doing so, DOJ departed from longstanding practice and has functionally interfered with the efforts of state law enforcement officials. This perpetuates the harm from DOJ's continued failure to seek justice for over 1,000 survivors of Epstein's egregious and predatory conduct. Based on publicly available information in the Epstein Files, Zorro Ranch was a location where Epstein and his co-conspirators trafficked, abused, and concealed young girls. The State has a sovereign duty to determine whether there remain chargeable criminal offenses under New Mexico law.

DOJ continues to refuse to cooperate and provide necessary information. And the State now asks this Court's to reject the arbitrary and capricious actions DOJ took in responding to the State's formal requests for information under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). Consistent with this administration's pervasive efforts to insulate itself from longstanding judicial checks on executive power, DOJ now moves to dismiss the State's complaint. DOJ's first argument—that the Court lacks jurisdiction—is plainly wrong under settled law. To the extent the Court looks past that basic error and evaluates DOJ's motion under Federal Rule of Civil Procedure 12(b)(6), the complaint readily states a plausible claim for relief. And if the Court goes further and converts the motion to one for summary judgment, DOJ's arguments on the merits all fail when

[1] Several DOJ components are implicated in this lawsuit, including DOJ and the United States Attorney's Offices for the Southern District of New York ("SDNY") and the District of New Mexico ("DNM"). For ease of reference these entities are collectively referred to as DOJ throughout this Response.

reviewed against the full administrative record rather than the incomplete version DOJ belatedly certified. This Court should deny DOJ's motion.

## BACKGROUND[2]

### I. Collaboration and Evidence Sharing Between the State and Federal Law Enforcement Agencies is the Norm.

New Mexico retains primary sovereign authority to define and enforce criminal law. *See, e.g.*, *Heath v. Alabama*, 474 U.S. 82, 93 (1985) (citing The Federalist No. 9, at 55 (A. Hamilton)). This authority is at the heart of the State's police powers. *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) (recognizing that "[t]he States' powers to undertake criminal prosecutions . . . .do not derive from the federal government" but from "authority originally belonging to [the States] before admission to the Union and preserved to them by the Tenth Amendment." (internal quotation marks and alterations omitted").

Moreover, under the "dual-sovereignty" doctrine, the States retain their sovereign authority to prosecute crimes within their territories even following prosecution by the federal government for the same crimes. *See, e.g., Gamble v. United States*, 587 U.S. 678, 681 (2019); *see also State v. Rogers*, 566 P.2d 1142, 1143-44 (N.M. 1977) (recognizing New Mexico's adoption of the dual sovereignty doctrine). Thus, New Mexico possesses both the authority and duty to investigate potential crimes committed within its jurisdiction and to gather evidence necessary to enforce its criminal laws. Many of the crimes New Mexico is investigating in connection with Epstein and his co-conspirators include allegations of criminal sexual penetration and criminal sexual contact,

---

[2] Throughout this brief, the State references the exhibits attached to its complaint instead of the administrative record compiled by DOJ. The reason is twofold. First, DOJ submitted its motion before it compiled the administrative record, and so this motion is atypical under the normal review process for APA complaints. Second, after belatedly compiling the administrative record at the State's request, DOJ submitted a record that was materially incomplete, omitting communications vital to determining this case even though they are exhibits to the complaint. *See* Docs. 15; 15-1. The State intends to supplement the record with those exhibits to ensure the Court has the full factual record if it proceeds to decide the case applying APA summary judgment standards now.

which lack generally applicable analogues in federal law. For those crimes, New Mexico is the only jurisdiction that can determine if prosecutable criminal cases can still be brought.

Collaboration between state and federal law enforcement agencies has long been a routine and essential feature of criminal investigations across the country. In New Mexico, this cooperation has led to several recent successful investigations related to human trafficking, human smuggling, and sexual abuse of minors. For example, on August 12, 2025, two alleged perpetrators of a transnational human smuggling operation were federally indicted after a joint investigation. *United States v. Zhang et al.*, 25-cr-03104, Doc. 2 (D.N.M. May 29, 2026). Cooperation also supports convictions based on New Mexico criminal statutes. An investigation under the Project Safe Childhood initiative facilitated the State's successful investigation and prosecution of a former Gallup firefighter for possession of Child Sexual Abuse Material involving children under the age of 13. *See New Mexico v. Garcia*, D-1113-CR-202400090 (N.M. 11th Dist. Ct. April 9, 2024). In these cases, and every other case in which the State has collaborated with federal law enforcement, the agencies were able to successfully coordinate sharing of extremely sensitive material and minimize revictimizing survivors with repetitive law enforcement interviews and information gathering. *See* Doc. 1 at 23-24 ¶ 85.

## II. Formal Requests for Information from Federal Agencies Are Governed by *Touhy.*

State authorities request and obtain evidence from federal authorities based on longstanding intergovernmental practice, as discussed above, and through the legal framework governing evidentiary demands directed to the United States and its agencies, as discussed below. DOJ promulgated regulations governing requests for testimony or documents for use in litigation or investigations in which the agency is not a party. These regulations—commonly known as "*Touhy* regulations"—were promulgated under authority from the Federal Housekeeping Act. 5,

U.S.C. § 301, and the Supreme Court's decision in *Touhy*. *See Houston Bus. J., Inc. v. v. Office of the Comptroller of Currency*, 86 F.3d 1208, 1213 (D.C. Cir. 1996) ("When the documents are sought from a federal agency . . . the proper procedure is to make an administrative request, from which review may be had under the APA.").

The Housekeeping Act "does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301.[3] An agency's withholding of information must rest upon an independent source of law. *Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) ("[T]hough an agency regulation may provide the method by which an agency head will comply with or oppose a [legal demand], the legal basis for any opposition to the [legal demand] must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure.")

DOJ *Touhy* regulations expressly provide that voluntary disclosure of information to state and local law enforcement and prosecutorial agencies is permitted, without the need for any formal demand. *See* 28 C.F.R. § 16.21(c) ("Nothing in this subpart is intended to impede the appropriate disclosure, in the absence of a demand, of information by Department law enforcement agencies to federal, state, local, and foreign law enforcement, prosecutive, or regulatory agencies."). DOJ's regulations also provide that the decisionmaker "***will authorize disclosure***" unless specified countervailing considerations—such as privilege, procedural rule, or an adverse impact on active federal investigations—counsel otherwise. 28 C.F.R. § 16.26(c) (emphasis added). And DOJ policy expressly "favors cooperation in state and federal cases . . . in which information obtained by the Department is sought. Authorization in one form or another is usually granted." U.S. Dep't

[3] Following the Supreme Court's decision in *Touhy*, Congress added this sentence to the Housekeeping Act to stop agencies from using the act to withhold information. H.R. Rep. No. 85-1461 (1958) ("Concealment has been the result of the application of [the Housekeeping Act] . . . The purpose of this bill is to correct that situation."); *see also* Pub. L. No. 85-619 (1958).

of Justice Manual, § 1-6.240. Nevertheless, DOJ's *Touhy* regulations also establish procedures and set criteria by which to evaluate a state agency's formal request for DOJ records when the informal information sharing process breaks down. *See* 28 C.F.R. § 16.21.

## III. DOJ Induced the State to Stand Down Its Own Independent Investigation of Epstein and His Co-conspirators Crimes in New Mexico in 2019.

The State launched a criminal investigation of Zorro Ranch in February 2019, a few months before Epstein's death in federal custody. Doc. 1 at 6 ¶ 24. The State began by interviewing a potential victim who reported being sexually abused in New Mexico by Epstein. *Id.* Recognizing the likelihood of overlapping state and federal criminal investigations, the State reached out to DOJ on May 14, 2019, to coordinate and de-conflict. *Id.* at ¶ 25. DOJ declined to coordinate but did not hesitate in accepting the information the State had collected. *Id.* at 7 ¶ 27. About a month later, on July 23, 2019, DOJ told the State to stand down its investigation into Epstein's potential crimes in New Mexico. *Id.* In exchange for the State's cooperation with this request, DOJ promised the State that it would "pass along any information [DOJ] may have gathered about state crimes that were committed in [the State's] jurisdiction." *Id.* at 7 ¶ 28.

DOJ broke that promise. *See id.* at 11 ¶ 42. Epstein died in 2019, Maxwell was convicted in 2021, and DOJ shared no material information to aid New Mexico's investigative efforts.

Epstein's crimes never faded from public consciousness. In 2025, Congress enacted the Epstein Files Transparency Act ("EFTA"), Pub. L. 119-38, Nov. 19, 2025, 139 Stat. 656. The EFTA required DOJ to publicly disclose records in its possession related to Epstein's crimes and, more importantly, his associates and co-conspirators. The EFTA represents Congress's intent to shed public light on a troubling saga that could implicate wealthy and powerful individuals across the globe. That transparency allows victims to seek closure and state law enforcement agencies to uncover previously obscured information about the scope of Epstein's schemes. The EFTA then

balances the need for public transparency with protections for survivors. But there is nothing in the statute that allows it to be used as a limitation on DOJ's *Touhy* obligations in sharing information with state law enforcement agencies that have agreed to abide by DOJ security protocols and are experienced in protecting the victims of violent crime and human trafficking.

## IV. The State Reopens Its Investigation and Renews Its Requests for Records to DOJ.

The State reopened its criminal investigation of the Zorro Ranch in February of 2026. Doc. 1 at 12 ¶ 44. One part of that work involved requesting information from DOJ, including review of unredacted portions of the Epstein Files that relate to Zorro Ranch and its visitors. *Id*. at 12 ¶ 45. Consistent with historical practice, the State initially sought access to the information on an informal and voluntary basis. *Id*. at 12 ¶ 46. Following conversations with AG Torrez and other high-ranking state officials, DOJ indicated that it would cooperate with the State's efforts. *Id*. at 12-14 ¶¶ 47-49. DOJ again reneged and refused to share any unredacted documents from the Epstein Files through normal informal law enforcement-sharing practices. *Id*. at 13-14 ¶¶ 49-50. Instead, DOJ, through Associate Deputy Attorney General Diego Pestana, directed the State to submit a formal *Touhy* request outlining which records the State intended to review. *Id*. at 14 ¶ 50.

The State mailed a letter formalizing its *Touhy* requests on May 3, 2026. *Id*. at 14 ¶ 53. As required by DOJ's *Touhy* regulations, the State provided a summary of information sought and its relevance to the ongoing state investigation. *Id*. at 14 ¶ 53. The letter specifically requested access to unredacted documents related to federal investigations of Epstein, Maxwell, and their associates. *Id*. at 14 ¶ 54. The State informed DOJ that it was "currently investigating potential felony offenses" under New Mexico law, including homicide, kidnapping, sex crimes, and human trafficking. *Id.* The State's *Touhy* requests further requested nine specific records, identified by publicly available document control numbers in the Epstein Files, that relate to the crimes the State

is currently investigating. *Id*. at 15 ¶ 55. Finally, in order to minimize the administrative burden on DOJ, the State offered to send personnel to Washington D.C., at the State's expense, to review DOJ's Epstein records under applicable security protocols. *See* Doc. 1-18 at 6.

On May 4, 2026, DOJ replied to that letter via email through the New Mexico field office of the Federal Bureau of Investigation. Doc. 1 at 16 ¶ 61. DOJ indicated that it would coordinate with various components, including FBI offices, regarding the State's *Touhy* requests. *Id.* Despite repeated follow up messages from the State, over 100 days elapsed without another substantive response from DOJ. *Id*. at 16-17 ¶¶ 62-65.

**V. DOJ Led the State Down Dead-End Paths While Flip-Flopping on its Commitment to Cooperate with New Mexico's Investigation.**

DOJ persisted in its silence. AG Torrez therefore sent direct letters to DOJ requesting an in-person meeting to discuss the State's requests. *Id*. at 17 ¶ 66. On June 11, 2026, Ryan Ellison, the First Assistant United States Attorney for the DNM, informed the State that "Main Justice" was working to prepare files responsive to the State's requests and assured that a response was forthcoming. Doc. 1 at 18 ¶ 67.[4] Ellison reiterated that promise the next day, emphasizing in a statement that "[AG Torrez] wants cooperations, we want to cooperate, and "I anticipate full cooperation." *Id*. at 18 ¶ 68.

That was again untrue. By June 30, 2026, DOJ still had not responded to the State's requests. AG Torrez personally sent another letter via certified mail reiterating the State's *Touhy* requests. *Id*. at 18 ¶ 69. AG Torrez emphasized that the State intended to support and protect survivors through its renewed criminal investigation, along with the critical role of DOJ's records

[4] The District of New Mexico does not have a United States Attorney. Like other districts across the country, DOJ has installed Mr. Ellison as "First Assistant" while purporting to allow him to function as the leader of the office. One appellate court already has held that this violates federal law. *United States v. Jackson*, 187 F.4th 1198 (9th Cir. 2026).

in that investigation. *Id*. at 18 ¶ 69. On July 7, 2026, a DOJ spokesperson stated that DOJ "reiterates that it welcomes New Mexico undertaking additional investigation of the Zorro Ranch and stands ready to provide necessary assistance[.]" *Id*. at 19 ¶ 70. But by July 14, 2026, DOJ still had not responded, and AG Torrez sent another letter to DOJ via mail and email requesting access to the requested materials. *Id*. at 19 ¶ 71. AG Torrez informed DOJ that if it did not respond by July 31, 2026, the State would consider its *Touhy* request to be denied and would pursue all available legal remedies. *Id.*

AG Torrez's letter finally prompted a response. On July 14, DOJ sent a letter (mistakenly dated June 30, 2026) providing a limited, thirty-one-page tranche of documents that did not include any new material information. *Id*. at 19 ¶¶ 72-73. DOJ's letter, signed by Ellison, otherwise objected to producing unredacted portions of the Epstein Files on only three grounds: the request was overbroad and unduly burdensome, it purportedly violated the Privacy Act, and it purportedly violated protective orders entered in the Epstein and Maxwell criminal cases. *Id*. at 20 ¶ 74. Sean Buckley, the Deputy United States Attorney for SDNY, called AG Torrez's office and stated that SDNY would not be providing any responsive materials, citing the same basic reasons. *Id*. at 20 ¶ 75. Buckley formalized SDNY's denial of the State's requests by email on July 31, 2026. *Id*. at 21 ¶ 76. No other DOJ officials directly responded to the State's request. No DOJ component has produced anything other than the thirty-one pages of largely public material Ellison provided.

## VI. The State's Touhy Requests Are in Aid of Grand Jury Proceedings.

Since no later than August 6, 2026, DOJ has been on express notice that there is a formal pending state proceeding associated with the *Touhy* request at issue. On that date, DOJ received a grand jury subpoena related to Zorro Ranch and associated potential crimes in New Mexico. See Grand Jury Subpoena Duces Tecum, attached as Ex. A (filed under seal). On August 19, 2026,

Ellison and Buckley, in their respective roles in DNM and SDNY, sent letters to the State refusing to produce any documents in response to the subpoena. *See* Ex. B. Both letters indicated that DOJ fully responded to the State's previous *Touhy* requests and that the subpoena was unenforceable. *Id.*[5]

This lawsuit seeks review of DOJ's refusal to share information related to Epstein's sex crimes and human trafficking activities in New Mexico even though DOJ's own regulations require it. The State asks the Court to review DOJ's actions under the Administrative Procedure Act ("APA") and find that DOJ's refusal to produce records in response to lawful *Touhy* requests was arbitrary and capricious. DOJ filed to dismiss for lack of subject matter jurisdiction and for summary judgment on the merits. *See* Docs. 8; 8-1; 8-3.

The State's complaint adequately establishes this Court's jurisdiction and demonstrates that DOJ acted arbitrarily and capriciously by withholding records that could lead to the perpetrators of vile criminal acts at Zorros Ranch. DOJ's motion should be denied.

## LEGAL STANDARDS

### *Federal Rule of Civil Procedure 12(b)(6) Controls*

DOJ leads its brief with a basic error in the controlling legal standard that precludes DOJ's jurisdictional argument. Challenges to whether matters are "committed to agency discretion by law" under the APA do not implicate the Court's jurisdiction. *See Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011). Having wrongly challenged the Court's jurisdiction under the distinct standards that govern under Federal Rule of Civil Procedure 12(b)(1), this alone warrants denying

[5] Prior to filing, undersigned counsel consulted with the prosecutors handling criminal matters associated with the Epstein investigation to ensure that any discussion of a grand jury subpoena is confined to acknowledging its existence for the limited purpose of demonstrating that an ongoing criminal proceeding exists. No reference is made to the substance of witness testimony, grand juror inquiries, or grand jury deliberations. This limitation is intended to preserve the secrecy of the grand jury process and ensure full compliance with the protections afforded to grand jury proceedings under New Mexico law. *See, e.g.*, N.M. Stat. Ann. § 31-6-1, et seq.

the motion. To the extent the Court nevertheless analyzed the issues under the Rule 12(b)(6) standard, the only question is whether, taking the allegations in the State's complaint as true, the complaint states a plausible claim for relief. *Id.* at 855-56.

***APA Summary Judgment***

"Ordinarily, summary judgment is appropriate when the pleadings and the evidence demonstrate that 'there is no genuine dispute as to any material fact.'" *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015) (quoting Fed. R. Civ. P. 56(a)). But when a district court reviews final agency action under the APA, the standard set forth in Rule 56(a) does not apply. *Id.* Summary judgment instead "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Powers v. Donley*, 844 F. Supp. 2d 65, 69 (D.D.C. 2012). That review is based on a factual review of the administrative record and the applicable standards for agency decision making. *Desa Grp., Inc. v. U.S. Small Bus. Admin.*, 190 F. Supp. 3d 61, 68 (D.D.C. 2016). Accordingly, it is the function of the district court "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (internal quotation omitted).

The distinction is particularly important here because DOJ has certified an incomplete administrative record that omits material documents that are the subject of detailed allegations in the complaint and are attached as exhibits to that pleading. *See* Docs. 15; 15-1 (indexing only the State's May 13 *Touhy* letter and DOJ's subsequent denial letter). To avoid confusion and further argument on the issue, the State intends to move to supplement the record to include necessary

additional material. DOJ has not put this matter in the proper procedural posture for final resolution.

***Substantive APA Review***

Under the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). Arbitrary and capricious review is not a "rubber stamp." *Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000). Though deferential, it still requires "thorough, probing, in-depth review," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), to determine whether an agency action was both "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency's decision is not reasonable if it "relied on factors which Congress has not intended," "failed to consider an important aspect of the problem," "runs counter to the evidence before the agency," or lacks a "rational connection between the facts . . . and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In determining whether an agency decision is arbitrary and capricious, courts rely on "the reasons [the agency] gave when it acted" rather than post hoc justifications. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020). This is a "foundational principle of administrative law." *Michigan v. EPA*, 576 U.S. 743, 758 (2015). A court should not look to *post hoc* rationalizations outside of the reasons the department initially provided—"[i]f the grounds propounded by the agency for its decision 'are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it consider to be a more adequate or proper

basis.'" *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629 (2023) (quoting *SEC v. Chenery*, 332 U.S. 194, 196 (1947)).

## ARGUMENT

The Court should deny DOJ's motion. This Court unquestionably has jurisdiction to review DOJ's wrongful denial of the State's *Touhy* requests, and the complaint more than plausibly states a claim for relief. Moreover, summary judgment is inappropriate based on the motion because DOJ does not ground its arguments in the administrative record and ignores information it had in hand before filing its motion. Even assuming DOJ could support its request with the appropriate and requisite evidence, it is not entitled to summary judgment as a matter of law because it acted arbitrarily and capriciously.

### I. This Court Has Subject Matter Jurisdiction to Review DOJ's Wrongful Denial of The State's *Touhy* Requests.

#### a. DOJ cannot escape judicial review by claiming that its *Touhy* regulations place its actions beyond the Court's reach.

DOJ argues that its *Touhy* regulations establish that "decisions about law-enforcement information sharing are committed to the agency's discretion," and are therefore not reviewable under the APA. *See* Doc. 8-1 at 16. DOJ is wrong.

There is a "'well-settled' and 'strong presumption'" favoring judicial review of agency action. *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (citations omitted). Consistent with this principle, the APA exception where "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), applies "quite narrowly…to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (internal quotation marks omitted). Moreover, courts "generally limited the exception to certain categories

of administrative decisions that courts traditionally have regarded as committed to agency discretion, such as a decision not to institute enforcement proceedings." *Id.* (internal citations omitted).

DOJ's argument seems to be that when an agency's own ***regulations*** do not set forth specific considerations for the agency to apply, then agency decisions have been committed to its discretion. *See* Doc. 8-1 at 17-20; *see also id.* at 8 ("[L]aw-enforcement to law-enforcement information sharing is a matter of discretion not subject to judicial review."). But the analytical focus in "committed to agency discretion" disputes is on the language of the ***statute***. *E.g.*, *Dep't of Com.*, 588 U.S. at 772. Thus, "[t]he key to any determination of reviewability is ***congressional*** intent," *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1343 (D.C. Cir. 1996) (emphasis added), and "unless there is persuasive reason to believe that ***Congress*** intended to preclude judicial review," then APA review remains available. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155–56 (2025) (emphasis added, internal quotation marks omitted). An agency's decision to give itself discretion does not supply the required clear evidence of congressional intent to overcome the APA's presumption of reviewability. Were it otherwise, agencies could simply unilaterally opt out of APA review contrary to law. *Foster v. Mabus*, 895 F. Supp. 2d 135, 145 (D.D.C. 2012).

Defendants' argument falls apart when measured against the relevant statutory language. Far from providing agencies with unfettered discretion to withhold evidence, the Housekeeping Statute expressly "does ***not*** authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301 (emphasis added). This language demonstrates congressional intent to guard against unfettered agency discretion in refusing to provide records.

*See also* H.R. Rep No. 85-1461, at 3353 (1958) ("Executive officials have let every file clerk become a censor. The purpose of this bill is to correct that situation.").

DOJ's reliance on the Privacy Act and the EFTA similarly fails. DOJ states that these statutes do not create manageable standards to evaluate DOJ's discretion, Doc. 8-1 at 18, but neither statute applies here because the Privacy Act and the EFTA do not govern DOJ's *Touhy* regulations. DOJ's regulations rest instead on DOJ's authority under the Housekeeping Act, 5 U.S.C. § 301.

The Privacy Act, 5 U.S.C. § 552a(b), is specifically inapplicable because it only creates a right or remedy for disclosures to "an individual," *i.e.*, "a citizen of the United States or an alien lawfully admitted for permanent residence," *id.* §§ (a)(2), (g)(1), and does not govern official requests by a state entity for official information for use in a criminal investigation. Indeed, the Privacy Act expressly exempts from its purview disclosures:

> to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought.

§ 552a(b)(7).

Thus, the Privacy Act cannot serve as a basis to prevent DOJ from disclosing records to the State for its investigation into Epstein, his associates, and their activities in New Mexico, and it sets the requirements for a valid request for information. Here, the State complied with the Privacy Act's requirements. As explained in the complaint, AG Torrez himself, as the "head of the agency or instrumentality," sent repeated letters to DOJ asking for the subject records. *See* Docs. 1-22; 1-24. Those requests, when read in conjunction with the State's *Touhy* letter, clearly sought

information from DOJ exempted from the Privacy Act. The Privacy Act is not the measure of DOJ's discretion in granting or denying *Touhy* requests.

The EFTA is also inapplicable because, as DOJ acknowledges, it does not address information sharing between law enforcement agencies. *See* Doc. 8-1 at 12. The EFTA instead addresses ***public*** disclosure of information related to Jeffrey Epstein, his associates, and their ongoing crimes and activities. EFTA §2(a). Consistent with the public-facing intent of the statute, the EFTA says nothing about how DOJ can exercise its discretion to withhold documents from disclosure to state law enforcement. Instead, the EFTA specifies that DOJ may "withhold or redact" from the publicly published Epstein files five different categories of information, including victim identification records, child sex abuse materials, active investigation documents, images of death or physical abuse, and information related to national security or foreign policy. EFTA §2(c)(1)(A)-(E).[6]

Insofar as DOJ argues that the EFTA's reporting requirements do not provide manageable discretionary standards, Doc. 8-1 at 12, those provisions do not constrain or otherwise bear on the agency's ability to disclose records to state law enforcement agencies.[7] And regardless, the five withholding criteria enumerated in the statute provide clear guidance on how DOJ should withhold certain records to protect victims and compelling governmental interests. So, even if the EFTA somehow cabins DOJ's *Touhy* regulations in sharing information with state law enforcement, the law provides specific criteria guiding DOJ's discretion in withholding pertinent information.

---

[7] DOJ's citation to *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) in support of this argument is inapposite. *Armstrong* held that Congress did not create a private right of enforcement under the Medicaid Act for individuals aggrieved by state Medicaid reimbursement rates. *Id.* at 327-29. Nothing in *Armstrong* related to Congressional reporting requirements. *See generally id.* Moreover, the EFTA's congressional reporting section does not contain any language related to enforcement, much less any statement evincing Congress's intent to retain exclusive enforcement remedies. *See* EFTA § 3. DOJ ignores the text of EFTA in a misguided attempt to place DOJ beyond judicial review.

Every day, courts review agency actions to ensure (among other things) that the agency gave a reasoned explanation that is not arbitrary or capricious. *E.g.*, *Dep't of Com.*, 588 U.S. at 772. And it is well established in this District that decisions regarding *Touhy* requests are not exempt from administrative review under the APA. *See Bobreski v. U.S. Envt'l Prot. Agency*, 284 F. Supp. 2d 67, 73-74 (D.D.C. 2003) ("A party challenging an agency's *Touhy*-based denial of a subpoena or request for testimony 'must proceed under the APA, and the federal court will review the agency's decision not to permit its employee to testify under an 'arbitrary and capricious' standard.'") (quoting *Houston Bus. J., Inc.*, 86 F.3d at 1212 n.4). DOJ's attempt to place its compliance with its *Touhy* regulations beyond this Court's review is improper. The Court should reject DOJ's motion to dismiss.

**b. DOJ cannot avoid its *Touhy* obligations by denying there is an applicable "proceeding" in New Mexico.**

According to DOJ, the Court lacks jurisdiction under the APA because the State's original *Touhy* letter did not trigger applicable disclosure regulations. *See* Doc. 8-1 at 9. DOJ's argument fails for three reasons.

*First*, DOJ invoked and applied to the *Touhy* requests the very regulations it now claims were never triggered. Doc. 1-7 at 3-4. This makes its new theory that there is no proceeding to require that analysis exactly the type of post hoc justification courts disregard. *Regents of the Univ. of California*, 591 U.S. at 24; *Michigan*, 576 U.S. at 758; *Calcutt*, 598 U.S. at 629.

*Second*, DOJ knew before it filed its motion that there is a formal pending proceeding in New Mexico that triggered the *Touhy* regulations. The State initially requested records from DOJ after reopening its investigation of the criminal activity that occurred at Epstein's Zorro Ranch in February of 2026. Doc. 1 at 12-13 ¶ 47. DOJ maintains that the State's criminal investigation, absent more, does not constitute a "proceeding" under § 16.21. Doc. 8-1 at 9-10. But following its

initial *Touhy* request, the State formalized its criminal investigation through grand jury proceedings and notified DOJ of those proceedings through service of a subpoena. On August 6, 2026, two months before DOJ submitted its motion, the State served a state grand jury subpoena on each required DOJ component, including Main Justice and the U.S. Attorney's Offices for the Districts of New Mexico and the Southern District of New York. *See* Ex. A (filed under seal).[8] DOJ refused to comply for the reason (among others) that the subpoenas "did not include a request pursuant to *U.S. ex. Rel. Touhy v. Ragen*, 340 U.S. 462 (1951), and your compliance with the *Touhy* regulations is a condition precedent to obtaining testimony or other information from USAO-DNM." Ex. B at 1. DOJ further referenced the State's prior *Touhy* request and expressly incorporated the reasons for denial DOJ speciously asserted in the first instance. *Id.* at 1-2. Beyond the patent gamesmanship of this response, the exchange shows that DOJ knew the State's work to obtain the information its *Touhy* requests seek is tied to a formal proceeding.

Like their federal counterparts, grand juries in New Mexico are convened by district courts and empowered by law to issue subpoenas to compel the appearance of witnesses and the production of evidence. *See* N.M. Stat. Ann. §§ 31-6-1, -6-12. Under the cases DOJ relies on to support its argument, that alone removes any doubt that there is a relevant pending proceeding. Doc. 8-1 at 9-11.[9] Moreover, the fundamental role of grand jury proceedings in the American

---

[8] To the extent the Court determines allegations of a pending proceeding are necessary for purposes of deciding this matter under Rule 12(b)(6), the State requests leave to amend to add the fact of the subpoena to the complaint. But accepting DOJ's contention that this should be resolved as a jurisdictional matter, the Court is not so limited. And for purposes of summary judgment, the Court should not be blinded from considering an undisputed (and indisputable) fact central to the analysis.

[9] DOJ's careful drafting in this section of its motion reflects its one nod toward acknowledgment that the subpoenas exist. Rather than deny that subpoenas were issued here, DOJ argues that no subpoenas have been "properly" issued. Doc. 8-1 at 17. That presumably is a reference to DOJ's claim that the subpoenas are not enforceable against the federal government. But the relevant fact here is that DOJ plainly knows there is a proceeding from a body empowered to issue subpoenas. Even under DOJ's theory, that is all that is necessary to trigger the *Touhy* regulations.

criminal justice system would make that true regardless. The Supreme Court has recognized that "[t]he Constitution itself makes the grand jury a part of the judicial process." *Cobbledick v. United States*, 309 U.S. 323, 327 (1940). "[A] proceeding before a grand jury constitutes a 'judicial inquiry' of the most ancient lineage." *Id.* New Mexico's grand jury proceedings fit comfortably within DOJ's *Touhy* regulations.

*Third*, DOJ's position that states must initiate judicial proceedings before submitting *Touhy* requests yields absurd and unworkable results. The government's longstanding position is that states cannot enforce subpoenas or other compulsory process against federal authorities at all. *See, e.g.*, *Houston Bus. J., Inc.*, 86 F.3d at 1212-13 (adopting the government's position that "a court cannot enforce a subpoena against an employee of the federal government when the agency validly enacted a regulation . . .that withdraws from employees the power to produce documents."). DOJ now insists, however, that the State must secure exactly that sort of subpoena—issued pursuant to a legal proceeding before a court—before DOJ will consider the State's *Touhy* requests. DOJ cannot have it both ways. Adopting this view would intrude on state law enforcement agency's ability to quickly and effectively obtain information related to criminal investigations. State and local officials could not, under DOJ's view, use *Touhy* requests to find evidence of crimes in DOJ's possession that help establish the probable cause necessary to bring criminal charges. Without that sort of information, state authorities may never be able to charge related crimes in the first place.

The permission for expedited law-enforcement information sharing contained in DOJ's regulations bolsters this interpretation. Section 16.21(c) allows DOJ to disclose information to state law enforcement agencies on its own volition or in the absence of a formal demand. This section plainly contemplates that DOJ will need to disclose information to its "federal, state, local, and foreign law enforcement" counterparts for the purposes of active criminal investigations. If

investigations were already outside of the regulation's processes because they are not "proceedings," as DOJ asserts here, then there would be no need to include this express authorization. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation omitted)).

DOJ's resistance to disclosure is particularly troubling given the strong indications that nonpublic information in the Epstein Files documents criminal activity in New Mexico. The State seeks to hold those accountable who used the privacy afforded by Zorro Ranch's rural New Mexico setting to traffic and abuse vulnerable young women for the pleasure of the wealthy. The State grand jury has full legal authority to investigate the scope of those crimes. The subpoena shows that it is doing so. At every step, the State has engaged in good faith with DOJ to obtain access to the unredacted Epstein Files. In turn, the DOJ refused to allow access and now asserts that its *Touhy* regulations were never triggered at all. That inconsistency shows the absurdity of DOJ's position that only active judicial proceedings are sufficient to invoke its *Touhy* regulations, especially when DOJ rebuffs concurrent official process issued in the course of such proceedings. This Court should decline to adopt DOJ's position.

That leaves DOJ with one rigidly formalistic argument based on timing (i.e., the Court can ignore the grand jury subpoena because it came after the State's initial *Touhy* request and the date of the complaint but before DOJ filed its motion). That argument only matters if the Court determines there would not be an applicable proceeding absent the grand jury. If that becomes the controlling question, DOJ must then explain why the State's follow up on August 19 with the subpoena and DOJ's response that again invokes its prior reasons for denying the requests under

the *Touhy* regulations do not provide an independent ground to review this matter as it stands. After all, the subpoena, as DOJ admits, requested "the same documents that were sought in the [State's] May 3, 2026 Touhy request." Ex. B at 1. The record shows that the State has made its requests, demonstrated that the requests are tied to grand jury proceedings, and need do no more under the case law that DOJ cites to trigger DOJ's obligation to comply with its regulations. *See, e.g., United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (emphasizing subpoena power as triggering a "proceeding"). To the extent the Court nevertheless has questions about the interrelationship between the *Touhy* issues and the subpoenas, the States requests leave to amend. *See* Fed. R. Civ. P. 15(d); 28 U.S.C. § 1653; *Baltimore v. Pruitt*, 293 F. Supp. 3d 1, 7-8 (D.D.C. 2017).

## II. DOJ's Denial of the State's *Touhy* Requests is Arbitrary and Capricious.

When the State relented to DOJ's 2019 request to cease the state criminal investigation into Epstein and his associates, it relied on DOJ's commitment to share information about potential criminal activity and the longstanding cooperative relationship between the state and federal governments in criminal investigations.[10] However, DOJ has not followed through on its 2019 guarantee to "pass along any information [DOJ] may have gathered about state crimes that were committed in [the State's] jurisdiction."[11] Consistent with this administration's aggressive efforts to keep Epstein materials secret, DOJ instead now relies on arbitrary and capricious justifications to withhold unredacted investigative materials, preventing the State from fulfilling its obligation to uphold and enforce the criminal laws of New Mexico.

---

[10] U.S. Dep't of Justice, Epstein Library, EFTA00019183 at -89 to -90, https://www.justice.gov/epstein/files/DataSet%208/EFTA00019183.pdf (last visited November 16, 2026); U.S. Dep't of Justice, Epstein Library, EFTA01681971 at -71, https://www.justice.gov/epstein/files/DataSet%2010/EFTA01681971.pdf (last visited November 16, 2026).

[11] U.S. Dep't of Justice, Epstein Library, EFTA01681971 at -71, https://www.justice.gov/epstein/files/DataSet%2010/EFTA01681971.pdf (last visited November 16, 2026).

**a. Summary judgment would be improper on DOJ's incomplete record.**

DOJ cannot prevail on its motion under Rule 12(b)(6) because the complaint plausibly alleges a right to relief for DOJ's violations of the APA. *See R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agriculture*, 130 F. Supp. 3d 356, 368-70 (D.D.C. 2015). Moreover, DOJ's arguments are not purely legal in nature because they implicate the factual basis of DOJ's wrongful decision to deny the State's *Touhy* request. Accordingly, dismissal is not warranted here. *Id.* ("[A] Rule 12(b)(6) motion to dismiss can be entertained in administrative law cases if the complaint 'presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action.'" (quoting *Marshall Cty. Health Care Auth. V. Shalala*, 988 F.3d 1221, 1226 (D.C. Cir. 1993)).

To the extent the Court instead converts the motion to one for summary judgment, the first issue will be DOJ's deficient administrative record, which must be supplemented with additional necessary material. This is an APA case, and the typical standard for summary judgment, as set forth in Rule 56(a), "does not apply." *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015). "Instead of reviewing the record for disputed facts that would preclude summary judgment, the function of the district court is a more limited one: to determine whether or not as a matter of law ***the evidence in the administrative record*** permitted the agency to make the decision it did." *Id.* (emphasis added) (internal quotation omitted). Put differently, when addressing a motion for summary judgment in an APA case, "the district judge sits as an appellate tribunal" and relies entirely on the administrative record to conduct the requisite analysis. *See Desa Grp., Inc. v. U.S. Small Bus. Admin.*, 190 F. Supp. 3d 61, 68 (2016).

Relevant here, DOJ submitted its summary judgment materials on October 12, 2026, Doc. 8, a full month before DOJ produced and certified the administrative record in this case. *See*

Docs. 15, 15-1. DOJ's statement of undisputed facts therefore lacks any citation to the administrative record, precluding meaningful review under the APA. *See* Doc. 8-3 (generally citing to the allegations in the State's complaint without any reference to the administrative record). And as already noted, the administrative record DOJ produced is incomplete and subject to supplementation because DOJ failed to include many of the communications between State and DOJ officials. Specifically, DOJ omitted the direct correspondence from AG Torrez to DOJ regarding the State's *Touhy* requests, even though those materials were attached to the Sate's complaint. *See* Docs. 1-12; 1-16; 1-24. The materials bear directly on DOJ's arguments regarding the Privacy Act and other authorities. This is also true of the subpoena and DOJ's subsequent response re-invoking unchanged its original rationale for denying the State's requests. The record needs to be complete before the Court can conduct an proper summary judgment analysis. At any rate, summary judgment may be flatly denied in an APA case where, as here, the defendant failed to produce or reference the administrative record. *West Virginia ex rel. Morrisey v. U.S. Dep't of Health & Human Servs.*, Civ. No 14-1287 (RBW), 2014 WL 12803229, at *2 (D.D.C. Nov. 3, 2014) ("Thus, absent the production of the administrative record, [] summary judgment briefing in this matter would be premature.").

The Court can and should deny DOJ's request for summary judgment as premature. The better course of action, at this early stage, is to allow the parties to address the deficiencies in the administrative record and provide the Court with the full facts of the case.

**b. DOJ's conduct in assuring the State that its *Touhy* request would be granted, only to then deny the request, is the definition of caprice.**

If the Court nevertheless evaluated DOJ's motion under APA summary judgment standards, DOJ acted arbitrarily and capriciously in denying the State's *Touhy* request. Summary judgment in DOJ's favor should therefore be denied. *Ardmore*, 118 F.Supp. at 393 ("Under the APA, a

reviewing court must set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 702(2)(A)).

DOJ has strung the State along at every step of this dispute. DOJ admits that as early as 2019, DOJ officials informed the State that it intended to cooperate in bringing Epstein and his associates to justice. Doc. 8-3 at ¶ 6. When the State reopened its investigation of crimes under New Mexico state law in February of 2026, it made multiple informal requests for information to DOJ, and Associate Deputy Attorney General Diego Pestana indicated that DOJ was willing to cooperate with DOJ's investigation. Doc. 1 at 14 ¶ 50. Pestana accordingly asked the State to submit a *Touhy* request so that DOJ could properly process the request for information. *Id.*; *see also* Doc. 1-17 (email memorializing Pestana's request). But when the State ultimately submitted its *Touhy* request, DOJ reneged on its commitments and refused to share any information that could lead to criminal charges for conduct that occurred at Zorro Ranch. Doc. 8-3 at 3 ¶¶ 18-19; Doc. 1 at 20 ¶¶ 74-75.

DOJ's string of commitments and reversals shows that its wholesale denials of access to information for the State is arbitrary and capricious. The catalyst for this entire dispute was DOJ's 2019 commitment to share investigative information with the State. Doc. 1 at 7 ¶ 27.[12] DOJ never followed through on that commitment after its own Epstein investigations concluded and the administration began affirmatively hiding Epstein information. That pattern continued when the State reopened its Epstein investigation, with DOJ initially expressing its willingness to engage collaboratively with the State's investigation and agreeing that the state investigation is important

[12] U.S. Dep't of Justice, Epstein Library, EFTA00019183 at -89 to -90, https://www.justice.gov/epstein/files/DataSet%208/EFTA00019183.pdf (last visited November 16, 2026).

for survivors. *Id*. at 14 ¶ 50. And yet, DOJ continues in its refusal to produce records in response to the State's *Touhy* request—records it no doubt possesses and promised to disclose.

DOJ now fails to provide any justification for its refusal to cooperate in favor of stonewalling. Further compounding this contradiction was First Assistant United States Attorney Ellison's public promises: "[AG Torrez] wants cooperation, we want to cooperate," and "I anticipate full cooperation."[13]

This series of flip flops shows the capriciousness of DOJ's decision to deny the State's *Touhy* request. DOJ does not and cannot provide a reasoned explanation for its actions, which are "incongruent with what the record reveals about the agency's priorities and decision making process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). The shifting positions provide further evidence that DOJ is simply shielding from state law enforcement information harmful to other perpetrators within Jeffrey Epstein's criminal enterprise.

**c. The State's records request was narrowly tailored, and the State further offered to facilitate the records review to minimize DOJ's administrative burden.**

DOJ argues that the State's request is overbroad and burdensome for two reasons—that "New Mexico has no pending case and the requests are not targeted to any particular fact or issue." Doc. 8-1 at 21. DOJ further argues that "New Mexico does not even attempt to narrow its request to relevant materials." *Id.* at 28. These assertions are demonstrably false. As explained above, DOJ filed its response to the Complaint *after* it received—and again denied—a New Mexico Grand Jury Subpoena intended to further the State's investigation into the areas outlined in the *Touhy* request. *See* Exs. A & B. The State's current grand jury proceeding is sufficient for DOJ to allow

[13] Ryan Laughlin, 4 Investigates: DOJ Says Full Cooperation Coming for Epstein Investigation, KOB News, June 12, 2026, https://www.kob.com/new-mexico/4-investigates-doj-says-full-cooperation-coming-for-epstein-investigation (last visited Aug. 4, 2026).

access to the Epstein Files to determine whether prosecutable crimes were committed at Zorro Ranch, like the kinds of horrific crimes Epstein and his associates committed around the world.

DOJ's objection is also directly contradicted by the plain language of the State's *Touhy* request. That request specifically seeks access to "the redacted materials contained in the DOJ's 'Epstein Library,' compiled pursuant to Section 2(a)(1)–(9) of the Epstein Files Transparency Act, Public Law 119-38 (Nov. 19, 2025), along with any relevant non-privileged unreleased files." Doc. 1-18 at 2. This request seeks nothing more than access to the documents DOJ was already required to gather for its congressionally mandated EFTA database. And even then, the scope is dramatically narrowed to the information DOJ did not make available to the general public.

The State's request further contextualizes the information it seeks by providing specific EFTA Bates numbers and keyword searches like "Zorro Ranch". Doc. 1-18 at 4-6. Trying to cast the request out writ large is arbitrary and capricious with documents DOJ already had to gather, review, Bates label, and render keyword searchable with unredacted versions of the material already compiled for review by members of Congress. *See* EFTA §3 (addressing DOJ's congressional reporting requirements).

Further, DOJ's characterization that the State seeks "millions of pages of unredacted Epstein files" misstates the nature of the State's request. The State is not asking DOJ to assemble and disclose millions of pages of documents for the State to hold in its own possession. The State instead asks DOJ to permit state officials to travel to Washington D.C. to review records at the State's time and expense and to retain only those records relevant to the Zorro Ranch investigation. Doc. 1-18 at 6. The State further agreed to be bound by any applicable security protocols to protect the identities of victims and to limit the exposure of private information. *Id.* This offer alleviates the burden on DOJ officials while limiting the disclosure of unredacted material beyond the scope

of the State's investigation. The State does not ask DOJ for "evidence irrelevant to the underlying claim." Doc. 8-1 at 28. It simply asks DOJ to allow an in-person review of unredacted material to determine what portions relate to the State's ongoing criminal investigation of sex trafficking and abuse at Zorro Ranch. That is a suitably narrow request, and DOJ acted arbitrarily and capriciously in denying it.

**d. DOJ's remaining reasons for denying the State's *Touhy* requests lack merit.**

DOJ's other arguments likewise are unfounded. *First*, for the same reasons set out above, DOJ's reliance on the Privacy Act, 5 U.S.C. § 552a(b)(7) is misplaced. *See* Doc. 8-1 at 24; Doc. 1-7 at 6. DOJ's insistence that the Privacy Act prohibits disclosure in this case would flip the entire state-federal system of cooperation on its head and require onerous disclosure procedures not contemplated by the text of the statute.

*Second*, DOJ invokes the protective orders the United States District Court for the Southern District of New York ("SDNY") implemented to protect survivors of Epstein and his associates. The issue in the Epstein and Maxwell criminal cases was, again, ***public*** disclosure of unredacted information that could identify Epstein's victims under the EFTA. A review of the relevant protective order modifications demonstrates the courts' intent to restrict DOJ and the defendants from ***publicly*** disclosing sensitive victim information. *See* Doc. 8-4 at 2-3 (discussing the public disclosure requirement of the EFTA); Doc. 8-5 at 22 ("The Court accordingly, in modifying the Protective Order, will require that, before any material subject to it is ***publicly*** released, the United States Attorney for this District personally certify that such material has been rigorously reviewed for—and found to be in—compliance with [the EFTA]." (emphasis added)). Here, the State has no interest in making public the identities of sex trafficking survivors or others who suffered at the

hands of Epstein and his associates. The State instead seeks to vindicate the rights of those very people by prosecuting their abusers.

*Third*, DOJ did not account for the State's reliance interest on DOJ's original information sharing commitment in 2019, and the harm its subsequent reversal imposes on the State and survivors of potential criminal conduct in New Mexico. In agreeing to stand down its criminal investigation at that time, the State reasonably relied on the historical norm of cooperation and on the express commitment by DOJ to share information that might support state charges of Epstein's co-conspirators. Had the State known that DOJ would wildly upend that norm by disregarding its previous express promises, the State would have pressed ahead to protect those harmed by crime here. New Mexico has a well-recognized sovereign interest in investigating crime within its territory, enforcing its criminal laws, protecting victims, and ensuring public confidence in impartial justice. *Heath v. Alabama*, 474 U.S. 82, 93 (1985). DOJ's failure to even recognize or consider this state interest while relying on irrelevant arguments to block the State's access to information is arbitrary and capricious. *See Schroeder v. U.S. Dep't of Veterans Affs.*, 673 F. Supp. 3d 1204, 1227 (D. Kan. 2023) (invalidating *Touhy* denial where government "failed to consider an important aspect of the problem—specifically, [the requester's] inability to procure the information from elsewhere") (internal quotations marks omitted).

*Fourth*, DOJ reversed longstanding practices related to intergovernmental sharing without meaningful explanation. For decades, federal and New Mexico authorities cooperated in overlapping criminal matters, including investigations involving overlapping jurisdictions, especially in a case like Epstein's, whose criminal web spans across the country and globe. DOJ's abrupt reversal of a longstanding practice without explanation is a hallmark of arbitrary decision making. *See Kirwa v. DOD*, 285 F. Supp. 3d 21, 38 (D.D.C. 2017).

*Fifth*, DOJ failed to consider obvious alternatives to blanket withholding. The State has demonstrated its willingness to work with DOJ to protect sensitive information from public disclosure. To that end, the State sent specific EFTA bates ranges and offered to come to D.C. to review unredacted versions of the Epstein files in person. In addition to minimizing any burden on DOJ, that offer mitigated any data security concerns. The State also offered to enter into privacy agreements and security protocols that DOJ deemed necessary. *See e.g.*, Doc. 1-18 at 6 ("To facilitate this process and minimize the administrative burden on your office, we are prepared to send a team to Main Justice in Washington, D.C., at your convenience to conduct an in-person review of these materials, subject to any security protocols and access conditions you deem necessary.") And DOJ did not consider the State's established capabilities in handling sensitive law enforcement information. As the State's top law enforcement agency, the New Mexico Department of Justice routinely handles sensitive information securely while protecting victim's rights. DOJ's wholesale failure to explain why its failure to choose available alternatives is arbitrary and capricious. *See Adaya LL v. DEA*, 826 F. Supp. 3d 115, 129 (D.D.C. 2026).

## III. This Court Should Disregard DOJ's *Post Hoc* Justifications for Denying the State's *Touhy* Request; But Even if Considered, Each is Arbitrary and Capricious.

After this lawsuit was filed, DOJ suddenly arrived at new explanations for the decisions it made, months earlier, to block the State from accessing evidence. This Court can easily reject these explanations—"an agency must defend its actions based on the reasons it gave when it acted." = *Regents of the Univ. of Cal.*, 591 U.S. at 24. DOJ is bound by the improper objections and rationales it listed in its response letter denying the State's *Touhy* request. *See generally* Doc. 1-7.

Even if the Court were to consider DOJ's *post hoc* rationales for its arbitrary denial of the State's request, each of its additional justifications is arbitrary and capricious.

*First*, as addressed in Part I, DOJ's argument that this court lacks authority to review APA decisions is contrary to settled law. This baseless position merely duplicates DOJ's improper jurisdictional arguments refuted in Section I, *supra*. DOJ's conduct is not beyond the reach of meaningful judicial oversight.

*Second*, DOJ argues that the EFTA both prohibits disclosure of unredacted files to the State for criminal investigatory purposes ***and*** "does not even contemplate information sharing for law enforcement purposes." Doc. 8-1 at 19. This argument ignores the text of the EFTA. It is unreasonable to assume that the statute changed the status quo of state-federal law enforcement cooperation when, as DOJ admits, the statute is wholly silent on that issue. *See Kimbrough v. United States*, 552 U.S. 85, 103 ("Drawing meaning from silence is particularly inappropriate . . . [when] Congress as shown that it knows how to [address an issue] in express terms."). Had Congress intended to prohibit federal law enforcement's cooperation in state Epstein investigations through EFTA, it had every reason to say so. Drawing that meaning from silence is unreasonable, particularly because the EFTA was passed to force ***more transparency*** related to Epstein in the wake of administration recalcitrance, not ***less***. Moreover, using EFTA as a shield to protect perpetrators is perverse on its own terms, but particularly in the face of survivors who are coming forward to call for DOJ and other law enforcement agencies to hold more perpetrators accountable.[14] DOJ's supposed privacy concerns only serve to interfere with the State's efforts arising in the wake of DOJ's failure to prosecute anyone beyond Epstein and Maxwell.

*Third*, DOJ's argument that the State's *Touhy* request is invalid because it was not personally submitted by AG Torrez is an effort to put form over substance in the most meaningless ways. *See* Doc. 8-1 at 25. The Privacy Act specifically exempts official requests by a state entity

[14] 'This is Not a Political Issue, This is a Crime,' Epstein Survivors Say, PBS News (Sept 3, 2025), https://www.pbs.org/newshour/show/this-is-not-a-political-issue-this-is-a-crime-epstein-survivor-says.

for official information for use in a criminal investigation from the act's disclosure restrictions. *See* 5 U.S.C. § 552a(b)(7). DOJ's *Touhy* regulations also do not require requests to the agency to be submitted by an agency head. *See* 28 C.F.R. § 16.21. Further, DOJ's Overview of the Privacy Act instructs that under subsection (b)(7)'s exception, "While the head of the agency or instrumentality must generally make the written request for the law enforcement request disclosure exception, agencies may, when necessary, delegate this responsibility to officials no lower than the 'section chief' level." *See* Dep't of Justice, Overview of the Privacy Act: 2020 Ed. (Dec. 15, 2022).[15] DOJ itself recognizes that agency heads can delegate disclosure requests to their high-ranking subordinates under the Privacy Act. This is the case here, since AG Torrez delegated his authority to request records from DOJ to Special Counsel Sean Sullivan, who acts with "section chief" authority at AG Torrez's direction. Mr. Sullivan signed the State's *Touhy* letter, *see* Doc. 1-18 at 7, which therefore complies with the requirements of §552a(b)(7) and the DOJ's internal procedures.

In any event, AG Torrez himself sent a multitude of personal demands for access to information related to Epstein's crimes in New Mexico meets this nonexistent requirement. DOJ ignores AG Torrez's written requests for the information at issue when he undeniably is the agency head of the New Mexico Department of Justice. AG Torrez sent multiple direct letters to DOJ requesting that the agency discuss the records request, Doc. 1-22, and comply with its disclosure obligations. *See* Docs. 1-16; 1-24. To the extent it was even necessary to do so, his correspondence ratifies the original requests as his own. The State has met its burden here.

*Fourth*, DOJ inserts several new statutory grounds for rejecting the State's *Touhy* request that it did not timely raise in its denial. *See* Doc. 1-7 at 6-7. Those additional grounds include, "the

[15] https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition/disclosures-third-parties

Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509(d)," "the Bank Secrecy Act, 31 U.S.C. § 5319," and the "Pen Register Act, 18 U.S.C. § 2123(d)." *Id.* Setting aside that these are *post hoc* attempts to bolster DOJ's unreasonable denials, DOJ has made no effort to explain how or why these statutes preclude the limited disclosure sought by the State. The statutes would, at most, apply to a narrow subset of what the State seeks and therefore provide no basis for DOJ's blanket denial. Moreover, DOJ concedes that the State's request is proper under the Child Victims' and Child Witnesses' Rights Act if there is a legal proceeding, and, as already established, DOJ knows there is one in the form of state grand jury proceedings. It is arbitrary and capricious to invoke the Child Victims' and Child Witnesses' Rights Act when the State satisfies its requirements. Further, DOJ did not produce information in its response or in the administrative record that indicates how the Bank Secrecy Act or the Pen Register Act are relevant to the State's *Touhy* request. The Court can disregard that argument entirely. Nevertheless, based on publicly available EFTA files, it is arbitrary and capricious to argue that either statute justifies the complete denial of the State's request because neither statute applies. *See e.g.,* Doc. 1-18 at 5-6 (requesting nine specific unredacted EFTA files, including EFTA00158500 to EFTA00158513, an interview with a victim who was brought to New Mexico on multiple occasions).

*Fifth,* (and finally), DOJ's argument that sharing investigative material with a state department of justice would negatively impact law enforcement is irreconcilable with Attorney General Blanche's own sworn testimony. Mr. Blanche testified under oath that DOJ would, if needed, investigate and prosecute any crime that may be suggested by relevant evidence. Doc. 1-13 at 191-192. That statement clearly indicates that DOJ is not currently pursuing (and may never pursue) Epstein-related investigations. Mr. Blanche's prior testimony, cited in the media report relied upon by DOJ, Doc. 8-1 at 19, does not rescue DOJ's argument. It instead reveals another

example of DOJ's flip-flopping, underscoring the arbitrary nature of the agency's stonewalling. Further, DOJ's argument, that disclosing "case notes, analysis, and communications with witnesses" to the State would undermine "the effectiveness of those strategies" and deter future informants, fails to acknowledge that the State's request is not for *public* disclosure. Doc. 8-1 at 26. Until now, states could rely on DOJ as a partner dedicated to cooperating so that criminals face justice under state and federal law. That obviously is no longer true, but the notion that DOJ would sacrifice law enforcement interests by sharing law enforcement information with fellow law enforcement is unseemly. Were this Court to adopt DOJ's argument here, the agency could refuse every request for collaboration moving forward, crumbling our system of state-federal cooperation.

## CONCLUSION

For the foregoing reasons, DOJ's motion, Doc. 8, should be denied.

Dated: November 23, 2026

Respectfully submitted,

**RAÚL TORREZ**
Attorney General of the State of New Mexico

By: <u>*/s/Anjana Samant*</u>
Anjana Samant
D.D.C. Bar ID 4267019
*Deputy Counsel*

New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501

Amanda Butler
Jessica Serrano

New Mexico Department of Justice
201 3rd NW, Suite 300
Albuquerque, New Mexico 87102

Mark T. Baker*

Jacques H. Chouinard*

Peifer, Hanson, Mullins & Baker, P.A.
500 Marquette NW, Suite 510
Albuquerque, New Mexico 87102

*Attorneys for the State of New Mexico*

* *Pro Hac Vice Motion Forthcoming*